**FOR PUBLICATION**

In the

United States Court of Appeals

For the Eleventh Circuit

————————————

No. 22-13129

————————————

U.S. SECURITIES AND EXCHANGE COMMISSION,

*Plaintiff-Appellee,*

*versus*

SPARTAN SECURITIES GROUP, LTD,
ISLAND CAPITAL MANAGEMENT,
CARL E. DILLEY,
MICAH J. ELDRED,

*Defendants-Appellants,*

DAVID D. LOPEZ,

*Defendant.*

————————————

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 8:19-cv-00448-VMC-CPT

————————————

Before BRANCH, LUCK, and TJOFLAT, Circuit Judges.

PER CURIAM:

The perpetrators of two microcap securities fraud schemes created nineteen shell companies that didn't maintain actual business operations or assets, and then sold the companies' securities at inflated prices after the securities became eligible for public trading. This case is about the firms who helped make those companies' securities publicly tradeable.

Carl Dilley and Micah Eldred owned and operated the two firms—Spartan Securities Group, Ltd., and Island Capital Management. Spartan, a broker-dealer, submitted Form 211 applications on each shell company's behalf to the Financial Industry Regulatory Authority (FINRA). Once a Form 211 was approved by FINRA, Spartan initiated public quotation on the companies' securities. Then Island, a transfer agent, applied to make the securities eligible for the Depository Trust Company's (DTC) convenient, electronic settlement process.

The Securities and Exchange Commission (SEC) brought this enforcement action against Dilley, Eldred, Spartan, and Island. Count six of its fourteen-count complaint alleged that each defendant made false statements to obtain FINRA clearance and DTC eligibility, in violation of section 10(b) of the Securities Exchange Act of 1934 (codified at 15 U.S.C. section 78j(b)) and SEC rule 10b-5(b) (codified at 17 C.F.R. section 240.10b-5(b)).

Ahead of trial, the defendants moved to exclude an SEC expert witness as unqualified and unreliable, and they moved for special interrogatories on facts that would determine the maximum

possible penalties.  The district court denied each motion.  The case went to trial, which ended in a jury verdict for the SEC as to count six.  Each defendant moved for judgment as a matter of law, and the district court denied that relief too.  And then, during the remedies phase, the district court enjoined the defendants from violating section 10(b) and rule 10b-5(b) in the future, barred them from having any involvement with penny stocks, ordered that each defendant pay civil penalties, and ordered Island to disgorge ill-gotten profits to the United States Treasury.

This is Dilley, Eldred, Spartan, and Island's appeal.  They argue the district court erred by denying their motion to exclude the SEC's expert witness and their motion for judgment as a matter of law.  They also contend that the district court abused its discretion when imposing remedies.  Most of the remedies were time-barred, they say.  As to the disgorgement, they argue (1) the Exchange Act doesn't authorize ordering disgorgement to the Treasury, (2) the facts of this case made that relief inequitable, (3) the SEC failed to show Island's profits and wrongdoing were causally related, and (4) the SEC didn't reasonably approximate the ill-gotten profits.  As to the civil penalties, they argue (1) the Seventh Amendment required that a jury find the facts establishing the maximum allowable penalties and (2) the district court failed to consider their ability to pay the fine.

After careful consideration, we affirm.

## FACTUAL BACKGROUND

*Over-the-Counter Market Regulation*

Before turning to the defendants' conduct, we first describe the process they used to take companies public for listing in the over-the-counter market.

Microcap securities are low-priced stocks—often called penny stocks—that trade "over the counter," meaning that they do not trade on a major national exchange. *See Microcap Fraud*, https://www.sec.gov/securities-topics/microcap-fraud [https://perma.cc/FF7A-BPC7] (last visited Jan. 21, 2025). To prevent microcap-securities fraud, the SEC adopted rule 15c2-11. Rule 15c2-11 requires that, before a broker-dealer can "publish any quotation for a security or . . . submit any such quotation for publication[]" in the over-the-counter marketplace, it must disclose certain information about the issuing company. 17 C.F.R. § 240.15c2-11(a)(1), (b)(5)(i). That information includes the issuer's name and address, the identity of its transfer agent, and a "description of the issuer's business," including what products or services it sells and the facilities it operates. *Id.* § 240.15c2-11(b)(5)(i).

A broker-dealer complies with rule 15c2-11 by submitting a Form 211 to FINRA, a private nonprofit organization that regulates broker-dealers. The Form 211 asks the broker-dealer to disclose the information required by rule 15c2-11, including the issuer's and transfer agent's identities. It also asks for "circumstances surrounding the submission of th[e] application," such as "the identity of any

person(s) for whom the quotation is being submitted and any information provided to [the] firm by such person(s)."

A "registered principal of the firm responsible for th[e] Form 211 application[] and all subsequent submissions made in connection with [it]" must certify that he "has a reasonable basis for believing that the information accompanying th[e] form . . . is accurate." By signing the certification, the principal "acknowledge[s] that copies of th[e] form, accompanying documents, and subsequent submissions made in connection with [the form]" may be given to the SEC, other agencies, and "to the public upon request."

After the broker-dealer certifies and submits the Form 211, FINRA examiners may request more information about the application, or point out issues of concern (called "red flags") by sending "deficiency letters" to the broker-dealer. If it still desires FINRA clearance, the broker-dealer will respond and cure the deficiencies; otherwise, the application is abandoned. This back-and-forth process continues until FINRA's concerns are resolved and it ultimately approves the application.

When FINRA approves a Form 211 application, it clears the issuer's securities for public quotation on the over-the-counter market. Or, in the words of FINRA compliance analyst Deji Adams, who testified at the defendants' trial, completing the Form 211 process "essentially open[s] the door" to over-the-counter public trading of the issuer's securities. Without broker-dealers initiating and completing the Form 211 process, he explained, "the

general public would not be able to invest" in the over-the-counter market.

FINRA approval also enables the transfer agent to apply to make the issuer's securities eligible for clearance and settlement through the DTC. The DTC is a financial clearinghouse and the largest depository for shares of securities in the United States. The DTC facilitates convenient, virtually instant transfers of securities for eligible issuers. It holds stock certificates in trust for eligible issuers and allows eligible issuers to take advantage of electronic settlements of any purchase or sale in the marketplace.

### The Shell Companies

From 2009 through 2014, Spartan was registered with the SEC as a broker-dealer. During that same period, Island was a registered transfer agent.

Spartan and Island were "sister companies." The two companies shared the same office space, equipment, and employees. They also shared the same corporate officers. Dilley was a registered principal of Spartan and the president of Island. Eldred was a registered principal of Spartan and the CEO of Island. Eldred testified that he created both companies to "complement" one another by providing both broker and transfer-agent services to the same clients.

Four of the "clients" who solicited Spartan and Island's services were Alvin Mirman, Sheldon Rose, Michael Daniels, and Diane Harrison. These four individuals asked Spartan and Island to

help them trade nineteen shell companies through the over-the-counter market.

<u>Mirman/Rose Issuers</u>

Mirman and Rose, collectively, created fourteen of the shell companies:  Kids Germ Defense Corp., Obscene Jeans Corp., On the Move Corp., Rainbow Coral Corp., First Titan Corp., Neutra Corp., Aristocrat Group Corp., First Social Networx Corp., Global Group Enterprises Corp., E-Waste Corp., First Independence Corp., Envoy Group Corp., Changing Technologies, Inc., and First Xeris Corp. (together, the "Mirman/Rose issuers").

Mirman and Rose's plan from the onset was for these companies to be sold as public vehicles.  To that end, they recruited an officer for each company to act as CEO in name only.  They recruited personal friends and family members to fill these positions.  Specifically, Mirman and Rose focused on friends and family who "had [a] background in th[e] specific company."  For example, E-Waste's purported business plan was to open an electronics recycling facility, so Rose recruited an electrical engineer to be its director.  Rose testified that these straw officers "knew . . . up front" that Mirman and Rose would sell the companies and give the officers a cut.  These officers, Rose explained, had no control over the issuers' business plans—Mirman and Rose "pretty much directed the total company."

After recruiting the straw officers, Mirman and Rose began the process of taking the companies public.  The parties stipulated

that Mirman and Rose "prepared false and misleading . . . SEC filings [that] falsely depicted the issuers as actively pursuing a variety of business plans, when the only plan from the onset was for the compan[ies] to be sold as public vehicles."

To discuss the next step—seeking FINRA clearance—Mirman and Rose "had a couple of lunches" with Dilley and Eldred. Dilley and Eldred would ask "'what's in the pipeline' type of things." Mirman and Rose responded that they were "working on a couple of things" that they "might be able to provide to [Dilley and Eldred] so that [they] can do some of the FINRA work." Mirman testified that Dilley and Eldred told him that "in order for [him] to deal with their broker-dealer, they would want me to deal with their transfer agent as well." So he and Rose asked Spartan to file the shell companies' Form 211 applications and for Island to be their transfer agent.

Spartan began preparing Form 211 applications for Mirman and Rose, and Mirman and Rose served as Spartan's "point people" during that process—providing Spartan with any information that it needed to complete the applications. Mirman and Rose forwarded documents necessary to complete the applications to Spartan. Spartan, Rose explained, would "take th[e] information" and "put it into the proper language for FINRA," including "writing basically the company's plan and what it's all about, the technical type of work to finally get the company public." That information included Mirman and Rose's purpose for creating the companies—

Rose testified that he told Spartan "that the plan from the beginning" was to sell "[n]ot only Kids Germ," but also "anyone down the road [he and Mirman] would be selling."

Rose testified that because he and Mirman were Spartan's point people, he never told the issuers' officers to contact Spartan or any of its employees, and he never introduced the officers to Spartan. He explained that Mark Nicholas, his son-in-law and Kids Germ CEO, "didn't know Carl Dilley" and had "no reason" to contact Spartan. Mirman testified he was unaware of Spartan ever asking the issuers' officers for information. Two of the issuers' officers—Nigel Lindsay of First Independence and Matt Egna of Changing Technologies—testified that they never contacted Spartan. Lindsay, a friend of Rose's son, testified he never spoke to anyone from Spartan and had never heard of Dilley's name. He also said that he never saw the Form 211 that Spartan completed for First Independence. Egna similarly testified that he did not know Dilley or Eldred, never spoke to them, and never interacted with them through Spartan while he was Changing Technologies' president.

Spartan ultimately submitted Form 211 applications for each Mirman/Rose issuer to FINRA between December 2009 and 2014, which Dilley signed as the "principal of the firm responsible for th[e] . . . application[s]." Each of these applications responded to the Form 211's question asking for "circumstances surrounding the submission of th[e] application," such as "the identity of any person(s) for whom the quotation is being submitted and any information provided to [the] firm by such person(s)," by saying "see

cover letter for details."   The cross-referenced cover letters were written on Spartan letterhead and signed on Spartan's behalf by Spartan employees—either Dilley, Anna Krokhina (who was an Island employee too), or Taylor Zajonc.

All of Spartan's cover letters opened with an "Introduction to Spartan Securities" section.  These introductory sections stated that Spartan was filing the Form 211 applications after Dilley talked to the issuers' respective officers by phone and electronically.  For example, the First Independence Form 211 letter stated "Dilley . . . was telephonically contacted by Nigel Lindsay," and that Spartan was proceeding with filing a Form 211 "[f]ollowing telephone conversations and electronic communication over the past two months with the [i]ssuer."

After the introduction, the cover letters included a, "The [i]ssuer described its business as follows:" section.  These sections said that "[t]he [i]ssuer['s] described" business plans included selling consumer products or services (Obscene Jeans—women's clothing, Kids Germ—germ defense products, On the Move—electronic devices for vehicles, First Xeris—landscaping, Changing Technologies—smartphone apps, Neutra—healthcare products), running a social networking site for parents (First Social), and opening various types of facilities (E-Waste—an electronics recycling facility, Aristocrat Group—a pregnancy healthcare center, Envoy Group—an "adult day care center," Global Group—a vodka distillery, Rainbow Coral—a sea "coral farm," and First Independence—a food-product labeling and testing facility).  Each letter then provided

more information about the issuers, including that "[t]he issuer[s] ha[d] represented" they had not entered into any merger discussions, that they "[we]re not working with any consultants," and that their officers had not "requested a listing quotation on" any other companies.

FINRA sent Spartan deficiency letters as to each application, and Spartan responded each time with additional information to address FINRA's concerns. FINRA ultimately cleared each Mirman/Rose issuer for public quotation, informing Spartan each time that it was "acting in reliance upon the information" in the applications. The parties stipulated that, after Spartan obtained the issuers' FINRA clearance, Spartan "acted as the exclusive market-maker for the issuer[s] for [thirty] days," holding itself out to the market as ready to buy and sell the issuers' securities.

Dilley testified that, "for every company that . . . had gone through the Form 211 process[, t]he next thing would be to go and figure out how to get them DTC eligible." He viewed this next step as important for "brokers that would buy or sell the stock," acknowledging that DTC eligibility was necessary to "allow[] for electronic settlement of any purchase or sale[] in the marketplace" and to "make[] the transaction easier in the event of a sale or purchase." Then, according to Rose, "once everything was formulated [with FINRA and DTC], the next thing was basically . . . to sell the shell of a company" and the "job was to basically sell the shell"—which he and Mirman did. Island was each Mirman/Rose shell's transfer agent, with the exception of Envoy Group.

22-13129               Opinion of the Court               12

Kids Germ, for example, took that path.  Kids Germ, according to Rose, "wasn't operating" when Spartan submitted its Form 211.  After FINRA approved its Form 211 on January 4, 2010, Rose emailed Dilley that same day asking, "What do you recommend the company do with the DTC know [sic] the route it is taking?"  Rose also asked, "Do you want to speak to the atty interested in the company?"  Dilley responded, "We should apply for DTC eligibility[—]Anna [Krokhina] can get that going."  And Dilley offered to call the "atty."  When asked about the email exchange at trial, Rose testified that "atty" meant "the attorney for the company, whoever was buying it at the time."  That the attorney was someone who "wanted to purchase the company and wanted to make sure that it's going to happen" was, Rose explained, "the only thing [he] could think of."

Less than two weeks later, Krokhina, who "did a lot of the work with the guidance of Dilley," used her Island email address to submit a DTC application for Kids Germ.  In January 2010, she sent the required information to Penson Financial Services, a DTC clearing firm, and wrote that "the company is not a shell."  One month later, once Kids Germ became DTC eligible, it sold in a reverse merger that Island assisted as the transfer agent.[1]

---

[1] Generally, a "reverse merger" refers to when a small public shell company acquires a large private company that isn't a shell.  This acquisition essentially allows the private company to go public without having to navigate the registration process.

Daniels/Harrison Issuers

Eldred knew that Daniels and Harrison (husband and wife) were both active in the "reverse merger business" and that they "dealt extensively" with shell companies.  Daniels and Harrison had been friends with Eldred since 2003 or 2004.  Aside from their personal friendship, Daniels, Harrison, and Eldred also frequently did business together.  Eldred testified that "Spartan and Island provided services to [Daniels's and Harrison's] law firm's clients," plus "some other things . . . outside of that."

For example, in 2010, Eldred and Harrison discussed becoming business partners.  Eldred emailed Harrison from his Spartan address about a "partnership approach," "proposing[] a series of transactions . . . to reorganize certain companies . . . through bankruptcy and then sell them."  Eldred mentioned "[one], or maybe [two] projects" that they could "do immediately" and that they could "add [one] or two additional per year."  As for splitting the profits from these projects, Eldred proposed that Harrison would receive a one-third share—telling Harrison that, for example, "if a cleaned up shell is worth $300k, then that's $100k for you when we sell it."  In 2012, Harrison helped Eldred sell a company called Endeavor to businessman Andy Fan.  Eldred emailed Harrison (again from his Spartan address) to "get to work" on a contract for that transaction, which Fan wrote was the "beginning of a beautiful relationship."

The parties stipulated that, spanning 2011 through 2014, Daniels and Harrison asked Spartan to file Form 211 applications

for five issuers: a 2011 application for Dinello Restaurant Ventures, Inc.; a 2012 application for Court Document Services, Inc.; another 2012 application for Quality Wallbeds, Inc.; a 2013 application for Top to Bottom Pressure Washing, Inc.; and a 2014 application for PurpleReal.com Corp. (together, the "Daniels/Harrison issuers"). Spartan submitted each of these applications—which Daniels and Harrison had both worked on—to FINRA. Harrison served as each issuer's attorney.

When Spartan submitted these applications on Daniels's and Harrison's behalf, Eldred signed the Top to Bottom and PurpleReal forms as the "principal of the firm responsible for th[e] . . . application[s]." These applications—like the Mirman/Rose applications—included cover letters, written on Spartan letterhead and signed by Zajonc, describing the issuer's "[i]ntroduction to Spartan Securities." The Top to Bottom letter stated Spartan's introduction to the issuer was that the company president's wife called Eldred, but Spartan "d[id] not have any other relationship with [the president's wife], [the president], Top to Bottom . . . , or any of their other representatives." Daniels served as Top to Bottom's treasurer and secretary, and Tina Donnelly—a Dinello employee who "handled all the financial records" for the Daniels/Harrison issuers—testified that Daniels's "role in taking [Top to Bottom] public" was that "[h]e directed everything." She elaborated that Top to Bottom "didn't do anything without his direction [and] guidance."

Similarly, the PurpleReal letter's introduction section stated that Harrison was the company's CEO and that she called Eldred.

Besides "Harrison [being] known to [Spartan] for many years," the letter wrote, Spartan "d[id] not have any other relationship with [her], the [i]ssuer, and/or its representatives." When asked about this statement at trial, Eldred testified he "personally did" other business with Harrison, which the application didn't disclose.

Both letters stated that "[t]he [i]ssuer ha[d] represented that they ha[d] not entered into any . . . discussions or negotiations concerning potential merger or acquisition candidates." Donnelly testified that the actual "business model" for these companies began with taking them public by obtaining FINRA clearance. After that, the plan was to "immediately" dispose of all the company's assets and sell the remaining public shell to an investor—usually for a reverse merger with one of Fan's "businesses in China." Donnelly explained that once FINRA cleared Top to Bottom, its assets were sold off in "a fire sale" and the remaining public shell was "sold to an[] . . . investor that Daniels and Harrison found." Daniels proposed doing the same with PurpleReal, telling Donnelly and two others, "Let's . . . create a company from scratch, and let's—let's take it through the process, take it public, and, you know, you girls would make, you know, tons of money." But before FINRA could clear PurpleReal, the SEC obtained a stop order.

★     ★     ★

The SEC pursued enforcement actions against Mirman, Rose, Daniels, and Harrison based on fraud and misrepresentations about the nineteen shell companies. It initiated criminal actions

against Mirman and Rose.  Mirman, who testified that he consented in 2007 to being barred from associating with any FINRA member and "shouldn't be involved in the . . . filing of [Form] 211s," pleaded guilty to conspiracy to commit securities fraud relating to ten of the Mirman/Rose issuers.  So did Rose as to all fourteen Mirman/Rose issuers.

The SEC initiated civil enforcement action against Daniels and Harrison, alleging they made misrepresentations as to the other five companies.  Daniels, who had a past forgery conviction before working with the defendants, did not admit the allegations but did consent to a judgment.  Likewise, Harrison did not admit the allegations but consented to a judgment.

## PROCEDURAL HISTORY

On February 20, 2019, after the enforcement actions against Mirman, Rose, Daniels, and Harrison ended, the SEC filed this enforcement action against Dilley, Eldred, Spartan, and Island.  The SEC's fourteen-count complaint alleged that the defendants schemed with Mirman, Rose, Daniels, and Harrison to "package[]" the shell companies "for sale as public vehicles," or at least aided and abetted schemes to do that, while knowing the companies "were pursuing their stated plans under false pretenses."[2]  Most rel-

---

[2] Count one alleged Spartan published quotations without the "reasonable basis" required by rule 15c2-11 and count two alleged Dilley and Eldred aided and abetted that violation.  Counts three through five and seven through thirteen alleged either that the defendants engaged in schemes to defraud with, or

evant to this appeal, the SEC alleged in count six that each defendant made false statements or misleading omissions about the shell companies to obtain FINRA clearance and DTC eligibility, in violation of Exchange Act section 10(b) and SEC rule 10b-5(b). As relief for those violations, the SEC sought a permanent injunction, monetary civil penalties, a penny stock bar as to Spartan, Dilley, and Eldred, and disgorgement as to Island.

*Pretrial Motions*

Before trial, the defendants filed three motions relevant to this appeal.

First, the defendants moved for summary judgment, arguing that "[m]ost of [the] SEC's claims" were time-barred. Citing 28 U.S.C. section 2462's five-year statute of limitations for any "action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise," they contended that "the only acts for which the SEC [could] seek penalties" or disgorgement were those related to Envoy Group, Changing Technologies, First Xeris, Top to Bottom, and PurpleReal. The defendants argued that

---

aided and abetted frauds conducted by, Mirman, Rose, Daniels, and Harrison. Count six alleged the defendants violated section 10(b) and rule 10b-5(b) through false statements and omissions. And count fourteen alleged that Spartan, Island, and Dilley violated the Exchange Act by selling or offering to sell securities without effective registration statements.

all conduct concerning the other issuers occurred before October 23, 2013.[3]

The district court denied the summary judgment motion, concluding that the defendants' alleged violations "[we]re based on a single course of conduct" spanning from 2009 through 2014. Less than a week after the district court denied the summary judgment motion, Congress enacted the William M. Thornberry National Defense Authorization Act (NDAA). The NDAA created a new ten-year statute of limitations applicable to "claim[s] for any equitable remedy" under the Exchange Act. *See* NDAA, Pub. L. No. 116-283, § 6501, 134 Stat. 3388, 4625–26 (2021); 15 U.S.C. § 78u(d)(8)(B). It separately created a new ten-year limitations period for certain "[d]isgorgement" claims, including those based on violations of section 10(b) or involving scienter. *See* 15 U.S.C. § 78u(d)(8)(A)(ii)(I), (IV).

Second, the defendants moved to exclude any trial testimony by the SEC's expert, James Cangiano. Cangiano is a private securities-regulation consultant. He largely studied English in college and has not published any peer-reviewed work on regulating securities. But Cangiano worked for over forty years in securities regulation. He served as NASDAQ's chief regulatory officer and spent more than twenty years as a regulator for the National Association of Securities Dealers, Inc. (NASD)—FINRA's predecessor

---

[3] Although five years from the SEC's February 20, 2019 filing date is February 20, 2014, the parties agreed to toll section 2462's five-year period by 119 days.

organization.  During his time with NASD, he oversaw hundreds of investigations, including investigations through which he "iden-tif[ied] and address[ed] major frauds" in the microcap market. Cangiano gave deposition testimony that there would sometimes "be a transfer agent element" involved in those fraud investiga-tions.

The SEC proffered Cangiano as an expert witness on "the role of transfer agents and their function in bringing securities to market."  The defendants conceded Cangiano had "extensive cre-dentials as a regulator."  They argued, though, that his "'jack of all trades' expertise" did not include any experience specific to transfer agents and thus did not qualify him to testify on practices "in the transfer agent industry."  His inexperience, they contended, ren-dered his opinions unreliable under *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).

The district court denied the defendants' *Daubert* motion.[4] It found that Cangiano was qualified to testify about transfer agents, explaining that he had extensive relevant experience based on his time as a NASD regulator and consultant, which included consulting on fraud cases where "fraudsters actually owned their own transfer agent and . . . used [it] . . . to clean up the stock and

---

[4] The defendants renewed their objection to Cangiano's qualifications and re-liability at trial.  The district court overruled their objection based on its pre-trial order.

get it saleable." And the district court found that Cangiano's opinions were reliable because he based them on his experience, SEC regulations and guidelines, and his review of the evidence in this case. At trial, Cangiano testified that DTC only accepts free-trading shares,[5] and that the transfer agent must affix a "restrictive legend" to stock certificates if the shares are not free-trading. And he opined that the defendants created "a one-stop shop" to "facilitate[] the cleaning of shells so that they could be sold" at inflated prices.

Third, the defendants moved for special interrogatories. Specifically, because section 21(d) of the Exchange Act allows a district court to impose one of three maximum-penalty "tiers" that increase based on the type of violation, *see* 15 U.S.C. § 78u(d)(3)(B), the defendants argued that the Seventh Amendment required a special jury finding of "th[e] facts that might be necessary for classification of penalties." The district court denied this motion, finding that the Seventh Amendment did not require a special jury determination.

### Trial and Rule 50 Motions

The case proceeded to trial, which lasted thirteen days. At the close of the SEC's case, both sides moved for judgment as a matter of law under Federal Rule of Civil Procedure 50(a). The

---

[5] Cangiano explained that "free-trading stock" means "unrestricted stock" that can "be freely traded without any restrictions in the marketplace." Stock that's controlled by an insider or control person is generally not unrestricted or free-trading.

district court reserved ruling on those motions and the jurors began deliberating.

A few hours later the jury returned a verdict. The jury found Spartan, Island, Dilley, and Eldred liable on count six—making false statements or omissions under Exchange Act section 10(b) and SEC rule 10b-5(b). It did not find any defendant liable on any other count. The district court then denied the rule 50(a) motions.

The defendants filed a renewed motion for judgment as a matter of law under rule 50(b). Their arguments as to Dilley, Eldred, and Spartan focused on the FINRA Form 211 applications. They first argued that Dilley, Eldred, and Spartan did not "make" any false statements in those applications; instead, they contended, they simply repeated statements the issuers told them. Second, they argued that any misrepresentations were immaterial to investors because the statements were made in nonpublic cover letters. Third, they asserted that none of these misrepresentations were made in connection with the purchase or sale of a security.

Island, for its part, argued that the only statements relevant to its liability were those made to Penson (the DTC clearing firm) about the status of stocks as free trading. Island specifically argued that the statement to Penson that "[Kids Germ] is not a shell," was true, immaterial, and not in connection with the purchase or sale of a security.

The district court denied the rule 50(b) motion. It concluded that sufficient evidence showed that the defendants made multiple misrepresentations, including that the issuers' officers contacted

Dilley or Spartan, that Spartan didn't have relationships with Daniels and Harrison, that Island, through Krokhina, told Penson that Kids Germ was "not a shell," and that Island misrepresented the status of the stocks as free-trading. The district court then rejected that the misrepresentations were immaterial and lacked any connection to the purchase or sale of securities.

### *Remedies*

After the district court denied the rule 50(b) motion, the focus turned to remedies. The SEC moved to permanently enjoin the defendants from violating section 10(b) and rule 10b-5(b) in the future, for the maximum tier-three civil penalties under section 21(d)(3)(B)(iii) of the Exchange Act, for penny stock bars against Spartan, Dilley, and Eldred, and for disgorgement of Island's ill-gotten profit to the Treasury.

As for the amounts of the financial remedies, the SEC initially requested that Island disgorge $147,508, which an SEC accountant calculated based on the "fees [Island was paid] from each of the [fourteen] Mirman/Rose companies through the date of the issuer's bulk sale." The accountant stated that he arrived at $147,508 after reviewing Island's financial statements regarding each issuer. After Island argued that it had legitimate expenses that needed to be deducted, the SEC stuck by its initial request. The agency acknowledged, though, that deducting $21,388 regarding "possible" legitimate expenses for line items like "[p]rinting; CUSIP; credit memo; courier; DTC" would result in disgorgement of $125,720 and prejudgment interest of $43,710.74.

For penalties, the SEC limited its civil-penalty request to statements about Envoy Group, Changing Technologies, and First Xeris as to Dilley, and Top to Bottom and PurpleReal as to Eldred. It requested "one-time" penalties as to Spartan and Island not specific to any issuer.

The defendants opposed each type of proposed remedy. They argued that the SEC asked for an overly broad "obey-the-law" injunction. As to the civil penalties, the defendants contended the SEC did not prove that tier-three penalties were appropriate. Dilley, Spartan, and Island also argued that their respective "financial condition[s]" warranted lesser (or no) penalties—Spartan and Island were out of business, and Dilley had a negative monthly net income.

As for disgorgement, Island made four arguments. First, it argued that the Exchange Act does not authorize ordering disgorgement directly to the Treasury. Although the parties stipulated that distributing any disgorged profits to investors instead "would be infeasible," Island contended that the Exchange Act *only* allows distributing disgorged profits to harmed investors. For this, Island cited section 21(d)(5), which allows the SEC to seek, and a district court to order, "any equitable relief that may be appropriate or necessary for the benefit of investors." 15 U.S.C. § 78u(d)(5).

Second, Island contended that disgorgement was inequitable because Island's profits were paid by the issuers, who "were proven at trial to be fraudsters" and had unclean hands. Further, citing the case's "unique timing," Island repeated its argument that

the SEC's disgorgement claim was mostly untimely under 28 U.S.C. section 2462. Island also asserted that it would be unfair to retroactively apply the NDAA's new ten-year statute of limitations. Third, Island argued that the SEC failed to connect its calculation to evidence from trial. And fourth, it maintained that the SEC did not reasonably approximate Island's ill-gotten gains because it failed to subtract Island's legitimate business expenses, like routine operational costs.

After an evidentiary hearing, the district court partly granted the SEC's remedies motion. The court permanently enjoined Dilley, Eldred, and Island from violating section 10(b) and rule 10b-5(b), and it imposed penny stock bars as to Dilley, Eldred, and Spartan.

Next, the district court ordered that Island disgorge $114,520 in profits to the Treasury, and it assessed $39,874.05 in prejudgment interest. The district court rejected Island's contention that the Exchange Act does not authorize ordering disgorgement directly to the Treasury. It acknowledged that the Supreme Court held, in *Liu v. SEC*, 591 U.S. 71, 74 (2020), that disgorgement ordered under section 21(d)(5) must be "awarded for victims." But it found that *Liu* left open whether a district court may order disgorgement to the Treasury "when it is impossible to identify defrauded victims." And, the district court reasoned, section 21(d)(7)—enacted through the NDAA after *Liu*—allowed ordering disgorgement to the Treasury even if doing so does not "benefit . . . investors" under sec-

tion 21(d)(5).  *See* 15 U.S.C. § 78u(d)(7) ("In any action or proceeding brought by the Commission under any provision of the securities laws, the Commission may seek, and any Federal court may order, disgorgement.").  Alternatively, the district court weighed the equities and found that it was "more equitable" to order disgorgement to the Treasury instead of "the money staying with Island, a key player in a scheme to put dubious equities on the market."

After it found that disgorgement was appropriate, the district court turned to determining the amount.  Although the SEC proposed disgorgement of all fees the Mirman/Rose issuers paid to Island, the district court deducted "legitimate expenses incurred by Island prior to the bulk sale date for each company," including expenses "for courier services, printing, and regulatory fees." While the SEC did not concede line items for "[p]rinting; CUSIP; credit memo; courier; DTC" were legitimate, the district court found that the SEC "tacitly agreed" these expenses should be deducted.

The district court also excluded three $200 payments made after the bulk sale date of Aristocrat Group, Global Group, and On the Move, plus a $3,500 expense related to Kids Germ because of its "odd payment history."  It did not order any disgorgement regarding Envoy Group, finding that the SEC's evidence was "insufficient" as to that issuer.  Although Island requested more reductions for "fixed costs and overhead," the district court found that Island

did not show these expenses were legitimate and "any risk of uncertainty necessarily [fell] on Island."

Lastly, for civil penalties, the district court determined that tier-two penalties were appropriate because the jury found the defendants liable of violating rule 10b-5(b), "which requires that a material misrepresentation . . . be made with scienter." To determine the amount, "the [c]ourt look[ed] to" seven factors and "all [of] the facts and circumstances," including "whether the penalty . . . should be reduced due to defendants' demonstrated current and future financial condition." After weighing these factors, the district court—citing the SEC's request to "assess penalties for three 'violations' against . . . Dilley, two violations against . . . Eldred, and a single violation against the corporate [d]efendants"—ordered that Dilley and Eldred each pay $150,000. It also ordered that Spartan and Island each pay penalties of $250,000 for a "single violation." The district court noted that the defendants "d[id] not dispute" the number of violations attributable to each defendant.

## DISCUSSION

The defendants appeal on multiple grounds. We first address their argument that the district court abused its discretion by admitting Cangiano's expert testimony. Second, we turn to their contention that each defendant was entitled to judgment as a matter of law. And third, we address their assertion that the district court's remedies order was an abuse of discretion.

*Cangiano's Qualifications and Reliability*

The defendants argue the district court abused its discretion when it allowed Cangiano to testify as an expert witness on transfer agent practices. They first challenge Cangiano's qualifications, contending that he was a "classic 'expert on everything,'" but not an expert on Island's role as a transfer agent. The defendants contend that Cangiano was not qualified to testify about "transfer agents and DTC eligibility" under Federal Rule of Evidence 702 "because he had *no experience* in the transfer agent industry." They argue that he "never worked for a transfer agent," and that NASD didn't directly regulate transfer agents while Cangiano worked there. Further, they highlight that Cangiano wasn't formally educated concerning transfer agents and has never published any work about them. For these same reasons, the defendants argue Cangiano's opinions were unreliable.

We review "a trial court's evidentiary rulings, including its rulings on the admissibility of expert testimony, for abuse of discretion." *Cook ex rel. Est. of Tessier v. Sheriff of Monroe Cnty.*, 402 F.3d 1092, 1103 (11th Cir. 2005). District courts "enjoy[] 'considerable leeway' in making these determinations." *United States v. Frazier*, 387 F.3d 1244, 1258–59 (11th Cir. 2004) (en banc) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)).

Rule 702 "has three basic requirements: the expert must be qualified; his methodology must be reliable; and his testimony must be helpful to the trier of fact." *Doe v. Rollins Coll.*, 77 F.4th 1340, 1347 (11th Cir. 2023); *see also Frazier*, 387 F.3d at 1259–60. The

proponent must establish each requirement by a preponderance of evidence. *Doe*, 77 F.4th at 1347 (citing Fed. R. Evid. 104(a)). While "there is inevitably some overlap among th[ese] basic requirements . . . they remain distinct concepts." *Frazier*, 387 F.3d at 1260 (citing *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003)). We "and litigants must take care not to conflate" them. *Quiet Tech.*, 326 F.3d at 1341.

Only the first two requirements are at issue here—Cangiano's qualifications and the reliability of his testimony. As to qualification, a witness "need not be formally educated" on a topic to be an expert on it. *United States v. Williams*, 865 F.3d 1328, 1338 (11th Cir. 2017). Instead, "experts may be qualified in various ways," including by knowledge, skill, training, or experience. *Frazier*, 387 F.3d at 1260–61. Nothing in rule 702 "suggest[s] that experience alone . . . may not provide a sufficient foundation for expert testimony." Fed. R. Evid. 702 Advisory Committee's Note to 2000 Amendments. "In certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony." *Id.*

Through its second requirement—reliability—rule 702 requires a district court "to act as a gatekeeper to [e]nsure that speculative . . . opinions do not reach the jury." *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1237 (11th Cir. 2005) (citing *Daubert*, 509 U.S. at 589 n.7, 597). The district court may take any relevant factors into account. *See Seamon v. Remington Arms Co.*, 813 F.3d 983, 988 (11th Cir. 2016); *Quiet Tech.*, 326 F.3d at 1341. But generally,

"the rejection of expert testimony [as unreliable] is the exception rather than the rule." *Moore v. Intuitive Surgical, Inc.*, 995 F.3d 839, 850 (11th Cir. 2021) (quoting Fed. R. Evid. 702 Advisory Committee's Note to 2000 Amendments).

Keeping in mind the "limited nature" of "appellate review in this area," *United States v. Brown*, 415 F.3d 1257, 1264 (11th Cir. 2005), we cannot say the district court abused its discretion when it found that Cangiano was qualified and that his opinions were reliable.  First, the district court reasonably relied on Cangiano's extensive job experience in the over-the-counter market when it found he was qualified to testify about Island's role as a transfer agent in that market.  Cangiano had more than forty years of regulatory experience in the over-the-counter market, including his time as a NASD regulator.  In that role, he oversaw hundreds of fraud investigations, including investigations where he "identif[ied] and address[ed] major frauds" in the microcap market.  *Cf. United States v. Majors*, 196 F.3d 1206, 1215–16 (11th Cir. 1999) (concluding district court didn't abuse its discretion by finding that a financial analyst with eight-and-a-half years of experience, including performing fifty-plus analyses in prior fraud cases, was qualified to testify about defendants' records in fraud case).  And since he retired as a regulator, he has continued working in the field by consulting.

The defendants contend that Cangiano's extensive regulatory and consulting experience likely makes him an expert on something, but not on transfer agents.  To that end, they say Cangiano "had *no experience* in the transfer agent industry" and never

worked with transfer agents. But that argument ignores Cangiano's testimony that, when he oversaw fraud investigations, there would sometimes "be a transfer agent element" involved. And he consulted on a case involving similar facts to the ones that the SEC alleged here—involving "fraudsters [who] actually owned their own transfer agent and . . . facilitate[d] the sale of . . . companies" by using the "transfer agent to clean up the stock." Thus it's not true that Cangiano has no job-related experience whatsoever involving transfer agents.

The defendants also argue Cangiano was unqualified to testify about transfer agents because he was never formally educated about them and he has never published peer-reviewed work about them. These arguments also miss the mark. Again, a witness "need not be formally educated" on a topic to be an expert on it. *Williams*, 865 F.3d at 1338. The district court reasonably found that Cangiano's experience qualified him to testify about transfer agents. *Cf.* Fed. R. Evid. 702 Advisory Committee's Note to 2000 Amendments ("In certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony.").

Second, the district court didn't abuse its discretion in finding Cangiano's opinions reliable. Cangiano applied his forty-plus years of experience to the issues in the case. He reached his opinions after reviewing a variety of fact sources—including the pleadings; deposition testimony by Rose, Mirman, Harrison, Eldred, Dilley, Lopez, Krokhina, and Zajonc; the defendants' emails; FINRA and SEC regulations and guidance; and the issuers' SEC filings. *Cf.*

Fed. R. Evid. 703 ("An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed."). Thus, the district court reasonably found that Cangiano's opinions were "properly grounded, well-reasoned, and not speculative." Fed. R. Evid. 702 Advisory Committee's Note to 2000 Amendments; *cf. United States v. 0.161 Acres of Land*, 837 F.2d 1036, 1040 (11th Cir. 1988) ("[W]here the expert's testimony has a reasonable factual basis, a court should not exclude it.").

In short, the district court did not abuse its discretion in admitting Cangiano's testimony under rule 702.

*Judgment as a Matter of Law*

The jury found each defendant liable on count six for violating section 10(b) of the Exchange Act and SEC rule 10b-5(b). Section 10(b) makes it unlawful "[t]o use . . . , in connection with the purchase or sale of any security . . . , any manipulative or deceptive device." 15 U.S.C. § 78j(b). And rule 10b-5(b), which "implements" section 10(b), *SEC v. Zandford*, 535 U.S. 813, 819 (2002), makes it unlawful "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made . . . not misleading," 17 C.F.R. § 240.10b-5(b). "The scope of liability under" these two provisions "is the same." *SEC v. Merch. Cap., LLC*, 483 F.3d 747, 766 n.17 (11th Cir. 2007). "To prove a . . . violation, the SEC must show (1) material misrepresentations or materially misleading omissions, (2) in connection with the purchase or sale of securities, (3) made with scienter." *Id.* at 766 (citing *Aaron v. SEC*, 446 U.S. 680, 695 (1980)).

Each defendant argues that no reasonable jury could have found that the SEC proved the first two elements. So, the defendants contend, the district court erred in denying their motions for judgment as a matter of law.

We review de novo a district court's ruling on a motion for judgment as a matter of law, "applying the same standard that the district court applied." *Mamani v. Sánchez Bustamante*, 968 F.3d 1216, 1230 (11th Cir. 2020) (citation omitted). Viewing all evidence and drawing all reasonable inferences in the nonmovant's favor, our "sole consideration" is whether sufficient evidence supported the jury's verdict. *Chaney v. City of Orlando*, 483 F.3d 1221, 1227 (11th Cir. 2007).

Because the defendants do not argue that a reasonable jury couldn't find the third element of a rule 10b-5(b) violation—scienter—we focus on whether the defendants made material misrepresentations in connection with the purchase or sale of securities.[6]

---

[6] We need not consider whether sufficient evidence showed the defendants made misrepresentations as to the three Daniels/Harrison issuers—Dinello, Quality Wallbeds, and Court Document Services—because any violation as to those issuers didn't result in a remedy before us on appeal. The district court ordered Dilley's civil penalty based on three violations regarding Envoy Group, Changing Technologies, and First Xeris, and it ordered Eldred's penalty based on two violations regarding Top to Bottom and PurpleReal. The district court ordered Spartan and Island's civil penalties based on a "single violation" without specifying a particular company. The disgorgement award was based on the Mirman/Rose issuers, with the exception of Envoy Group.

*See Merch. Cap.*, 483 F.3d at 766.  As to those two elements, sufficient evidence supported the jury's verdict.  First, a reasonable jury could find that Spartan and Dilley made material misrepresentations, in connection with the purchase or sale of securities, on the FINRA Form 211 applications for the Mirman/Rose issuers.  Second, a reasonable jury could find that Spartan and Eldred did the same on the FINRA applications for Top to Bottom and Purple-Real.  Third, a reasonable jury could find that Island made a materially false statement, in connection with the purchase or sale of a security, to obtain Kids Germ's DTC eligibility.

Mirman/Rose FINRA Applications
(Spartan and Dilley)

We begin with the Mirman/Rose issuers' FINRA applications, which Spartan submitted and Dilley certified as the "principal of the firm responsible for th[e] application[s]."  We divide our discussion of the first rule 10b-5(b) element—material misrepresentation—into two parts:  whether Spartan and Dilley actually made any false statements or misrepresentations and, if so, whether the misrepresented information was material.  We then address the second rule 10b-5(b) element—the misrepresentations' connection to the purchase or sale of securities.

1.  *Misrepresentations or omissions*

Spartan and Dilley argue that they didn't actually "make" any false statements in the Mirman/Rose Form 211 applications.  They also contend that they did not have a duty to disclose any omitted facts necessary to make the applications' statements not

misleading. A reasonable jury could find that they affirmatively made false statements in the applications, independent of any misleading omissions.

There was evidence that Spartan and Dilley made false statements in the Form 211 cover letters about who solicited them to file the applications and why. Each Form 211 asked for "circumstances surrounding the submission," "[i]nclud[ing] the identity of any person(s) for whom the quotation[s were] being submitted and any information provided . . . by such person(s)." On each Mirman/Rose application, Spartan responded by saying "see [an attached] cover letter for details." Each cross-referenced cover letter, written on Spartan letterhead, began with an "Introduction to Spartan Securities" section stating that the issuers' officers "telephonically contacted" Dilley to initiate the Form 211 process.

Then, after each introduction, Spartan included a section with statements detailing the issuers' business plans. Each of these sections stated that "[t]he [i]ssuer described its business as" planning to maintain future active operations or tangible assets. Spartan's letters said that "[t]he [i]ssuer[s'] described" operations included selling consumer products or services (Obscene Jeans, Kids Germ, On the Move, First Xeris, Changing Technologies, Neutra), running a social networking site for parents (First Social), and opening various types of facilities—an electronics recycling facility (E-Waste), a healthcare center for pregnant mothers (Aristocrat), an "adult day care center" (Envoy), a vodka distillery (Global Group),

a "coral farm" (Rainbow Coral), and a food-product labeling and testing facility (First Independence).

These statements that Spartan and Dilley made were false because the issuers never "described [their] business[es]" as planning to maintain real operations or assets—not to Dilley and not to anyone else at Spartan.  The Mirman/Rose issuers' officers never planned to actively operate the companies.  Mirman and Rose recruited personal friends or family to be straw officers, or, in other words, CEOs in name only.  These officers, Rose testified, had no control over the issuers' business plans; Mirman and Rose "pretty much directed the total company."  The officers "knew . . . up front" that Mirman and Rose would sell the companies and give them a cut.

Rose also testified that he never told the issuers' officers to contact Spartan or any of its employees, and that he never introduced the officers to Spartan.  Mirman echoed this testimony—explaining that he was unaware of Spartan ever asking the issuers' officers for information.  Two of the officers—Lindsay (First Independence) and Egna (Changing Technologies)—testified they didn't even know who Dilley was.

Instead of the issuers' officers, it was Mirman and Rose who contacted Spartan to file the Mirman/Rose FINRA applications.  In that process, Mirman and Rose served as Spartan's "point people"—providing Spartan with any information that it needed to complete the applications.  And there was evidence that those "point people" never told Dilley, or anyone else at Spartan, that the

issuers planned to actively operate the businesses. Rose testified that he told Spartan "that the plan from the beginning" was to sell "[n]ot only Kids Germ," but also "anyone down the road [he and Mirman] would be selling" as shells. According to Rose, he and Mirman "controlled the compan[ies]" and never had any intention of running them.

Spartan and Dilley argue that they didn't "make" these false statements because "all the statements provided to FINRA were from the issuers themselves." In other words, because the cover letters prefaced some statements with language like "[t]he [i]ssuer described" or "[t]he issuer has represented," they argue that the issuers sent them statements to include in the applications and they simply repeated those statements to FINRA. Spartan and Dilley contend they had no control over the issuers' statements, "false or not." But a reasonable jury could find Spartan and Dilley had "ultimate authority over the statement[s], including [their] content and whether and how to communicate it," for two independent reasons. *Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011).

First, although the Mirman/Rose FINRA letters did attribute some statements to the issuers, they didn't attribute everything to the issuers. Every "Introduction to Spartan Securities" section of the letters stated that the issuers' respective officers "telephonically contacted" Dilley, and that Spartan then had more "telephone conversations and electronic communication" with the issuers. But not once did a cover letter qualify those statements by saying

"[t]he issuer has represented" its officer called Dilley or Spartan. Just as attributing a statement to someone else is evidence that its maker was "the party to whom it is attributed," *Janus*, 564 U.S. at 142–43, speaking without attributing suggests that the statement's speaker is the statement's maker, *cf. id.* at 142 ("One 'makes' a statement by stating it."). So because Spartan didn't qualify the statements that the issuers' officers called Dilley and Spartan—in letters with Spartan letterhead for applications that Dilley certified as the responsible principal—a reasonable jury could find Spartan and Dilley had "ultimate authority over the statement[s]," *id.* at 142. Indeed, Rose testified that he delegated that authority to Spartan—explaining that Spartan would "take th[e] information" and "put it into the proper language for FINRA," *including* "writing basically the company's plan and what it's all about."

Second, there was evidence that the attributions themselves were false statements made by Spartan and Dilley. Whenever Spartan's letters stated that "[t]he [i]ssuer described" its business as planning to maintain future operations and assets, Spartan and Dilley made a statement that the issuers told Spartan that was the plan. But again, there was evidence that the issuers' officers never told anyone at Spartan about any plans to maintain active business operations or assets. Rose testified that he told Spartan the opposite—that he and Mirman created the companies to use as shells.

2. *Materiality*

Next, Spartan and Dilley argue no reasonable jury could have found that the misrepresentations in the applications were

material.  Spartan and Dilley contend that, although the misrepresentations might've mattered to FINRA regulators, those misrepresentations couldn't have impacted an investor's investment decision because Form 211 applications are not publicly available.  But because there was evidence that the misrepresentations could have impacted an investment decision, a reasonable jury could find materiality.

A misrepresented fact is material under rule 10b-5(b) if "a reasonable man would attach importance to [it] . . . in determining his course of action." *SEC v. Goble*, 682 F.3d 934, 943 (11th Cir. 2012) (quoting *Merch. Cap.*, 483 F.3d at 766).  "Course of action" means "an investment decision."  *Id.* (quotation omitted); *cf. In re Galectin Therapeutics, Inc. Secs. Litig.*, 843 F.3d 1257, 1275 (11th Cir. 2016) ("The omission of facts is actionable only to the extent that the absence of those facts would, under the circumstances, render another reported statement misleading to the 'reasonable investor, in the exercise of due care.'" (quoting *FindWhat Inv. Grp. v. Findwhat.com*, 658 F.3d 1282, 1305 (11th Cir. 2011)).

In weighing materiality, we consider "the 'total mix' of information available to a hypothetical reasonable investor" determining his course of action, not just the information available "to the public at large."  *SEC v. Morgan Keegan & Co.*, 678 F.3d 1233, 1248 (11th Cir. 2012) (citing *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38 (2011)).  When we consider what inferences an investor would draw from that information, we must keep in mind

the Supreme Court's caution that materiality "assessments are peculiarly ones for the trier of fact." *Id.* at 1253 (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976)); *SEC v. Ginsburg*, 362 F.3d 1292, 1302 (11th Cir. 2004) (quoting *TSC Indus., Inc.*, 426 U.S. at 450).

Here, Spartan and Dilley misrepresented who solicited them to file FINRA applications for the issuers—Mirman and Rose. And Spartan and Dilley misrepresented why—Mirman and Rose wanted to create public shells and sell them. A reasonable investor "would attach importance" to each of these facts in making "an investment decision." *Goble*, 682 F.3d at 943.

First, a reasonable investor would attach importance to Mirman and Rose's involvement in the issuers, including their hiring of Spartan to take the companies public. An investor would have wanted to know that Mirman and Rose, while not officers of the issuers, controlled the issuers and served as Spartan's point people for filing the FINRA applications. *SEC v. Blackburn*, 15 F.4th 676, 681 (5th Cir. 2021) (reasoning that, "[e]ven though [an undisclosed control person] was not an officer of [a company whose stock sold over the counter], there [wa]s 'little doubt that a reasonable investor would have wanted to know the true identity' of who was leading the company" (citation omitted)). A company's leadership "might . . . matter[] to investors for a number of reasons," including whether that leadership engaged in past criminal conduct or simply has a "good, bad, or nonexistent" reputation. *Id.*

That Mirman and Rose enlisted Spartan to take the companies public would matter to investors because Mirman and Rose were related to the issuers' officers and shareholders, which Adams testified could "call into question the control of ownership." It would also matter because when Mirman and Rose selected straw officers, they picked a friend or relative who "had [a] background in th[e] specific company"; for example, E-Waste's purported business plan was to open an electronics recycling facility, so Rose picked an electrical engineer to be its director. An investor would want to know that these expert straw officers actually had no say in the issuers' business plans and that nonexperts (Mirman and Rose) were taking them public. And an investor would want to know Mirman's involvement, specifically, because of his past discipline—FINRA barred Mirman from associating with any FINRA member, which, as Mirman described it, meant "basically [that he] shouldn't be involved in the . . . filing of [Form] 211s" at all.

Second, a reasonable investor would attach importance to why Mirman and Rose solicited Spartan to file the applications. Mirman and Rose wanted public shells—their "job was to basically sell the shell" after Spartan secured FINRA clearance. Mirman and Rose's plan to sell the companies as shells, rather than to actively operate them, was material because a plan to sell the company relates to its future. And "material facts include . . . those facts which affect the probable future of the company." *SEC v. Tex. Gulf Sulphur Co.*, 401 F.2d 833, 849 (2d Cir. 1968) (en banc).

Spartan and Dilley argue that their misrepresentations weren't material because it was "undisputed" that completed FINRA applications are not public, making their misrepresentations inaccessible by anyone outside of FINRA. To that end, they analogize this case to our decision in *Goble*—where we held that a defendant's recording of a sham transaction in its internal books, given to FINRA during an audit, wouldn't have influenced an investor's investment decision. *See* 682 F.3d at 941, 943–44.

Contrary to Spartan and Dilley's suggestion, their misrepresentations on FINRA applications aren't like the *Goble* defendant's recording of a sham transaction in internal books. There was evidence that the completed FINRA applications here—including the cover letters—could've been accessed by the investing public. The acknowledgement that Dilley signed on each Form 211 certified that he "acknowledge[d] that copies of th[e] form, accompanying documents, and subsequent submissions made in connection with [the form]" could be given to the SEC, other agencies, and "to the public upon request." So, for example, if a hypothetical investor wanted to access the FINRA application for Obscene Jeans before making an investment decision about it, there was evidence that it was possible for the investor to request the application, obtain it, and see Spartan and Dilley's misrepresentations.[7]

---

[7] Spartan and Dilley cite how Adams testified that the Form 211 applications and any related correspondence were not publicly available. But we view the facts in the SEC's favor, *see Chaney*, 483 F.3d at 1227, and the jury was free to credit the terms of the Form 211's acknowledgment over Adams's testimony.

### 3. *Connection with the purchase or sale of securities*

Spartan and Dilley next argue that even if they made material misrepresentations on the FINRA applications, the misrepresentations were not "in connection with" the sale or purchase of securities. 17 C.F.R. § 240.10b-5(b). They contend that there was no evidence of a connection because their misrepresentations didn't "coincide with" a securities transaction.[8] They also argue that there was no connection because rule 10b-5(b) doesn't apply to false statements "directed at FINRA." Because Spartan and Dilley's misrepresentations enabled the issuers' stocks to be bought and sold, we conclude that a reasonable jury could find they were made in connection with the sale or purchase of securities.

The Supreme Court interprets the "in connection with" requirement "flexibly," *Zandford*, 535 U.S. at 819 (quoting *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 151 (1972)), so we do as well, *see Goble*, 682 F.3d at 945–46. "The [Supreme] Court [has] made clear that a direct or close relation between the fraud and the securities transaction [i]s not required." *Smallwood v. Pearl Brewing*

---

Indeed, Spartan and Dilley's codefendant—Eldred—testified that he thought that the Form 211 applications were "publicly available" based on the acknowledgment, just not "correspondence between [the defendants] and FINRA."

[8] Spartan and Dilley also repeat their materiality argument that the statements couldn't have impacted a securities transaction because completed Form 211 applications aren't publicly accessible. Because we've already explained why a jury could find that the forms were publicly accessible, we will not address the argument further.

*Co.*, 489 F.2d 579, 595 (5th Cir. 1974) (citing *Superintendent of Ins. v. Bankers Life & Cas. Co.*, 404 U.S. 6, 12–13 (1971)).  Instead, "it is enough that the fraud 'touch' the sale in some manner," *Rudolph v. Arthur Anderson & Co.*, 800 F.2d 1040, 1046 (11th Cir. 1986) (quoting *Bankers Life*, 404 U.S. at 12–13), or "coincide" with it, *Zandford*, 535 U.S. at 822.  "The requirement is satisfied, for example, if the purchase or sale of a security and the proscribed conduct are 'part of the same fraudulent scheme.'" *Rudolph*, 800 F.2d at 1046 (quoting *Alley v. Miramon*, 614 F.2d 1372, 1378 n.11 (5th Cir. 1980)).  Thus the requirement can be satisfied even if the misrepresentations existed before any actual purchase or sale.  *See id.* ("[I]f a scheme to defraud is formulated before a sale or purchase, the fraud when carried out is . . . 'in connection' with the security transaction even if the scheme does not culminate until after the transaction." (citing *Brown v. Ivie*, 661 F.2d 62, 65–66 (5th Cir. Unit B Nov. 1981); *Smallwood*, 489 F.2d at 594–95)).  Indeed, "[i]n some instances," there can be a rule 10b-5(b) violation "without an actual purchase or sale of securities" ever occurring.  *Goble*, 682 F.3d at 946 (citing *Grippo v. Perazzo*, 357 F.3d 1218, 1223–24 (11th Cir. 2004)).

There was sufficient evidence here that Spartan and Dilley's misrepresentations "touch[ed]" the purchase or sale of securities. *Rudolph*, 800 F.2d at 1046.  Adams testified that broker-dealers like Spartan "essentially open the door" to over-the-counter public investing by obtaining FINRA clearance.  Spartan obtained FINRA clearance for the issuers here by making false statements in the applications—relied on by FINRA—which in turn enabled Spartan to initiate quotations in the issuers' securities.  And Spartan actually

marketed those securities soon after obtaining FINRA clearance. The parties stipulated that it acted as each issuer's exclusive market-maker for thirty days after obtaining FINRA clearance—holding itself out to the market as ready to buy and sell the issuers' securities. Without Spartan initiating and completing the Form 211 process for each Mirman/Rose issuer, Spartan wouldn't have been able to market the securities and "the general public would not [have] be[en] able to invest" in them.

Spartan and Dilley argue that there was insufficient evidence supporting the "in connection with" element for two reasons. First, they contend that rule 10b-5(b)'s "in connection with" element doesn't "encompass[] *any* step in the process of going public"; instead, citing the Supreme Court's decision in *Zandford*, they say that it requires that "the violation and the sale of securities . . . , at a minimum, 'coincide.'" They argue that a misrepresentation and securities transaction only "coincide" if the "misrepresentation . . . and [the] securities transaction . . . occur at the same time." Spartan and Dilley contend that because their misrepresentations were made "well before any securities transaction," those misrepresentations didn't coincide with a securities transaction. Second, they argue that rule 10b-5(b) "was not targeted at misleading statements *to regulators* like FINRA, so [the connection element] does not encompass [false statements] directed at FINRA." We find each of these arguments unpersuasive.

First, while "[i]t is enough" for a connection "that the scheme to defraud and the sale of securities coincide," *Zandford*,

535 U.S. at 822, Spartan and Dilley are mistaken that a discrete misrepresentation and securities transaction must always occur at the same time" for the connection element to be satisfied. "[I]n connection with the purchase or sale of any security," 17 C.F.R. § 240.10b-5, is broad. *See Zandford*, 535 U.S. at 819–20. And it is broad enough to cover a situation where—as here—a defendant makes a false statement intentionally calculated to facilitate the purchase or sale of a security on a later date. *See Rudolph*, 800 F.2d at 1046 (citing *Brown*, 661 F.2d at 65–66; *Smallwood*, 489 F.2d at 594–95); *see also Brown*, 661 F.2d at 65–66 (holding that the plaintiff, a corporate officer, alleged a connection where the defendants, other officers, convinced him to sign an agreement requiring that persons leaving the corporation sell their shares back to it—without telling the plaintiff they planned to oust him seven days later); *Smallwood*, 489 F.2d at 594–95 (concluding that a letter's misleading omissions about a proposed merger "touch[ed]" the actual merger, which happened forty-three days after the letter was mailed); *SEC v. Pirate Inv. LLC*, 580 F.3d 233, 248 (4th Cir. 2009) (discussing cases where defendant's "intent to induce a securities transaction" supported connectivity). *Zandford* itself—where the Supreme Court held that a stockbroker's misrepresentation and securities transactions "coincide[d]"—involved an initial misrepresentation that the stockbroker would "conservatively invest" a man's money, followed by a "series of transactions" completed "throughout [a two]-year period." 535 U.S. at 815, 819–21.

There may be cases where the alleged deceit is too remote to "touch" or "coincide" with the purchase or sale of securities.

But we need not resolve where that line should be drawn because the misrepresentations here were not so remote or "well before any securities transaction" as Spartan and Dilley argue. *See Smallwood*, 489 F.2d at 595 ("It is important that the standard be fleshed out by a cautious case-by-case approach."). The misrepresentations were an "integral part" of getting FINRA clearance to initiate quotations in the issuers' stock. *Cf. Brown*, 661 F.2d at 65–66 (distinguishing cases where the connection between fraud and transactions were too remote because, in those cases, "the defendants . . . did not as an integral part of their scheme induce the plaintiffs to enter into [a] stock-retirement agreement" (citations omitted)).

Second, although Spartan and Dilley made their statements directly to FINRA rather than face-to-face to an investor, the "in connection with" element doesn't require that a misrepresentation be made directly to investors. *See Graham v. SEC*, 222 F.3d 994, 1001–03 (D.C. Cir. 2000) (concluding that fraud perpetrated on brokers who executed securities transactions, rather than the actual investors, was in connection with the transactions); *cf. United States v. Naftalin*, 441 U.S. 768, 772–73 & n.4 (1979) (holding that "in the offer or sale of any securities," which Congress "ha[s] on occasion used . . . interchangeably" with "in connection with," "does not require that the victim of [a] fraud be an investor"). In any event, despite Spartan and Dilley making their statements to FINRA, there was evidence that investors could have had access to, and could have relied on, the false statements.

\*    \*    \*

To summarize, there was sufficient evidence that Spartan and Dilley made materially false statements in connection with the purchase or sale of securities on each FINRA application for the Mirman/Rose issuers.

### Daniels/Harrison FINRA Applications
### (Spartan and Eldred)

We now turn to the FINRA applications for the relevant Daniels/Harrison issuers—Top to Bottom and PurpleReal—which Spartan submitted and Eldred signed as the "principal of the firm responsible for th[e] . . . application[s]." The evidence showed that Spartan, through Eldred, made materially false statements about these issuers "in connection with the purchase or sale of . . . securit[ies]." *See* 17 C.F.R. § 240.10b-5(b).

First, there was evidence that Spartan and Eldred made false statements about Daniels's and Harrison's role in taking the companies public. Spartan and Eldred made a false statement about Daniels's involvement and relationship with Spartan in the Top to Bottom application. The cover letter stated that the issuer's president's spouse introduced the company to Spartan, and that Spartan "d[id] not have any other relationship with" the company "or any of [its] other representatives." But there was evidence that Spartan filed the Top to Bottom application at *Daniels's* request—and Daniels was Top to Bottom's secretary and treasurer. The parties stipulated that Daniels (and Harrison) "requested [that] Spartan file" the Form 211 for Top to Bottom. Indeed, Daniels's "role in taking

[Top to Bottom] public" was that "[h]e directed everything. [They] didn't do anything without his direction [and] guidance." There was also evidence that Spartan had other business with Daniels. The parties stipulated that Daniels (and Harrison) had solicited Spartan to file three earlier FINRA applications—those for Dinello, Court Document Services, and Quality Wallbeds.

Similarly, Spartan and Eldred made a false statement about Spartan's relationship with Harrison in the PurpleReal application. The cover letter stated that Spartan "d[id] not have any other relationship with Diane Harrison" beyond (1) Harrison calling Eldred about taking the company public and (2) Harrison being "known to [Spartan] for many years." When asked about this statement at trial, Eldred himself—Spartan's majority owner—testified that he had done "other business with Diane Harrison." Other evidence showed that their "other business" included a partnership arrangement to sell shell companies. Eldred emailed Harrison in 2010 proposing that "if a cleaned up shell is worth $300k, then that's $100k for you when we sell it." Eldred also wrote that "there [we]re actually [one] or maybe [two] projects to do immediately," and that he thought "we could add [one] or two additional per year."

And after the 2010 email, but before the 2014 PurpleReal application, Spartan and Harrison continued collaborating on "other business." Spartan filed three other FINRA applications at Harrison and Daniels's request—those for Court Document Services,

22-13129                Opinion of the Court                49

Quality Wallbeds, and Top to Bottom.[9] In 2012, Harrison helped Eldred sell a company to Fan. Eldred emailed (from his Spartan address) Harrison to "get to work" on a contract for that transaction, which Fan wrote was the "beginning of a beautiful relationship."

Second, the false statements downplaying Daniels's and Harrison's involvement and relationships with Spartan were material because a reasonable investor would attach importance to how Spartan was working with Daniels and Harrison to take multiple issuers public, one after the other. Adams testified that when "certain individuals . . . get market makers to file [Form] 211s for multiple companies," it raises a red flag that those individuals are engaging in "possible manipulation of the market." Adams explained that it "is very, very uncommon" for "one individual [to] be behind . . . a [Form] 211 being filed for multiple issues." Cangiano testified similarly, explaining that "hav[ing] numerous companies in the pipeline" is an "indication . . . that they're in the business of selling . . . shells." He further testified that it "indicates . . . that the[] companies are not being brought forward and, you know, operating as real companies but they're being formed to be sold." There was also evidence that the SEC has informed investors, through bulletins and proposed rules, that these indicators suggest that a shell company is being used to manipulate the market. From

---

[9] Their "other business" also included Spartan's filing of the Dinello application, but the PurpleReal application did disclose that fact.

this, a reasonable investor familiar with these indicators could believe that Spartan, Daniels, and Harrison were working together to maintain a shell factory and manipulate the over-the-counter market. That belief would "affect the [investor's] desire . . . to buy, sell, or hold the compan[ies'] securities." *Tex. Gulf Sulphur Co.*, 401 F.2d at 849.

That those indicators would've affected an investor's decision to buy, sell, or hold the securities Spartan brought to market at Daniels's and Harrison's behest is supported by the evidence of their "general reputation[s] . . . in the . . . industry." *Blackburn*, 15 F.4th at 681. The parties stipulated that Daniels and Harrison "were active in the reverse merger business and had consummated a number of reverse mergers prior for clients who wanted to enter the public market." And Daniels, for his part, had a past forgery conviction.

Third, there was evidence that the false statements in the Top to Bottom and PurpleReal applications were made "in connection with the purchase or sale of . . . securit[ies]." 17 C.F.R. § 240.10b-5. Donnelly testified that the "business model" for all Daniels/Harrison issuers had three steps: (1) to take the company public by obtaining FINRA clearance; (2) to "immediately" dispose of all the company's assets; and (3) to sell the remaining public shell to an investor—usually for reverse mergers with Fan's "businesses in China." That's what happened once Spartan's misrepresentations secured Top to Bottom's FINRA clearance. Donnelly explained that once FINRA cleared Top to Bottom, its assets were

22-13129                Opinion of the Court                51

sold off in "a fire sale" and the remaining public shell was "sold to an[] . . . investor that Daniels and Harrison found." And Daniels and Harrison planned to do the same with PurpleReal once Spartan obtained its FINRA clearance—a sale that Spartan and Eldred's misrepresentations would've facilitated but for the SEC's intervention. *See Goble*, 682 F.3d at 946 ("In some instances a [section] 10(b) fraud may occur even without an actual purchase or sale of securities." (citing *Grippo*, 357 F.3d at 1223–24)); *cf. Grippo*, 357 F.3d at 1223 (giving the example of "a broker who accepts payment for securities that he never intends to deliver" (quoting *Zandford*, 535 U.S. at 819)). So, as to both Top to Bottom and PurpleReal, Spartan's misrepresentations—calculated to allow Daniels and Harrison to sell public shells—"'touch[ed]' the sale" of securities "in some manner." *Rudolph*, 800 F.2d at 1046 (quoting *Bankers Life*, 404 U.S. at 12–13).

Spartan and Eldred challenge the sufficiency of the evidence as to these issuers by making the same arguments that we've already addressed in the context of the Mirman/Rose issuers. Specifically, they contend that they didn't make any statements in the Daniels/Harrison applications because they only repeated the issuers' statements; that they didn't have any duty to disclose omitted facts; that their misrepresentations weren't material because they weren't publicly accessible; and that the connection between their deceit and the purchase or sale of securities was too remote. These arguments fail for the same reasons we've already discussed.

22-13129                Opinion of the Court                52

We conclude that a reasonable jury could find that Spartan and Eldred made materially false statements in connection with the purchase or sale of securities as to Top to Bottom and PurpleReal.

Statements for DTC Clearance (Island)

We now turn to Island. The district court instructed the jury that the SEC alleged Island violated rule 10b-5(b) in three ways— by: (1) stating that issuers weren't shell companies in applications filed for DTC clearance; (2) representing the restricted securities as "free trading," and (3) omitting restrictive legends from the stock certificates. Island argues that there wasn't enough evidence for the jury to find it liable under the first theory. Island also contends that the jury couldn't have found it liable under the second or third theories because it found Island not liable on count fourteen, which alleged that Island offered to sell securities without any effective registration statements for them. We conclude that sufficient evidence supported Island's liability under the first theory, which is enough to affirm the verdict as to Island on count six.[10]

_____

[10] To the extent the jury found Island liable on count six under the second and third theories, Island forfeited any argument that the jury's finding was irreconcilable with its verdict on count fourteen. "A party must object to a verdict as inconsistent before the jury has been dismissed," and "failure to object to an inconsistent verdict before the jury is excused forfeits the objection." *Reider v. Philip Morris USA, Inc.*, 793 F.3d 1254, 1259–60 (11th Cir. 2015) (citations omitted). Island didn't raise its inconsistency objection before the jury was excused; instead, it raised the argument in its later renewed motion for judgment as a matter of law.

Island made a false statement to Penson—a DTC clearing firm—about Kids Germ's shell status.  Island employee  Anna Krokhina, who "did a lot of the work with the guidance of [Island president] Dilley," emailed Penson from her Island email address, stating "the company is not a shell."  There was evidence that this statement was false.  Rose testified that Kids Germ "wasn't operating" and that the plan from the beginning was to sell it as a public shell, which Dilley knew.

The misrepresentation that Kids Germ wasn't a shell company was material.  There was evidence that the entire point of obtaining DTC clearance was to facilitate selling Kids Germ in a reverse merger.  Rose informed Dilley of a potential buyer for the Kids Germ shell on the same day that Dilley told him Krokhina would file a DTC application.  In a January 4, 2010 email exchange (on the same day FINRA cleared Kids Germ), Rose asked Dilley, "Do you want to speak to the atty interested in the company?" and "What do you recommend the company do with the DTC know [sic] the route it is taking?"  Dilley responded that he could call the interested attorney and that they "should apply for DTC eligibility[—]Anna [Krokhina] can get that going."  Rose testified that "atty" meant "the attorney for the company, whoever was buying it at the time."  That the attorney was someone who "wanted to purchase the company and wanted to make sure that it's going to happen" was, as Rose explained, "the only thing [he] could think of."  This actual plan to use Kids Germ for a reverse merger "affect[ed] the probable future of the company." *Tex. Gulf Sulphur Co.*,

401 F.2d at 849; *see also Ginsburg*, 362 F.3d at 1302 ("A merger is an event of considerable magnitude to an investor . . . .").

And the misrepresentation was in connection with the purchase or sale of securities. Based on Dilley and Rose's email exchange, a reasonable jury could find Island's misrepresentations to Penson were calculated to facilitate Kids Germ's sale to the "atty." In February 2010—shortly after obtaining DTC eligibility—Kids Germ was sold in a reverse merger that Island assisted as the transfer agent.

Island argues that insufficient evidence showed the "not a shell" statement violated rule 10b-5(b) for two reasons. First, it argues that Krokhina told Penson the truth. It contends Kids Germ wasn't a shell because its SEC filings showed that the company "had 'nominal' assets and operations." They specifically cite how Rose testified about a Kids Germ 2009 Form 10-K filing with the SEC, where he "had Kids Germ report" to the SEC "that it had [$25,254 in] cash" assets and that it had "spent approximately $62,000 over the year in its operations." Second, it argues that the misrepresentation wasn't in connection with the purchase or sale of securities because it was made in "nonpublic communications" to Penson, rather than to any investors. They characterize the DTC application as "but one step in the process" too remote from the purchase or sale of a security.

As for Island's first argument about the Form 10-K, that filing doesn't conclusively establish that Kids Germ maintained cash assets and active operations. There was evidence that the Form 10-

K *itself* misrepresented Kids Germ's assets and operations. The parties stipulated that the issuers' registration statements "and subsequent SEC filings . . . falsely depicted the issuers as actively pursuing a variety of business plans, when the only plan from the onset was for the compan[ies] to be sold as public vehicles." And Rose repeatedly testified that Kids Germ was a shell company.

Island's second argument fares no better. Even if the "not a shell" statement wasn't publicly visible to investors, Island's misrepresentation wasn't too remote from the sale of Kids Germ's securities because, as Dilley himself testified, Island sought Kids Germ's DTC eligibility to "make[] the transaction easier in the event of a sale or purchase." He viewed obtaining DTC eligibility after FINRA clearance as important for "brokers that would buy or sell the stock," acknowledging that DTC eligibility was necessary to "allow[] for electronic settlement of any purchase or sales in the marketplace." Cangiano similarly testified that obtaining Kids Germ's DTC clearance was "important" to "the route it [wa]s taking"—being sold in a reverse merger. He explained that it was "important" to facilitate that merger because getting DTC eligibility allows for convenient, less expensive public trading—"the whole process [through DTC] is electronic." Without DTC clearance, Cangiano explained further, a security would be "ex-clearing," which means that trading it would require "physical delivery of the shares and a physical check." Critically, he testified that "no one would buy or sell a security that's ex-clearing usually because it's very expensive to do that."

22-13129                Opinion of the Court                56

So, in short, there was sufficient evidence that Island made a materially false statement to Penson about at least one issuer's shell status.  Because that misrepresentation was material and in connection with the purchase or sale of securities, a reasonable jury could find Island liable on count six.[11]

*Remedies*

The defendants next argue that, even if sufficient evidence supported the jury's verdict, the district court erred when it (1) ordered Island to disgorge its ill-gotten gains to the Treasury and (2) imposed civil penalties on the defendants.

We review for abuse of discretion a district court's award of disgorgement, civil penalties, and injunctive relief under the securities laws, *see SEC v. Diversified Corp. Consultant Grp.*, 378 F.3d 1219, 1228 (11th Cir. 2004), including the "amount of a[ny] monetary remedy." *SEC v. Warren*, 534 F.3d 1368, 1369 (11th Cir. 2008); *see also SEC v. Monterosso*, 756 F.3d 1326, 1337–38 (11th Cir. 2014).  We

---

[11] After oral argument, we ordered the parties to brief what impact, if any, the Supreme Court's recent decision in *Macquarie Infrastructure Corp. v. Moab Partners, L.P.* had on this appeal.  601 U.S. 257 (2024).  *Macquarie* held that "pure omissions" are not actionable under SEC rule 10b-5(b).  *Id.* at 266.  "A pure omission occurs when a speaker says nothing[.]" *Id.* at 263.  Pure omissions are distinct from "[h]alf-truths," which are "representations that state the truth only so far as it goes, while omitting critical qualifying information." *Id.* (quoting *Universal Health Servs., Inc. v. United States*, 579 U.S. 176, 188 (2016)).  Half-truths *are* covered by section 10b-5(b).  *Id.*  Because, in the end, our decision rests on the defendants' misstatements and half-truths, and not on any pure omissions by the defendants, *Macquarie* does not affect our analysis.

22-13129                Opinion of the Court                57

review de novo the timeliness of these remedies under the governing statutes of limitations.  *See Berman v. Blount Parrish & Co.*, 525 F.3d 1057, 1058 (11th Cir. 2008).

The defendants argue that the district court ordered remedies based on conduct that was time-barred.  Beyond timeliness, they make several disgorgement- and penalty-specific arguments. We address their contentions below.[12]

Statute of Limitations

We begin with the defendants' timeliness argument.  They contend the district court erred when it "ordered sanctions based on . . . time-barred conduct," citing 28 U.S.C. section 2462.  It did not.

The defendants concede on appeal, as they did in the district court, that the civil penalties claims for five issuers—Envoy Group, Changing Technologies, First Xeris, Top to Bottom, and Purple-Real—were timely under 28 U.S.C. section 2462's five-year statute of limitations.  The defendants did not request summary judgment based on timeliness as to those five issuers.

The defendants' concession is key because these were the only issuers that the district court relied on when it ordered the

---

[12] We reject one of the defendants' conclusory arguments at the outset—that the district court violated due process by "order[ing] remedies based on conduct that the jury found did not violate the law."  The district court based the ordered remedies on the defendants' false statements in violation of count six, and not on any violation alleged in other counts.

civil penalties.  The court cited the SEC's request to "assess penalties for three 'violations' against . . . Dilley," which the SEC based on Envoy Group, Changing Technologies, and First Xeris.  And it cited the SEC's request to "assess penalties for . . . two violations against . . . Eldred," which the SEC based on Top to Bottom and PurpleReal.  Based on the defendants' concession, the district court's civil penalties were timely.

All other relief granted by the district court—the disgorgement, penny stock bar, and injunction—was timely as well.  Congress enacted the NDAA while this case was pending, and we apply an amended statute of limitations if Congress "clearly manifest[s] an intent to have an amended limitations statute apply to existing causes of action." *Sarfati v. Wood Holly Assocs.*, 874 F.2d 1523, 1525 (11th Cir. 1989).  Under section 21(d)(8), as enacted through the NDAA, *see* Pub. L. No. 116-283, section 6501, 134 Stat. at 4625–26, the statute of limitations applicable to a "claim for any equitable remedy" is ten years.  15 U.S.C. § 78u(d)(8)(B).  A ten-year period also controls claims for "[d]isgorgement" based on violations of section 10(b) or those that involve scienter—which is what count six alleged.  *Id.* § 78u(d)(8)(A)(ii)(I), (IV).

Congress "clearly manifest[ed]" its intent for these new, Exchange Act-specific provisions—not 28 U.S.C. section 2462—to apply to this action while it was pending.  *See Sarfati*, 874 F.2d at 1525.  The NDAA provided that these amendments "appl[ied] with respect to any action or proceeding that [wa]s pending on . . . the date of enactment."  NDAA, Pub. L. No. 116-283, § 6501(b), 134 Stat. at

22-13129               Opinion of the Court               59

4626. Island does not dispute that the injunctive relief, penny stock bar, and disgorgement—based on statements about the Mirman/Rose issuers that occurred, at the earliest, after December 2009—are timely under the new statute of limitations.

So, in sum, the statutes of limitations did not bar any of the relief ordered by the district court.[13]

## Disgorgement

Disgorgement "is a form of '[r]estitution measured by the defendant's wrongful gain.'" *Kokesh v. SEC*, 581 U.S. 455, 458–59 (2017) (quoting Restatement (Third) of Restitution & Unjust Enrichment § 51, cmt. a, at 204 (Am. L. Inst. 2010)). The district court ordered Island to disgorge $114,520 to the Treasury, plus $39,874.05 in prejudgment interest. Island appeals the disgorgement award on four different grounds.

Island first argues that the Exchange Act bars a district court from ordering disgorgement to the Treasury. It contends that because disgorgement is an equitable remedy and Exchange Act section 21(d)(5) requires that "any equitable relief" be "for the benefit

---

[13] Because the district court relied only on timely conduct when it ordered remedies, we need not resolve the defendants' argument that the district court erred by applying the continuing violations doctrine at summary judgment, or that it relied on untimely conduct when it denied the rule 50(b) motion. Nor do we resolve their argument that the district court's order denying summary judgment is appealable after a full trial on the merits under *Dupree v. Younger*. *See* 598 U.S. 729, 731 (2023) (holding that "a purely legal issue resolved at summary judgment" is reviewable after trial even if not raised in a post-trial motion).

of investors," 15 U.S.C. § 78u(d)(5), a district court may only order disgorgement if it orders that the money be returned to harmed investors. Second, although it conceded that repaying harmed investors was infeasible in this case, Island argues that the equities didn't support ordering disgorgement to the Treasury and thus the district court abused its discretion. Third, Island asserts that "there was no proof that [its profits] were causally related to the . . . violation[s] found by the jury." And fourth, Island maintains that the SEC didn't satisfy its burden of reasonably approximating the ill-gotten gains. We disagree.

1. *Disgorgement to the Treasury*

We begin with Island's argument that the Exchange Act does not authorize a district court to order disgorgement to the Treasury. We conclude that it does.

"Initially, the only statutory remedy available to the SEC in an enforcement action was an injunction." *Kokesh*, 581 U.S. at 458. The original Exchange Act, in 1934, did not expressly authorize district courts to award monetary remedies like civil penalties or disgorgement. *See id.*; *SEC v. Hallam*, 42 F.4th 316, 327–30 (5th Cir. 2022) (outlining history of available remedies under the Exchange Act, explaining that "[t]he concept of 'disgorgement' as a securities remedy is essentially the product of a runaway mutation"). However, we and other circuits held that district courts could order disgorgement "as an ancillary remedy in the exercise of . . . general equity powers." *Tex. Gulf Sulphur Co.*, 446 F.2d at 1307 (citation omitted); *see also Kokesh*, 581 U.S. at 458–59 (discussing how in the

1970s, courts began awarding disgorgement in securities actions "as an exercise of their 'inherent equity power[s]'" (citation omitted)); *SEC v. Blatt*, 583 F.2d 1325, 1335 (5th Cir. 1978) ("The trial court acted properly within its equitable powers in ordering [the defendant] to disgorge the profits that he obtained by fraud.").

Congress later expanded the category of remedies the SEC may seek in enforcement actions. Congress amended the Exchange Act in 1990 to authorize civil penalties by adding section 21(d)(3), titled "[m]oney penalties in civil actions." Securities Enforcement Remedies and Penny Stock Reform Act of 1990, Pub. L. No. 101-429, § 201, 104 Stat. 931 (1990). And in 2002, Congress added section 21(d)(5), which provides that "[i]n any action" brought by the SEC, the SEC may seek, and district courts may grant, "any equitable relief that may be appropriate or necessary for the benefit of investors." 15 U.S.C. § 78u(d)(5); *see Hallam*, 42 F.4th at 330. But even after these amendments, the SEC's ability to seek certain remedies under the Exchange Act remained uncertain. The Exchange Act does not define "equitable relief," and "courts have had to consider which remedies the SEC may impose as part of its [section 21(d)(5)] powers." *Liu*, 591 U.S. at 75.

The Supreme Court faced that question in *Liu*. There, the Supreme Court held that "equitable relief," as used in section 21(d)(5), includes "a disgorgement award that does not exceed a wrongdoer's net profits and is awarded for victims." *Id.* Citing the provision's "for the benefit of investors" language, the Court

concluded that "[t]he equitable nature of the profits remedy generally requires the SEC to return a defendant's gains to wronged investors for their benefit." *Id.* at 88 ("[T]he SEC's equitable, profits-based remedy must do more than simply benefit the public at large . . . . To hold otherwise would render meaningless the latter part of [section] 78u(d)(5)."). The Court did "not address" the "open question" of whether "the SEC's practice of depositing disgorgement funds *with the Treasury*" is relief "for the benefit of investors." *Id.* at 88–89 (emphasis added).

About seven months after *Liu*, Congress again amended section 21(d) through the NDAA. Section 21(d)(3), which Congress newly labeled "[c]ivil money penalties and authority to seek disgorgement," now provides that the SEC "may bring an action in a United States district court to seek, and the court shall have jurisdiction to[,] . . . require disgorgement under paragraph [(d)](7) of any unjust enrichment by the person who received such unjust enrichment as a result of such violation." 15 U.S.C. § 78u(d)(3), (d)(3)(A)(ii). Section 21(d)(7), which Congress also added after *Liu*, provides that "[i]n any action or proceeding brought by the [SEC] under any provision of the securities laws, the [SEC] may seek, and any [f]ederal court may order, disgorgement." *Id.* § 78u(d)(7). Congress did not amend section 21(d)(5).

Consistent with the text of the new disgorgement provision, we hold that in a civil enforcement action brought by the SEC under the Exchange Act, the SEC may seek, and a district court may order, that a defendant disgorge its ill-gotten gains to the Treasury

under sections 21(d)(3)(A)(ii) and (d)(7)—even if directing the money to the Treasury wouldn't "be appropriate or necessary for the benefit of investors" under section 21(d)(5). Here's why.

Our starting point is the statutory text itself. *Korman v. HBC Fla., Inc.*, 182 F.3d 1291, 1295 (11th Cir. 1999) ("The first, and most important, step in statutory construction is to examine the language of the [statute] itself."). Looking to the text here, sections 21(d)(3)(A)(ii) and (d)(7) are unconditional—both allow the SEC to seek, and a district court to order, disgorgement. Section 21(d)(3)(A)(ii) allows the SEC "to seek . . . disgorgement . . . of any unjust enrichment." 15 U.S.C. § 78u(d)(3)(A)(ii). Section 21(d)(7) repeats that the SEC "may seek . . . disgorgement." *Id.* § 78u(d)(7). In no way does either provision limit where or to whom those profits must go. We must take these provisions as Congress wrote them; we cannot rewrite sections 21(d)(3)(A)(ii) and (d)(7) to include an investor-benefit limitation where Congress did not provide for one. *Korman*, 182 F.3d at 1295 ("We . . . neither add words to nor subtract them from [a statute].").

The statutory context confirms that the Exchange Act doesn't limit who can be the recipient of disgorged profits. *See Black Warrior Riverkeeper, Inc. v. Black Warrior Minerals, Inc.*, 734 F.3d 1297, 1302–03 (11th Cir. 2013) (explaining that "statutory construction is a 'holistic endeavor'" and courts must "fit, if possible, all parts into a harmonious whole" (citations omitted)). Unlike sections 21(d)(3)(A)(ii) and (d)(7), section 21(d)(5) includes express limiting language. A district court may grant "any equitable relief"

under the Exchange Act if the relief is "appropriate or necessary for the benefit of investors." 15 U.S.C. § 78u(d)(5). While section 21(d)(5)'s investor-benefit limitation might foreclose ordering disgorgement to the Treasury, *cf. Liu*, 591 U.S. at 88 ("The equitable nature of the profits remedy generally requires the SEC to return a defendant's gains to wronged investors for their benefit."), Congress omitted any investor-benefit language from sections 21(d)(3)(A)(ii) and (d)(7). We presume sections 21(d)(3)(A)(ii) and (d)(7) lack the investor-benefit requirement Congress provided for in section 21(d)(5). "When Congress includes particular language in one section of a statute but omits it in another section of the same Act, we generally take the choice to be deliberate." *Badgerow v. Walters*, 596 U.S. 1, 11 (2022) (cleaned up); *see also State Farm Fire & Cas. Co. v. U.S ex rel. Rigsby*, 580 U.S. 26, 34 (2016) ("Congress' use of 'explicit language' in one provision 'cautions against inferring' the same limitation in another provision." (quoting *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 384 (2013)); *Jones v. Governor of Fla.*, 975 F.3d 1016, 1042 (11th Cir. 2020) (en banc) ("A material variation in language suggests a variation in meaning.").

Island recognizes that we must read sections 21(d)(3)(A)(ii) and (d)(7) in their proper context rather than in isolation. But it insists that because courts have historically considered disgorgement an equitable remedy, the only harmonious interpretation is that disgorgement ordered under section 21(d)(7) must still satisfy section 21(d)(5)'s investor-benefit requirement for "any equitable relief." 15 U.S.C. § 78u(d)(5). Island maintains that Congress's addition of sections 21(d)(3)(A)(ii) and (d)(7) simply "ma[d]e explicit

that which had previously only been implicit"—"that disgorgement is an available equitable remedy." If we do not read the Exchange Act to bar ordering disgorgement to the Treasury, Island contends, then we would render section 21(d)(5)'s investor-benefit requirement superfluous. Island points to one representative's pre-*Liu* statement in the legislative history to support its interpretation.

Contrary to Island's suggestion, reading sections 21(d)(3)(A)(ii) and (d)(7) to allow ordering disgorgement to the Treasury is harmonious with section 21(d)(5). Section 21(d)(5) is a general provision—it authorizes district courts to grant "any equitable relief" that benefits investors. 15 U.S.C. § 78u(d)(5). But sections 21(d)(3)(A)(ii) and (d)(7), which lack the investor-benefit requirement, are provisions specific to one remedy—"disgorgement." *Id.* § 78u(d)(3)(A)(ii) (providing, in subsection labeled "[c]ivil money penalties and authority to seek disgorgement," that the SEC may seek "disgorgement"); *id.* § 78u(d)(7) (providing, in subsection labeled "[d]isgorgement," that the SEC may seek "disgorgement"). To read those provisions harmoniously, we simply treat the specific disgorgement authorization as an exception to the general provision governing all other equitable relief. *See RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 644–45 (2012) ("It is a commonplace of statutory construction that the specific governs the general." (cleaned up)).

Our holding that the Exchange Act allows ordering disgorgement into the Treasury doesn't render section 21(d)(5)'s investor-benefit requirement superfluous or ineffective. Construing

a specific provision as an exception to a general provision "does not mean that the . . . specific provision voids the general provision." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts*, § 28, at 184 (2012). "[A]ny equitable relief" ordered under the Exchange Act—except disgorgement—must still "be appropriate or necessary for the benefit of investors." 15 U.S.C. § 78u(d)(5). Thus, there are still circumstances where the investor-benefit requirement applies. *See RadLAX Gateway Hotel, LLC*, 566 U.S. at 645–46 (discussing how applying the general/specific canon can avoid introducing superfluity into a text).

Section 21(d)(8)—which includes the Exchange Act's new statute-of-limitations provisions—also illustrates how the new disgorgement provisions operate as exceptions to general ones governing other types of equitable relief. Under section 21(d)(8)(B), titled "[e]quitable remedies," the SEC must bring "a claim for any equitable remedy . . . not later than [ten] years after" the claim accrues. 15 U.S.C. § 21(d)(8)(B). But section 21(d)(8)(A), titled "[d]isgorgement," allows the SEC to "bring a claim for disgorgement" within ten years only for four types of violations. *Id.* § 21(d)(8)(A)(ii). For all other types of violations, the SEC must "bring a claim for disgorgement" within five years. *Id.* § 21(d)(8)(A)(i). That the statute requires the SEC to enforce certain disgorgement claims sooner than claims seeking other equitable relief does not mean sections 21(d)(8)(A) and (B) are necessarily irreconcilable. *See RadLAX Gateway Hotel, LLC*, 566 U.S. at 644–45.

It is Island's interpretation that renders parts of the Exchange Act superfluous and ineffective. *See Black Warrior Riverkeeper, Inc.*, 734 F.3d at 1303 ("[A] court should . . . avoid interpreting a provision in a way that would render other provisions of the statute superfluous."). We must presume that Congress "intend[ed] its [post-*Liu*] amendment[s] to have real and substantial effect." *Intel Corp. Inv. Pol'y Comm. v. Sulyma*, 589 U.S. 178, 189 (2020) (quoting *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 258–59 (2004)). But under Island's theory, Congress added sections 21(d)(3)(A)(ii) and (d)(7) to settle an issue that *Liu* had already settled once and for all—whether the SEC can seek disgorgement under section 21(d)(5).[14] *See Liu*, 591 U.S. at 74–75 ("The Court holds today that a disgorgement award that does not exceed a wrongdoer's net profits and is awarded for victims is equitable relief permissible under [section] 78u(d)(5)."); *cf. Ryan v. Gonzales*, 568

---

[14] The parties have directed us to two Second Circuit cases as supplemental authorities: *SEC v. Ahmed*, 72 F.4th 379 (2d Cir. 2023), and *SEC v. Govil*, 86 F.4th 89 (2d Cir. 2023). *Ahmed* "conclude[d] that disgorgement under [section] 78u(d)(7) must comport with traditional equitable limitations as recognized in *Liu*." 72 F.4th at 396. And *Govil*, applying *Ahmed*, held that a district court abuses its discretion if it orders disgorgement under section 78u(d)(7) without first finding "that . . . investors suffered pecuniary harm" because "disgorgement must be 'awarded for victims.'" 86 F.4th at 93–94 (quoting *Liu*, 591 U.S. at 75). Island argues that these two cases establish that the disgorgement ordered here was inequitable. But neither case spoke to the question *Liu* expressly left "open"—whether ordering disgorgement to the Treasury is "for the benefit of investors" if "the wrongdoer's profits cannot practically be disbursed to the victims." *Liu*, 591 U.S. at 88–89 (quoting 15 U.S.C. § 78u(d)(5)).

22-13129                Opinion of the Court                68

U.S. 57, 66 (2013) ("We normally assume that, when Congress enacts statutes, it is aware of relevant judicial precedent." (citation omitted)).

Finally, we reject Island's reliance on a lone congressman's pre-*Liu* statement to interpret sections 21(d)(3)(A)(ii) and (d)(7)'s unambiguous text.  *See CSX Corp. v. United States*, 18 F.4th 672, 680 (11th Cir. 2021) ("To the extent that legislative history is useful at all in statutory interpretation, 'we do not consider legislative history when the text is clear.'" (citation omitted)).  These provisions unambiguously allow the SEC to seek, and district courts to order, disgorgement—without any requirement that it benefit investors.

2. *The balance of equities*

We next address whether the district court abused its equitable discretion in ordering disgorgement to the Treasury because repaying harmed investors was infeasible.  We conclude that the district court didn't abuse its discretion.

"Equity courts have routinely deprived wrongdoers of their net profits from unlawful activity[.]" *Liu*, 591 U.S. at 79.  That practice "reflect[s] a foundational principle:  '[I]t would be inequitable that [a wrongdoer] should make a profit out of his own wrong[.]'" *Id.* at 79–80 (quoting *Root v. Ry. Co.*, 105 U.S. 189, 207 (1882)); *see also* Restatement (Third) of Restitution & Unjust Enrichment § 51, cmt. *e* (Am. L. Inst. 3d ed. Oct. 2024 Update) ("The object of the disgorgement remedy—to eliminate the possibility of profit from conscious wrongdoing—is one of the cornerstones of the law of restitution and unjust enrichment.").

Relying on that foundational principle, we have affirmed judgments directing wrongdoers to pay ill-gotten gains to the Treasury when compensating harmed parties was infeasible.  We first did so in *Burk Builders, Inc. v. Wirtz*—a Fair Labor Standards Act case where an employer argued any unlawfully retained wages that could "not be delivered to the [entitled employees] should remain with it and become its property."  355 F.2d 451, 452–53 (5th Cir. 1966).  We later affirmed another judgment directing disgorgement to the Treasury in *FTC v. Gem Merch. Corp.*—a case arising under the Federal Trade Commission Act.  87 F.3d 466, 470 (11th Cir. 1996), *abrogated on other grounds*, *AMG Cap. Mgmt., LLC v. FTC*, 593 U.S. 67, 75 (2021) (holding that section 13(b) of the FTC Act "does not authorize . . . court-ordered monetary relief").  In each case, we concluded that "equitable principles would not suggest that [the wrongdoer wa]s entitled to the funds," *Burk Builders, Inc.*, 355 F.2d at 453, and "because it is not always possible to distribute the money to the victims . . . , a court may order the funds paid to the United States Treasury."  *Gem Merch. Corp.*, 87 F.3d at 470; *accord FEC v. Craig for U.S. Senate*, 816 F.3d 829, 847–48 (D.C. Cir. 2016) ("[C]ourts of appeals have often affirmed the propriety of directing disgorged funds to the U.S. Treasury."); *Off. Comm. of Unsecured Creditors of WorldCom, Inc. v. SEC*, 467 F.3d 73, 81 (2d Cir. 2006) ("'[I]t remains within the [district] court's discretion to determine how and to whom the money will be distributed,' and if the district court determines that no party is entitled to receive the disgorged profits, they will be paid to the United States Treasury[.]" (citations omitted)).

The district court didn't abuse its broad discretion in applying the same foundational principle to the Exchange Act. *Cf. Porter v. Warner Holding Co.*, 328 U.S. 395, 398 (1946) (explaining that a district court's "equitable powers assume a[] . . . broad[] and more flexible character" in proceedings where "the public interest is involved"). The SEC and the defendants stipulated that "[a] distribution to investors of the disgorgement amount requested would be infeasible." That stipulation presented the district court with two options: either let Island keep its ill-gotten gains, or direct that the money be paid to the Treasury. The district court reasonably found that it would be more equitable to direct the money be paid to the Treasury because it "would be inequitable that [Island] should make a profit out of [its] own wrong." *See Liu*, 591 U.S. at 79–80 (quoting *Root*, 105 U.S. at 207).

Island argues the district court abused its discretion because "equity requires clean hands," and the $114,520 in profits at issue here was paid by fraudsters—Mirman and Rose. The "clean hands" doctrine recognizes that "'he who comes into equity must come with clean hands,' and a party . . . 'tainted with . . . bad faith' 'closes the doors of a court of equity.'" *Arkin v. Pressman, Inc.*, 38 F.4th 1001, 1012 (11th Cir. 2022) (quoting *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814 (1945)). But Island doesn't explain how the *fraudsters'* unclean hands makes it fair to allow Island to profit from illegal conduct. "[E]quitable principles [do] not suggest that [Island] is entitled to the funds" merely because there are no investors that can be feasibly reimbursed. *See Burk Builders, Inc.*, 355 F.2d at 453.

3. *Causation*

Island's third challenge to the disgorgement award is that the SEC never showed a "causal connection" between the fees that Mirman and Rose paid Island and its wrongdoing.  Specifically, Island contends that the SEC didn't show causation because the jury found that it didn't "scheme" with Mirman and Rose to commit securities fraud.  But we conclude that the SEC showed a causal link between the fees and wrongdoing.

Spartan and Island, through Dilley and Eldred, worked in tandem—they were "sister companies" with common ownership, office space, equipment, and employees.  The evidence shows that they marketed themselves as a one-stop shop to get shell companies quoted through Spartan and then transferred through Island.  Mirman even testified that Dilley and Eldred told him that "in order for [him] to deal with their broker-dealer [Spartan], they would want [him] to deal with their transfer agent [Island] as well."  And as we've already discussed, this one-stop shop's shared employees repeatedly lied to take Mirman and Rose's companies public and help sell them—which is what Mirman and Rose paid for.  Island was ultimately each Mirman/Rose shell's transfer agent, with the exception of Envoy Group (an issuer that the district court disregarded when it ordered disgorgement).

4. *Reasonable approximation*

Lastly, Island argues that the SEC's approximation of Island's ill-gotten gains was "rife with errors" because it did not exclude legitimate expenses.  The company also argues that, because

the SEC didn't satisfy its burden of reasonably approximating the gains, the district court abused its discretion by shifting the burden to Island to prove the SEC's estimate was unreasonable. We conclude that the district court didn't abuse its discretion.

"The SEC is entitled to disgorgement upon producing a reasonable approximation of a defendant's ill-gotten gains." *SEC v. Calvo*, 378 F.3d 1211, 1217 (11th Cir. 2004). Ordering disgorgement of ill-gotten gains isn't "limited to confiscation of trading profits." *SEC v. Blavin*, 760 F.2d 706, 713 (6th Cir. 1985); *see also SEC v. Wash. Cnty. Util. Dist.*, 676 F.2d 218, 227 (6th Cir. 1982) (remanding for district court to order disgorgement of defendant's kickbacks from an underwriter's "fiscal agent fee"); *Blatt*, 583 F.2d at 1335–36 (reasoning that district court could order disgorgement of "fee[s] realized by each defendant for his assistance in executing the fraud," which included "legal fees" and fees paid "for [a defendant's] efforts in soliciting sellers"). The SEC has the initial burden of showing that its approximation of the gains is reasonable. *See Calvo*, 378 F.3d at 1217; *SEC v. First City Fin. Corp.*, 890 F.2d 1215, 1232 (D.C. Cir. 1989). If the SEC reasonably approximates the ill-gotten gains, "[t]he burden then shifts to the defendant to demonstrate that the SEC's estimate is not a reasonable approximation." *Calvo*, 378 F.3d at 1217.

Reasonableness doesn't require "[e]xactitude," *id.*, but a district "court's power to order disgorgement extends only to the amount with interest by which the defendant profited from his

wrongdoing. Any further sum would constitute a penalty assessment." *Blatt*, 583 F.2d at 1335. That means "courts must deduct legitimate business expenses" to "ensure that any disgorgement award falls within the limits of equity practice." *Liu*, 591 U.S. at 92.

Here the district court didn't abuse its discretion by finding that the SEC satisfied its initial burden of reasonably approximating Island's ill-gotten gains. The SEC initially requested that Island disgorge $147,508, which an SEC accountant calculated based on the "fees [Island was paid] from each of the [fourteen] Mirman/Rose companies through the date of the issuer's bulk sale." The SEC accountant relied on Island's own financial statements regarding each issuer, showing the fees that the shells paid. The SEC then acknowledged $125,720 would account for line-item expenses that Island argued were legitimate—specifically, "[p]rinting; CUSIP; credit memo; courier; DTC." The district court held the SEC to this "tacit[] agree[ment]" that $125,720 more accurately accounted for legitimate expenses.

Because Island's statements were evidence of the "fees [it] received for [its] role" in facilitating public trading of the Mirman/Rose securities, *see Blatt*, 583 F.2d at 1335–36, and because the adjusted estimate excluded legitimate expenses, the district court reasonably found that the SEC satisfied its initial burden, *Calvo*, 378 F.3d at 1217. And the district court then did what *Liu* requires district courts to do—it deducted other legitimate costs. The district court excluded three $200 payments made after the bulk sale date

of Aristocrat Group, Global Group, and On the Move.  It also excluded a $3,500 expense related to Kids Germ because of its "odd payment history."

Island argues that the district court abused its discretion by finding that the SEC satisfied its initial burden because the initial calculation was "rife with errors," which "included unsubstantiated fees and payments, fees paid after the bulk transfer date, and a failure to account for legitimate business expenses."  But Island's brief doesn't identify which fees the SEC included in its adjusted request that were "unsubstantiated."  Although the SEC's approximation included fees paid after the bulk transfer date, those amounts totaled—at most—$4,100 out of the SEC's estimate.  More "[e]xactitude" wasn't required.  *Calvo*, 378 F.3d at 1217.  To the extent Island argues that the district court should've excluded other allegedly "legitimate" expenses, including Island's fixed costs and overhead, Island hasn't shown that the district court abused its discretion in that respect either.  Island doesn't explain how the district court could've allocated its fixed costs to the thirteen transactions out of the many it processed.

Island also argues that the district court erroneously shifted the burden of proof, presuming that any risk of uncertainty in calculating the disgorgement amount fell onto Island.  But the district court applied the appropriate framework:  it found that the SEC satisfied its initial burden, it deducted legitimate expenses under *Liu*, and it determined that Island didn't rebut the SEC's showing as to other allegedly legitimate expenses.

So, in the end, the district court didn't abuse its discretion when it ordered disgorgement.

## Civil Penalties

The Exchange Act allows the SEC to seek monetary penalties "[f]or each violation." 15 U.S.C. § 78u(d)(3)(B)(i). A district court may "impose, upon a proper showing," those penalties against the violator. *Id.* § 78u(d)(3)(A)(i).

"The amount . . . shall be determined by the court in light of the facts and circumstances," *id.* § 78u(d)(3)(B)(i), and the maximum penalty allowed depends on the type of violation. "First tier" penalties, which "shall not exceed the greater of (I) $5,000 for a natural person or $50,000 for any other person, or (II) the gross amount of pecuniary gain to such defendant as a result of the violation," are the general rule. *Id.* "Second tier" penalties, which "shall not exceed the greater of (I) $50,000 for a natural person or $250,000 for any other person[] or (II) the gross amount of pecuniary gain," may be imposed if the violation "involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement." *Id.* § 78u(d)(3)(A)(ii). And "[t]hird tier" penalties, which "shall not exceed the greater of (I) $100,000 for a natural person or $500,000 for any other person[] or (II) the gross amount of pecuniary gain," may be imposed if the violation qualifies for tier two *and* "directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons." *Id.* § 78u(d)(3)(A)(iii).

The district court here ordered tier-two penalties against each defendant. It imposed a $150,000 penalty on Dilley and Eldred for violations relating to Envoy Group, Changing Technologies, First Xeris, Top to Bottom, and PurpleReal. It also ordered that Spartan and Island each pay a $250,000 penalty.

The defendants appeal the penalties on two grounds. First, they argue that the district court violated the Seventh Amendment by finding the facts necessary to establish the total civil-penalty amounts instead of allowing a jury to determine those facts. Second, Dilley, Spartan, and Island argue that the district court abused its discretion by not considering their respective abilities to pay the fines. Again, we disagree with both arguments.

1. *Right to jury trial*

The defendants' first challenge is that the district court violated their Seventh Amendment right to a jury trial. Specifically, they contend that the Seventh Amendment required a jury—not the district judge—to find (1) the facts necessary to establish tier-two penalties (that the violation "involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement," 15 U.S.C. section 78u(d)(3)(B)(ii)), and (2) the number of violations that each defendant was responsible for. We do not reach whether the Seventh Amendment required a jury to find those facts because the defendants' arguments fail for other reasons.

First, even if the district court couldn't order tier-two penalties without a jury finding of the qualifying facts—fraud, deceit, manipulation, or disregard of a regulatory requirement—the jury

here necessarily found deceit in this case as to each defendant. The jury held each defendant liable on count six. And count six required that the SEC prove deceit through either an "untrue statement" or an omission "necessary . . . to make the statements . . . not misleading." 17 C.F.R. § 240.10b-5(b). Thus, the jury's finding allowed the district court to order tier-two penalties without any additional factfinding. *See* 5 U.S.C. § 78u(d)(3)(B)(ii), which is what the district court did here.

Second, the defendants forfeited their assertion that the Seventh Amendment required a special jury finding on the number of violations. "[F]orfeiture is the failure to make the timely assertion of a right." *United States v. Campbell*, 26 F.4th 860, 872 (11th Cir. 2022) (en banc) (citation omitted). No defendant timely asserted a right to have the jury determine the number of violations before the district court submitted the case to the jury. Their motion for special interrogatories only sought a special jury finding as to the penalty tier.

The defendants argue that they preserved the number-of-violations issue because they "never wavered in their conviction that they were not liable—that they committed [zero] violations." But an assertion that the defendants weren't *liable* cannot preserve the issue that, if the jury found them liable, it should specify the number of violations on the verdict form.

2. *Defendants' ability to pay*

Next, Dilley, Spartan, and Island argue that the district court abused its discretion in determining the penalty amounts. They

contend that they lack the net worth and assets to pay the penalties that the district court ordered.  To that end, they argue that the district court should've considered their inability to pay before ordering penalties and that its failure to do so was an abuse of discretion.  Dilley, Spartan, and Island are mistaken for two independent reasons.

First, the district court *did* consider Dilley's ability to pay a $150,000 penalty, and it *did* consider Spartan and Island's ability to pay a $250,000 penalty.  The district court's remedies order expressly stated that it considered "all [of] the facts and circumstances," including "whether the penalt[ies] that would otherwise be appropriate should be reduced due to defendants' demonstrated current and future financial condition."

The second reason is one that Dilley, Spartan, and Island concede—even if the district court didn't consider their ability to pay the penalties, our precedent did not require it to consider that factor.  A district court abuses its discretion "when a relevant factor that should have been given significant weight is not considered." *Ameritas Variable Life Ins. Co. v. Roach*, 411 F.3d 1328, 1330 (11th Cir. 2005).  But we held in *Warren* that a wrongdoer's ability to pay Exchange Act penalties "does not merit significant weight."  534 F.3d at 1370.  "At most, ability to pay is one factor to be considered in imposing a penalty." *Id.*

Dilley, Spartan, and Island maintain that we got it wrong in *Warren*.  They argue that because the Eighth Amendment bars excessive fines, "ability to pay [Exchange Act penalties] is a factor that

should be given significant weight" by district courts.  Under our prior panel precedent rule, though, *Warren* binds us "unless and until it is overruled or undermined to the point of abrogation by the Supreme Court or by this court sitting *en banc." United States v. Archer*, 531 F.3d 1347, 1352 (11th Cir. 2008).

## The Dissenting Opinion

A few words about the dissenting opinion before we conclude.  We should reverse, it says, because the district court erred in denying the defendants' motions to dismiss the SEC's complaint as a shotgun pleading, and that error resulted in the district court's disqualification.  For two reasons, we disagree.  First, of the fourteen issues and sub-issues the defendants raised in this well litigated appeal, they never argued that we should reverse on shotgun-pleading or judicial-disqualification grounds.  *See Clark v. Sweeney*, No. 25-52, 2025 WL 3260170, at *1 (U.S. Nov. 24, 2025) ("In our adversarial system of adjudication, we follow the principle of party presentation." (quoting *United States v. Sineneng-Smith*, 590 U.S. 371, 375 (2020))).  Second, even if they did, those grounds would not support reversal.  *See Liteky v. United States*, 510 U.S. 540, 555 (1994) ("[J]udicial rulings alone almost never constitute a valid basis for a bias or partiality motion. . . .  Almost invariably, they are proper grounds for appeal, not for recusal."); *Fin. Info. Techs., LLC v. iControl Sys., USA, LLC*, 21 F.4th 1267, 1273 n.2 (11th Cir. 2021) ("[C]oncerns" about defectively pleaded claims "dissipate when, as

22-13129              Opinion of the Court              80

here," the claims "have been litigated and adjudicated in a full-blown trial.").[15]

## CONCLUSION

In short, the district court did not abuse its discretion when it allowed Cangiano to testify as an expert witness about a transfer agent's role in bringing securities to market. Neither did it err when it denied the defendants' motions for judgment as a matter of law—sufficient evidence showed that the defendants made material misrepresentations. And as to the remedies—all of which were timely under 28 U.S.C. section 2462 and section 21(d) of the Exchange Act—the district court didn't abuse its discretion. The Exchange Act authorizes ordering disgorgement to the Treasury, the disgorgement award here was equitable, causally related to Island's wrongdoing, and it accounted for Island's legitimate expenses. Regarding civil penalties, the jury's finding supported the tier-two penalties, and the district court adequately considered the defendants' ability to pay those penalties.

**AFFIRMED**.

---

[15] The *Dupree* exception, which "extends to a purely legal issue resolved at summary judgment," does not apply here. *See Dupree v. Younger*, 598 U.S. 729, 731 (2023). The shotgun pleading issue in this case was not resolved at summary judgment. And dismissing a complaint as a shotgun pleading is partly a discretionary, rather than a purely legal, call. *See Barmapov v. Amuial*, 986 F.3d 1321, 1324 (11th Cir. 2021) ("When a district court dismisses a complaint because it is a shotgun pleading, we review that decision for abuse of discretion.").

22-13129                TJOFLAT, J., Dissenting                    1

TJOFLAT, Circuit Judge, dissenting:

### INTRODUCTION

The Securities and Exchange Commission ("SEC") filed a complaint that was repugnant to every Federal Rule of Civil Procedure governing the filing of complaints in the United States District Courts. It stood in blatant defiance of Eleventh Circuit and Supreme Court precedent. Yet when the defendants directed the District Court's attention to the complaint's glaring deficiencies in their motion to dismiss, the Court denied the motion and marched onward.[1]

The SEC's complaint was brought against four defendants, Spartan Securities ("Spartan"), Island Stock Transfer ("Island"), Carl Dilley, and Micah Eldred. It presented more than 300 causes of action, 260 of which alleged securities fraud taking place over the span of three to four years. Rule 9(b) of the Federal Rules of Civil Procedure required the SEC's complaint to "state with particularity the circumstances constituting" each fraud-based cause of action. Fed. R. Civ. P. 9(b). But it did no such thing.

Instead, the SEC pleaded fourteen counts as conclusory statements of law paired with a sentence realleging the complaint's first 122 paragraphs. These 122 paragraphs essentially encompassed the SEC's entire investigative report, detailing wide-ranging conduct by both the defendants and third parties. Antonyms for

---

[1] The Honorable Virginia M. Hernandez Covington presided over the district court proceedings.

22-13129                TJOFLAT, J., Dissenting                2

"with particularity," like "generally," "imprecisely," or "indefinitely" more aptly describe how the SEC pleaded the fraud.

In the months of pretrial discovery that followed, the SEC steadfastly refused defense counsel's request to inform the defendants of the fraudulent acts and statements for which they would be standing trial. It was not until the trial concluded that the District Court effectively assumed the SEC's Rule 9(b) pleading obligation and notified the defendants of the fraud it thought the SEC had alleged.

The jury convicted the defendants on *only one of the SEC's fourteen* counts. That count, Count VI, alleged that the defendants "knowingly or recklessly made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made . . . not misleading." As indicated *infra,* Count VI presented fifty-two causes of action: nineteen against Spartan, fourteen against Island, fourteen against Dilley, and five against Eldred. The jury returned a verdict against each defendant on Count VI without identifying the misrepresentations or omissions on which it based its verdict. After denying the defendants' renewed motion for judgment as a matter of law, the District Court entered a final judgment awarding the SEC the remedies it sought.

The defendants appeal. Their best argument for reversal is that the District Court erred in denying their motion to dismiss. Unfortunately, when they filed their appeal, binding Eleventh Circuit precedent precluded that argument because a full trial had taken place. *See Fin. Info. Techs., LLC v. iControl Sys., USA, LLC,* 21

F.4th 1267, 1273 n.2 (11th Cir. 2021) (refusing to review pleading deficiencies because "those concerns dissipate when, as here, the alleged trade secrets have been litigated and adjudicated in a full-blown trial"); *American Builders Ins. Co. v. Southern-Owners Ins. Co.*, 56 F.4th 938, 950 (11th Cir. 2023) ("Our Circuit has no such legal-issue exception to the general rule that 'a party may not appeal an order denying summary judgment after there has been a full trial on the merits.'" (quoting *Carrizosa v. Chiquita Brands Int'l, Inc.*, 47 F.4th 1278, 1339 (11th Cir. 2022))). After briefing closed, however, the United States Supreme Court overruled our precedent with *Dupree v. Younger*, 598 U.S. 729, 143 S. Ct. 1382 (2023).[2] The Courts of Appeals, *Dupree* explained, may review a pretrial question of law following the entry of judgment pursuant to a jury verdict without re-raising the question in a post-trial motion. *Id.* at 734, 143 S. Ct. at 1398.

The Majority dedicates but one footnote to *Dupree*. Relying on our now-overruled precedent, it suggests that pleading-deficiency arguments cannot be vetted by this Court after trial. Maj. Op. at 79–80. This, of course, stands in contrast to the longstanding principle that "an appeal from a final judgment permits review of all rulings that led up to the judgment." Fed. R. App. P. 3 advisory

---

[2] *Dupree* specifically cited *American Builders* as a decision requiring a "post-trial motion to preserve claims of pure legal error"—the exact type of decision it proceeded to overrule. 598 U.S. at 733 n.2, 143 S. Ct. at 1388 n.2.

22-13129                TJOFLAT, J., Dissenting                4

committee's note to 2021 amendment; *Dupree*, 598 U.S. at 734, 143 S. Ct. at 1389 ("[T]he general rule is that a party is entitled to a single appeal, to be deferred until final judgment has been entered, in which claims of district court error *at any stage of the litigation* may be ventilated." (internal quotation marks omitted) (emphasis added) (quoting *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 712, 116 S. Ct. 1712, 1718 (1996))).

What's more, the Majority contends that the "principle of party presentation" precludes us from even considering the issue. Maj. Op. at 79–80. The Majority explains we cannot look beyond the four corners of the parties' briefing to spot plain error—in total disregard of our en banc opinion in *United States v. Campbell*, 26 F.4th 860, 865 (11th Cir. 2022) (en banc), cert. den. *Campbell v. United States*, 143 S. Ct. 95 (2002) ("[W]e may exercise our discretion to consider issues not raised by the parties on appeal.").

The error here was plain indeed. As explained in the discussion that follows, the SEC's complaint was insufficient under Federal Rules of Civil Procedure 8(a)(2), 9(b), 10(b), and 11(b). It also failed to state a claim sufficient to survive Rule 12(b)(6) and the Supreme Court's decision in *Ashcroft v. Iqbal*, because the allegations lacked "sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974 (2007)).

This Dissent is about process. The conduct of the SEC in prosecuting the fourteen counts of its complaint and of the District

22-13129          TJOFLAT, J., Dissenting                    5

Court in handling the litigation was so devoid of fundamental fairness and respect for due process that this Court's affirmance of the District Court's judgment constitutes a manifest miscarriage of justice.

## I. BACKGROUND AND THE SEC'S COMPLAINT

### A. The "Shell Factory" Schemes

Two schemes gave rise to this litigation, each involving the fraudulent public registration of "shell companies"—companies with no real assets or operations—with the ultimate goal of selling the shells to private companies that could "go public" fast. The primary culprits were Alvin Mirman, Sheldon Rose, Michael Daniels, Andy Fan, and Dianne Harrison (collectively, the "Fraudsters"). The Fraudsters are not parties to this litigation; Mirman and Rose pleaded guilty to criminal charges in 2016, and Daniels, Fan, and Harrison entered into consent decrees with the SEC in 2018.

In the first operation, Alvin Mirman and Sheldon Rose registered the securities of fourteen shell companies (the "Mirman/Rose Companies") under SEC Form S-1,[3] fraudulently representing that the shells were operating companies with real business plans and independent management. The second operation was essentially identical: Daniels, Fan, and Harrison registered five shell

---

[3] Form S-1 is an SEC form used to publicly register securities under the Securities Act of 1933. *See* U.S. Sec. and Exch. Comm'n, *Form S-1, Registration Statement Under the Securities Act of 1933* (OMB 3235-0065), https://www.sec.gov/files/forms-1.pdf.

companies (the "Daniels Companies") with fraudulent Form S-1 filings.

Although these securities were now registered with the SEC, they were not listed on any exchange. And while they could technically be sold on "over-the-counter" markets, they would not benefit from any meaningful liquidity until at least one broker, acting as a market-maker, was allowed to issue "quotations" (i.e., offers to buy or sell the securities at a specific price). Such authority required a FINRA-registered broker-dealer to file a Form 211, certifying that it had performed the obligations imposed by SEC Rule 15c2-11. *See* 17 C.F.R. § 240.15c2-11.

Enter Spartan, a FINRA-registered broker-dealer that frequently filed Forms 211 as part of its business model. Between 2010 and 2014, Spartan filed Form 211 applications with FINRA for all fourteen Mirman/Rose Companies and all five Daniels Companies. Dilley and Eldred, registered principals and representatives of Spartan, assisted Spartan in filing the Form 211 applications. Island served as the shell companies' transfer agent and recorded share ownership, at the direction of the companies, to facilitate the issuances and transfers of securities.

After FINRA approved the Forms 211 and Spartan published quotations for the shell companies' securities, the Fraudsters had accomplished their objective. The shells were sold to real businesses, which, through reverse mergers, were transformed into public companies with highly liquid securities. The Fraudsters, of course, reaped the lion's share of the proceeds from the shell sales.

22-13129            TJOFLAT, J., Dissenting                7

## B. The SEC's Complaint

The SEC filed its 14-count complaint in this case on February 20, 2019. Counts I, II, and XIV were "non-fraud" counts, alleging that the defendants did not have a reasonable basis to file the Forms 211. Counts III through XIII were "fraud" counts, alleging that the defendants either committed fraud or aided and abetted the Fraudsters' fraud in connection with the sale of securities. Every count asserted multiple causes of action—in some cases, dozens. And each cause of action was expressed as a pure legal conclusion with a statement incorporating the first 122 paragraphs of the complaint. Although repetitive, I will now describe how each count was pleaded, in an effort to convey the SEC's utter disregard for the Federal Rules of Civil Procedure.

### 1. The Non-fraud Counts

#### *Count I*

The SEC brought Count I against Spartan alone. With nothing but a wholesale incorporation of the first 122 paragraphs of the complaint, Count I alleged that from January 2010 through May 2014, Spartan "published quotations for securities or . . . submitted quotations for publication . . . without having a reasonable basis for believing, based on a review of the documents and information required by Rule 15c2-11(a)(1)[4] . . . that the . . . information was

---

[4] Rule 15c2-11 provides, in relevant part:

> [I]t shall be unlawful for . . . [a] broker or dealer to publish any quotation for a security or, directly or indirectly, to submit any

22-13129                TJOFLAT, J., Dissenting                8

accurate in all material respects and that the sources of that information were reliable."

Count I appeared to apply to all nineteen Forms 211 Spartan filed on behalf of the Fraudsters. But each filing was a separate transaction, occurring on a separate date, and respecting a different entity. Therefore, Count I stated a minimum of nineteen causes of action. It provided no specificity as to how Spartan's investigation was inadequate or why the documents it reviewed were unreliable.

*Count II*

---

such quotation for publication, in any quotation medium, unless . . .

(A) Such broker or dealer has in its records the documents and information specified in paragraph (b) of this section;

(B) Such documents and information specified in paragraph (b) of this section (excluding paragraphs (b)(5)(i)(N) through (P) of this section) are current and publicly available; and

(C) Based upon a review of the documents and information specified in paragraph (b) of this section, together with any other documents and information required by paragraph (c) of this section, such broker or dealer has a reasonable basis under the circumstances for believing that:

> (1) The documents and information specified in paragraph (b) of this section are accurate in all material respects; and

> (2) The sources of the documents and information specified in paragraph (b) of this section are reliable[.]

17 C.F.R. § 240.15c2-11.

22-13129                TJOFLAT, J., Dissenting                9

Count II alleged that Dilley and Eldred, and Spartan's Chief Compliance Officer David Lopez,[5] "knowingly or recklessly provided substantial assistance" to Spartan's violations alleged in Count I. According to the 122 paragraphs, Dilley assisted Spartan's publication of quotations for the fourteen Mirman/Rose Companies' securities between January 2011 and March 2014, and Eldred assisted the publication of quotations for the five Daniels Companies' securities between June 2011 and May 2014. Lopez allegedly helped Spartan approve certain deficiency letters from FINRA in connection with the Form 211 filings for six of the fourteen Mirman/Rose Companies.

Count II presented at least twenty-five causes of action. To prevail on the causes of action, the SEC would have to prove that Spartan published or submitted for publication quotations for securities, as alleged in Count I, on a specific date. The 122 paragraphs never identify these specific dates, nor do they indicate the specific manner in which Dilley, Eldred, and Lopez assisted Spartan's unspecified Rule 15c2-11 violations.

### Count XIV

Count XIV alleged that Spartan, Island, and Dilley "directly or indirectly . . . [sold] securities . . . when no registration statement was in effect with the Commission as to such securities" and "offer[ed] to sell such securities when no registration statement had

---

[5] Lopez was charged only in Count II, for which the jury returned a verdict of not guilty. Accordingly, Lopez is not a party to this appeal.

22-13129            TJOFLAT, J., Dissenting            10

been filed with the Commission as to such securities," in violation of Sections 5(a) and (c) of the Securities Act of 1933 ("Securities Act").

Like the other counts, this allegation was a mere legal conclusion. The 122 paragraphs may have provided some predicate facts for the violations of Sections 5(a) and (c), but they did not identify the securities to which they referred. Nor did they mention when and to whom Spartan, Island, and Dilley sold and offered to sell the securities. Thus, it is not possible to determine how many causes of action Count XIV actually presented without speculation.

## 2. The Fraud Counts

Counts III through XIII alleged fraud. Like the non-fraud counts, each fraud count contained several causes of action expressed as pure legal conclusions. And, despite Rule 9(b)'s mandate that these counts be pled with particularity, the SEC only vaguely gestured toward fraud. To identify the predicate facts in support of each count, the SEC, again, pointed the defendants and the Court to the first 122 paragraphs in the complaint.

I turn first to the causes of action brought under Section 17(a) and then to those brought under Section 10(b).[6]

Section 17(a) states in relevant part:

---

[6] The conduct proscribed by Section 17(a)(1)–(3) and Rule 10b-5(a)–(c) is the same. Section 17(a) applies to the offer or sale of securities. Rule 10b-5 applies to the purchase or sale of securities.

22-13129                 TJOFLAT, J., Dissenting                 11

It shall be unlawful for any person in the offer or sale
of any securities . . . directly or indirectly—

(**1**) to employ any device, scheme, or artifice to
defraud, or

(**2**) to obtain money or property by means of any
untrue statement of a material fact or any omis-
sion to state a material fact necessary in order to
make the statements made, in light of the circum-
stances under which they were made, not mis-
leading; or

(**3**) to engage in any transaction, practice, or
course of business which operates or would oper-
ate as a fraud or deceit upon the purchaser.

15 U.S.C. § 77q(a).

*Count III*

Count III alleged that, from December 2009 through July
2014, Spartan, Island, and Dilley violated Section 17(a)(1) by "em-
ploy[ing] [a] device, scheme or artifice to defraud" in connection
with the fourteen Mirman/Rose Companies. Separately, it alleged
that, from May 2011 through August 2014, Spartan and Eldred vi-
olated Section 17(a)(1) in the same way with respect to the five
Daniels Companies.

Referring to the complaint's 122 paragraphs, Count III ap-
pears to present fifty-two causes of action: nineteen against Spar-
tan, fourteen against Island, fourteen against Dilley, and five
against Eldred. Count III did not, with respect to each cause of ac-
tion, "state with particularity the circumstances constituting fraud"

or state predicate facts necessary to withstand a motion to dismiss under Rule 9(b). Fed. R. Civ. P. 9(b). And even if Spartan, Island, Dilley, and Eldred did partake in the "offer or sale" of securities—the details of which are left to the imagination—the paragraphs did not describe the "device, scheme, or artifice to defraud" they employed or even explain whom they defrauded.

### Count IV

Count IV alleged that, from December 2009 through July 2014, Spartan, Island, and Dilley violated Section 17(a)(3) by "negligently engag[ing] in transactions, practices and courses of business which operated . . . as a fraud or deceit" in connection with the fourteen Mirman/Rose Companies. It separately alleged that, from May 2011 through August 2014, Spartan and Eldred violated Section 17(a)(3) in the same way with respect to the five Daniels Companies.

Count IV also presented fifty-two causes of action: nineteen against Spartan, fourteen against Island, fourteen against Dilley, and five against Eldred. But the 122 paragraphs did not remotely "state with particularity the circumstances constituting fraud" or state predicate facts necessary to survive a motion to dismiss. Fed. R. Civ. P. 9(b). The SEC did not identify how the defendants "engage[d] in . . . transaction[s], practice[s], or course[s] of business which operate[d] . . . as a fraud or deceit upon the purchaser[s]" of the securities. 15 U.S.C. § 77q(a)(3).

### Counts VIII, IX, and X

Counts VIII, IX, and X alleged that, from December 2009

22-13129          TJOFLAT, J., Dissenting          13

through July 2014, Spartan, Island, and Dilley, "knowingly or recklessly provided substantial assistance to Mirman and Rose's" violations of Section 17(a)(1), (2), and (3).[7] The counts separately alleged that Spartan and Eldred "knowingly or recklessly provided substantial assistance to Daniels, Fan, and Harrison's" violations of Section 17(a)(1), (2), and (3).[8]

How many aiding and abetting causes of action Counts VIII, IX, and X presented is unknowable. To prove any of these causes of action, the SEC would have to establish first that the Fraudsters violated Section 17(a) in a specific timeframe and in a specific manner. The SEC does not allege with particularity what the schemes, misstatements, or deceitful business practices were that formed the Section 17(a) violations. *See* Fed. R. Civ. P. 9(b). And even if the facts presented were sufficient to identify the Fraudsters' Section 17(a) violations, they certainly did not reveal precisely what Spartan, Island, Dilley, and Eldred did to assist those violations.

⋆          ⋆          ⋆

Now for the Rule 10b-5 counts. Rule 10b-5 states in relevant part:

It shall be unlawful for any person . . .

---

[7] Count VIII alleged violations of Section 17(a)(1), Count IX alleged violations of Section 17(a)(2), and Count X alleged violations of Section 17(a)(3).

[8] Again, Count VIII alleged violations of Section 17(a)(1), Count IX alleged violations of Section 17(a)(2), and Count X alleged violations of Section 17(a)(3).

22-13129                TJOFLAT, J., Dissenting                14

> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
>
> in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

### *Count V*

Count V alleged that, from December 2009 through July 2014, Spartan, Island, and Dilley violated Rule 10b-5(a) by "knowingly or recklessly employ[ing] devices, schemes or artifices to defraud in connection with the purchase or sale of securities" of the fourteen Mirman/Rose Companies. It separately alleged that, from May 2011 through May 2014, Spartan and Eldred did the same with respect to the five Daniels Companies.

Count V presented fifty-two causes of action: nineteen against Spartan, fourteen against Island, fourteen against Dilley, and five against Eldred. Count V did not "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). The 122 paragraphs incorporated therein failed to describe the "device,

22-13129                TJOFLAT, J., Dissenting                15

scheme, or artifice" the defendants employed or identify the person(s) or entity(ies) they defrauded. 17 C.F.R. § 240.10b-5(a); 15 U.S.C. § 77q(a)(1).

### Count VI

Count VI alleged that, from December 2009 through April 2014, Spartan, Island, and Dilley violated Rule 10b-5(b) by "knowingly or recklessly ma[king] untrue statements of material facts and omit[ting] to state material facts necessary in order to make the statements made . . . not misleading" in connection with the fourteen Mirman/Rose Companies. It separately alleged that, from May 2011 through May 2014, Spartan and Eldred violated Rule 10b-5(b) in exactly the same way with respect to the five Daniels Companies.

Like Count V, Count VI presented fifty-two causes of action: nineteen against Spartan, fourteen against Island, fourteen against Dilley, and five against Eldred. Count VI did not "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). The 122 paragraphs incorporated therein failed to identify the defendants' specific material misstatements and omissions, let alone when they were made or to whom they were made.

### Count VII

Count VII alleged that, from December 2009 through July 2014, Spartan, Island, and Dilley violated Rule 10b-5(c) by "directly and indirectly . . . knowingly or recklessly engag[ing] in acts, practices and courses of business which operated . . . as a fraud or deceit upon any person" in connection with the fourteen Mirman/Rose

22-13129                    TJOFLAT, J., Dissenting                    16

Companies. It separately alleged that, from May 2011 through May 2014, Spartan and Eldred did the same with respect to the five Daniels Companies.

Like Counts V and VI, Count VII presented fifty-two causes of action: nineteen against Spartan, fourteen against Island, fourteen against Dilley, and five against Eldred. Count VII did not "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). The 122 paragraphs did not identify the predicate acts required to state a Rule 10b-5(c) cause of action sufficient to withstand a motion to dismiss because they did not describe the defendants' "engage[ment] in . . . act[s], practice[s], or course[s] of business which operate[d] . . . as a fraud or deceit" upon the purchasers of the securities. 17 C.F.R. § 240-10b-5(c). Nor did the paragraphs identify the person(s) or entity(ies) who purchased or sold the securities.

*Counts XI, XII, and XIII*

Counts XI, XII, and XIII alleged that Spartan, Island, and Dilley "knowingly or recklessly provided substantial assistance to Mirman and Rose's" violations of Rule 10b-5(a), (b), and (c).[9] They separately alleged that Spartan and Eldred "knowingly or recklessly

---

[9] Count XI alleged violations of Rule 10b-5(a), Count XII alleged violations of Rule 10b-5(b), and Count XIII alleged violations of Rule 10b-5(c).

22-13129                TJOFLAT, J., Dissenting                17

provided substantial assistance to Daniels, Fan and Harrison's"
Rule 10b-5(a), (b), and (c) violations.[10]

How many aiding and abetting causes of action Counts XI,
XII, and XIII presented cannot be determined from the complaint.
It would require grand speculation to fix the number of Rule 10b-
5(a), (b), and (c) violations the Fraudsters committed in nearly four
years. Moreover, as with Counts VIII, IX, and X, it would be well-
nigh impossible to discern from the 122 paragraphs both whether
the purported Rule 10b-5(a), (b), and (c) violations had the required
predicate factual support and what Spartan, Island, Dilley, and El-
dred may have done to assist the respective Mirman and Rose and
Daniels, Fan, and Harrison violations.

⋆          ⋆          ⋆

The SEC's complaint presented the District Court with a
case that, at first blush, appeared to be unmanageable. Counts I
through VII of the complaint presented 304 causes of action, 260 of
which alleged fraud. The aiding and abetting counts contained
even more causes of action, albeit incalculable. Most counts in-
cluded multiple groupings of defendants and a myriad of different
transactions. There was nary one application of fact to law. Rather,
each count was written as an entirely speculative legal conclusion.

We condemned these types of pleadings thirty years ago in
*Fikes v. City of Daphne*:

---

[10] Again, Count XI alleged violations of Rule 10b-5(a), Count XII alleged viola-
tions of Rule 10b-5(b), and Count XIII alleged violations of Rule 10b-5(c).

22-13129          Tjoflat, J., Dissenting          18

> By combining several claims for relief in each count, [lawyers] disregard[] the rules governing the presentation of claims to a district court. Federal Rule of Civil Procedure 8(a)(2) requires a pleader, in setting forth a claim for relief, to present "a short plain statement of the claim showing that the pleader is entitled to relief." Federal Rule of Civil Procedure 10(b) provides that "[a]ll averments of claim shall be made in separate paragraphs, the contents of each of which shall be limited as far as practicable to a statement of a single set of circumstances . . . ." Moreover, "each claim founded upon a separate transaction or occurrence . . . shall be stated in a separate count whenever a separation facilitates the clear presentation of the matters set forth." These rules work together "to require the pleader to present his claims discretely and succinctly, so that his adversary can discern what he is claiming and frame a responsive pleading, the court can determine which facts support which claims and whether the plaintiff has stated any claims upon which relief can be granted, and, at trial, the court can determine that evidence which is relevant and that which is not."

79 F.3d 1079, 1082 (11th Cir. 1996) (alterations adopted) (quoting *T.D.S. Inc. v. Shelby Mut. Ins. Co.*, 760 F.2d 1520, 1543 n.14 (11th Cir. 1985) (Tjoflat, J., dissenting)).

The Supreme Court has also elaborated on what is required to satisfy Rule 8(a)(2). In *Iqbal*, it held that a cause of action must "contain sufficient factual matter . . . to 'state a claim to relief that

is plausible on its face.'" 556 U.S. at 678, 129 S. Ct. at 1949 (quoting *Twombly*, 550 U.S. at 570, 127 S. Ct. at 1974). "A claim has facial plausibility when the . . . plead[ed] factual content . . . allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. Perhaps it should go without stating, but the Supreme Court's use of the singular nouns "cause of action" and "claim" means that the requisite factual content must exist and be traceable with respect to *each* cause of action.

All of this background is at play before Rule 9(b) enters the picture. When a plaintiff alleges fraud, Rule 9(b) adds to the other Federal Rules of Civil Procedure, like Rules 8(a)(2) and 10(b). A plaintiff alleging fraud must not only plead factual content sufficient to create an inference of liability under *Iqbal* but also "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b).

Consider the Count VI allegation that Dilley violated Section 10(b) of the Securities Act and Rule 10b-5(b) thereunder. The SEC was obligated to plead exactly how Dilley carried out the alleged fraud. It should have alleged that, at a given point in time and place, in connection with the purchase or sale of specifically identified securities, Dilley made a specific untrue statement of material fact to a specific person or entity or in a specific document and omitted to state a specific material fact necessary to make other specific statements not misleading. Anything short of this would necessarily (1) fail Rule 10(b)'s mandate to break up different causes of action; (2) fail to create an inference of fraud under Rule 8(a)(2)

22-13129                TJOFLAT, J., Dissenting                20

and *Iqbal*; or (3) fail to comply with Rule 9(b)'s particularity require-ment. Here, the SEC failed on all three fronts.

## II. THE DEFENDANTS' MOTION TO DISMISS, THE SEC'S RESPONSE, AND THE DISTRICT COURT'S ORDER

On April 22, 2019, the defendants moved to dismiss the com-plaint, arguing that the SEC "fail[ed] to state a claim upon which relief can be granted."[11] *See* Fed. R. Civ. P. 12(b)(6). Specifically, the defendants argued that the SEC did not comply with Rule 8(a) or Rule 9(b) and that the complaint was an impermissible "shotgun pleading."[12]

On June 5, 2019, the District Court denied the defendants' Motion to Dismiss, rejecting each of their arguments. I now walk through the defendants' contentions, the SEC's response, and how the Court reached its conclusions.

---

[11] Two motions to dismiss were filed: one by Eldred, and the other by Spartan, Island, and Dilley. For convenience, I consider the motions as one.

[12] The defendants also argued that the claims were time-barred by 28 U.S.C. § 2462 and that, under a recent Supreme Court ruling, they could not be liable for the Fraudsters' misrepresentations because they were not the "maker[s]" of any fraudulent statements. Defs.' Mot. to Dismiss 6–7, 27–30; *see Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142, 131 S. Ct. 2296, 2302 (2011). However, the pleading-deficiency arguments are the focus of this Dis-sent.

## A. Rule 8(a)

First, the defendants asserted that all fourteen counts violated Rule 8(a)(2) because they did not state a short and plain statement of the claim "show[ing] that the [SEC was] entitled to relief." Defs.' Mot. to Dismiss 15; *see* Fed. R. Civ. P. 8(a)(2). They argued that the counts alleged mere conclusions of law, which are not granted an assumption of truth, and that the counts otherwise lacked the predicate facts, "accepted as true, to 'state a claim to relief that is plausible on its face.'" Defs.' Mot. to Dismiss 3 (quoting *Iqbal*, 556 U.S. at 678, 129 S. Ct. at 1949).

The SEC disagreed. But its argument for Rule 8(a)(2) compliance was as conclusory as the complaint itself:

> [T]o satisfy the liberal notice pleading standards of Rule 8(a), the Commission must do nothing more than set forth "a short and plain statement of the claim showing that the pleader is entailed [sic] to relief." The Court's inquiry at the motion to dismiss stage still focuses on whether the challenged pleadings "give the defendant fair notice of what the . . . claim is and the grounds on which it rests." The Commission has satisfied this pleading standard.

Pl.'s Resp. to Mot. to Dismiss 6–7 (internal citations omitted).

Evidently, that explanation was enough for the District Court. After quoting *Iqbal*, it held that "[t]he SEC's 62-page, 191-paragraph Complaint contains more than enough detail to satisfy Rule 8(a)'s notice pleading requirements." *United States Sec. & Exch. Comm'n v. Spartan Sec. Grp., LTD*, No. 8:19-CV-448-T-33CPT, 2019

WL 2372277, at *3 (M.D. Fla. June 5, 2019). It had nothing further to say on the matter.

### B. Rule 9(b)

Second, the defendants argued that the fraud counts should be dismissed because they did not state with particularity the circumstances constituting the fraud. Defs.' Mot. to Dismiss 3–4; Fed. R. Civ. P. 9(b). Citing *FindWhat Investor Group v. FindWhat.com*, 658 F.3d 1282, 1296 (11th Cir. 2011), the defendants pointed out that where a cause of action is brought under Rule 10b-5(b), as in Count VI, the complaint must:

> set forth (1) precisely what statements or omissions were made; (2) the time and place of each statement; (3) the manner in which they misled the investor; and (4) what the defendant obtained as a result of the fraud.

Defs.' Mot. to Dismiss 4. Instead, the defendants wrote, the SEC exhibited "no effort to state with particularity which specific factual allegations apply to which claim for relief, leaving Defendants unable to discern the exact nature of the charges." *Id.* at 5.

The SEC disagreed, but its argument for Rule 9(b) compliance was, again, conclusory:

> The complaint need only provide a reasonable delineation of the underlying acts and transactions constituting the fraud. A complaint pleads fraud with particularity if it alleges the substance of the fraudulent acts, who engaged in the fraud, and when the fraud occurred. Under those standards, the Commission's

> detailed Complaint, which includes 122 paragraphs of underlying facts of who, what, when, where, and how satisfies the requirements for pleading fraud with particularity.

Pl.'s Resp. to Mot. to Dismiss 7–8 (internal citations omitted).

The Court agreed with the SEC, finding that the complaint "provides specific details on [Spartan] and [Island]'s alleged roles in serving as a one-stop shop for issuers of microcap securities that were later found to have violated federal securities laws." *Spartan Sec. Grp.*, 2019 WL 2372277, at \*3. It continued, "[the complaint] alleges the date, substance, and persons responsible for numerous statements and omissions in FINRA and Depository Trust Corporation (DTC) related filings . . . . Therefore, the Court finds the Complaint's factual allegations satisfy the particularity pleading requirements of Rule 9(b)." *Id.*

## C. Shotgun Pleading

Third, the defendants argued that the complaint was a quintessential shotgun pleading. Citing *Wagner v. First Horizon Pharmaceutical*, 464 F.3d 1273, 1279 (11th Cir. 2006), they correctly asserted that shotgun pleadings include "those that incorporate every antecedent [allegation] by reference into each subsequent claim for relief." Defs.' Mot. to Dismiss 5. Here, the defendants explained, "each of the 14 counts repeats and incorporates paragraphs one through 122, which contain *all* factual allegations, irrespective of to which defendant, issuer, time period, or 'scheme' they relate."

*Id*. at 5 (emphasis in original); *see Davis v. Coca-Cola Bottling Co. Consol.*, 516 F.3d 955, 980 (11th Cir. 2008) (holding a complaint to be a shotgun pleading because it contained "untold causes of action, all bunched together in one count contrary to the requirements of" Rule 10(b)).[13]

The SEC disagreed. It cited the District Court's recent decision in *Terry v. Interim Healthcare Gulf Coast, Inc.*, No. 8:18-CV-692-T-33JSS, 2018 WL 1992276, at *2 (M.D. Fla. Apr. 27, 2018), for the proposition that a "complaint that re-alleges just the factual allegations and does not re-allege each count, is different from a typical shotgun pleading." Pl.'s Resp. to Mot. to Dismiss 9.

The District Court sided with the SEC. It began by correctly identifying one of our finest cases detailing this Circuit's law on shotgun pleadings: *Weiland v. Palm Beach County Sheriff's Office*, 792

---

[13] In *Davis*, we explained:

> Rule 8(a)(2) . . . requires a complaint to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Rule 10(b) instructs that "[E]ach claim founded upon a separate transaction or occurrence . . . shall be stated in a separate count . . . whenever a separation facilitates the clear presentation of the matters set forth." Fed. R. Civ. P. 10(b) (emphasis added.).

516 F.3d at 980 n.57.

We then explained the plaintiff's complaint "failed to conform to these instructions . . . [because it] contained in one count a host of claims based on discrete acts . . . committed by [the defendants] against different plaintiffs at different times." *Id*.

F.3d 1313, 1321–23 (11th Cir. 2015). But rather than exploring the full scope of that opinion, the Court quickly turned to its decision in *Terry* for a narrower inquiry. It concluded that the complaint was not a shotgun pleading because "each count does not incorporate the prior count." *Spartan Sec. Grp.*, 2019 WL 2372277, at *3.

### III. PRECEDENT REQUIRED THE COMPLAINT BE DISMISSED

### A. The District Court Got the Law Wrong

The District Court was wrong. The SEC's complaint failed to comply with Rules 8(a), 9(b), and 10(b) and was a quintessential shotgun pleading. Because our caselaw on shotgun pleadings incorporates the underlying policy goals of each of the three aforementioned rules, I discuss the complaints' multitude of failures as one.

By way of background, in *Weiland*, then Chief Judge Ed Carnes identified the most common types of shotgun complaints that have been condemned in the Eleventh Circuit:

> [1] the most common type . . . is a complaint containing multiple counts where each count adopts the allegations of all preceding counts, causing each successive count to carry all that came before and the last count to be a combination of the entire complaint. [2] The next most common type . . . is a complaint that does not commit the mortal sin of re-alleging all preceding counts but is guilty of the venial sin of being replete with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action. [3] The third type of shotgun pleading is

one that commits the sin of not separating into a different count each cause of action or claim for relief. [4] Fourth, and finally, there is the relatively rare sin of asserting multiple claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions, or which of the defendants the claim is brought against. The unifying characteristic of all types of shotgun pleadings is that they fail to one degree or another, and in one way or another, to give the defendants adequate notice of the claims against them and the grounds upon which each claim rests.

792 F.3d at 1321–23.

Now, back to *Terry*. In that case, decided by the District Court just thirteen months before its ruling on the defendants' motion to dismiss in the instant case, the District Court demonstrated a perfect application of *Weiland*. That is, it asked whether the plaintiff's complaint fell into any of the four categories of shotgun pleading that our Court refuses to tolerate. 2018 WL 1992276, at *2. And it walked through the proper analysis for each. *Id.* at *2–3. But when the Court revisited its *Terry* opinion for application to the instant case, it looked only at its discussion of *Weiland*'s first shotgun pleading category. At no point in its analysis did the District Court consider the second, third, or fourth type.

How it accomplished this feat is remarkable. To make *Weiland*'s first category appear exhaustive, the District Court took a jaw-dropping liberty in crafting an explanatory parenthetical. Referring to the SEC's complaint, the District Court wrote:

22-13129                TJOFLAT, J., Dissenting                27

> While each count incorporates by reference all the
> factual allegations, each count does not incorporate
> the prior count. . . . *Terry v. Interim Healthcare Gulf
> Coast, Inc.*, No. 8:18–cv–692–T-33JSS, 2018 WL
> 1992276, at *2 (M.D. Fla. Apr. 27, 2018) (***explaining a
> complaint that re-alleges just the factual allegations
> and does not re-allege each count is not a shotgun plead-
> ing***). . . . Therefore, the Complaint is not a shotgun
> pleading.

*Spartan Sec. Grp.*, 2019 WL 2372277, at *3 (emphasis added).

Where did the District Court find support in *Terry* for this emphatic proposition? Its citation leads us to the following passage:

> A complaint that re-alleges just the factual allegations
> and does not re-allege each count, like the Complaint
> at issue, is ***different from a typical shotgun pleading***
> and should be treated as such. *Weiland*, 792 F.3d at
> 1324 (holding that a complaint was not a shotgun
> pleading, ***in part*** because "[t]he allegations of each
> count are not rolled into every successive count on
> down the line").

*Terry*, 2018 WL 1992276, at *2 (emphasis added).

The District Court's parenthetical plainly misrepresented the law. *Terry* did not hold that "a complaint that re-alleges just the factual allegations and does not re-allege each count is not a shot-gun pleading."[14] Nothing of the sort. If a litigant had crafted that

---

[14] Moreover, if *Terry* had reached such a conclusion, it would have been in flagrant violation of this Court's binding precedent.

22-13129                TJOFLAT, J., Dissenting                28

explanatory parenthetical, such litigant would be subject to sanctions under Rule 11 for misleading the court. *See* Fed. R. Civ. P. 11(b) ("By presenting to the court a pleading, written motion, or other paper . . . an attorney . . . certifies that to the best of the person's knowledge . . . the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law[.]"). That is why the SEC—to its credit—accurately excerpted the passage in its response to the motion to dismiss.

In *Terry*, the Court proceeded to consider the other ways a complaint may constitute a shotgun pleading. 2018 WL 1992276, at *3. Why the Court changed course in the instant case is puzzling. Had the District Court evaluated the other three types of shotgun pleadings, it would have no sensible explanation for why the SEC's complaint did not fit all three.

⋆        ⋆        ⋆

The SEC's complaint surely fit *Weiland*'s second type of shotgun pleading. It failed to include facts connected to particular causes of action, and it effectively and inappropriately forced the defendants to "sift through the factual allegations to determine which [we]re relevant to those claims against them." *Gregory v. City of Tarpon Springs*, No. 8:16-CV-237-T-33AEP, 2016 WL 5816026, at *4 (M.D. Fla. Oct. 5, 2016) (Covington, J.).

Our Court analyzed this type of shotgun pleading in *Anderson v. District Board of Trustees of Central Florida Community College*,

22-13129                TJOFLAT, J., Dissenting                29

77 F.3d 364, 366–67 (11th Cir. 1996). There, we held that the plaintiff's complaint was "a perfect example of [a] 'shotgun' pleading" because it was "virtually impossible to know which allegations of fact [were] intended to support which claim(s) for relief." *Id.* at 366.

To avoid inappropriately saddling the defendants with the burden of sifting through the entire fact section to locate the predicate facts for its 304-plus causes of action, the District Court should have required the SEC to re-plead the claims in separate counts and to incorporate into each count only those factual allegations pertinent to that count.[15]

The SEC's complaint was also the third type of shotgun complaint. Each count contained a multitude of defendants, referred to a multitude of transactions, and lacked any and all clarity. Failing to split these causes of action into separate counts constituted an obvious violation of Rule 10(b).

The complaint was the fourth type of shotgun complaint as well. It "assert[ed] multiple claims against multiple defendants

---

[15] In *McNeil v. Alternative Home Financing, Inc.*, the District Court did exactly this. No. 2:04-CV-356-FTM33DNF, 2006 WL 1151592, (M.D. Fla. May 1, 2006) (Covington, J.). It explained, "[i]t is not sufficient to incorporate all of the factual allegations for each count and [d]efendants should not be made to sift through the allegations and attempt to decipher which facts [we]re supportive of a given claim." *Id.* at *1.

22-13129                    TJOFLAT, J., Dissenting                    30

without specifying which of the defendants are responsible for which acts or omissions."[16] *Weiland*, 792 F.3d at 1323.

---

[16] By the time it denied the defendants' motion to dismiss the SEC's complaint (June 5, 2019), the District Court was well aware of this Court's concern about shotgun pleadings and had been assiduously applying our precedent that called for district judges faced with a shotgun complaint to order the plaintiff to file a repleader in the form of a Rule 12(e) more definite statement. The Court was also well aware that for the most part, shotgun complaints stem from a violation of Rules 8(a)(2) or 10(b), or both. As former Chief Judge Carnes noted in *Weiland*, complaints that violate either Rule 8(a)(2) or Rule 10(b), or both, are invariably shotgun pleadings. 792. F.3d at 1320.

> The purpose of these rules is self-evident, to require the pleader to present his claims discretely and succinctly, so that, his adversary can discern what he is claiming and frame a responsive pleading, the court can determine which facts support which claims and whether the plaintiff has stated any claims upon which relief can be granted, and, at trial, the court can determine that evidence which is relevant and that which is not. "Shotgun" pleadings, calculated to confuse the "enemy," and the court, so that theories for relief not provided by law and which can prejudice an opponent's case, especially before the jury, can be masked, are flatly forbidden by . . . these rules.

*Id.* (quoting *T.D.S.,* 760 F.2d at 1544 n.14 (Tjoflat, J., dissenting)).

Chief Judge Pryor repeated Judge Carnes's point in *Barmapov v. Amuial*: "A shotgun pleading is a complaint that violates either Federal Rule of Civil Procedure 8(a)(2) or Rule 10(b), or both." 986 F. 3d 1321, 1324 (11th Cir. 2021).

In *Mesa v. Kajaine Fund III, LLC*, the District Court, drawing on our decision in *Fikes v. City of Daphne,* remarked on the importance of the two rules in drafting a complaint:

The SEC's complaint clearly failed to meet federal pleading standards. It was a shotgun complaint composed in violation of Rules 8(a)(2), 9(b), and 10(b). We explained in *Byrne v. Nezhat* what a district court must do under such circumstances:

> [I]f, in the face of a shotgun complaint, the defendant does not move the district court to require a more definite statement, the court, in the exercise of its inherent power, must intervene sua sponte and order a repleader.[17] Implicit in such instruction is the notion

Pursuant to Rule 8(a), Fed. R. Civ. P., a pleading that states a claim must contain, among other things, "a short plain statement of the claim showing that the pleader is entitled to relief." Additionally, Rule 10(b) provides that "[a] party must state its claims or defenses in numbered paragraphs, each limited as far as practicable to a single set of circumstances." Fed. R. Civ. P. 10(b). Taken together, these rules "require the pleader to present his claims discretely and succinctly." *Fikes*, 79 F.3d at 1082 (citation omitted).

No. 8:17-CV-450-T-33JSS, 2017 WL 770951 (M.D. Fla. Feb. 28, 2017) (Covington, J.).

[17] "Discharging this duty ensures that the issues get defined at the earliest stages of litigation. The district court 'should strike the complaint and instruct counsel to replead the case—if counsel could in good faith make the representations required by Fed. R. Civ. P. 11(b).'" *Byrne*, 261 F.3d at 1133 n.113 (quoting *Cramer v. Florida,* 117 F.3d 1258, 1263 (11th Cir. 1997) (alterations adopted)); *see also Ebrahimi v. City of Huntsville Bd. of Educ.*, 114 F.3d 162, 165 (11th Cir. 1997); *Cesnik v. Edgewood Baptist Church*, 88 F.3d 902, 905 (11th Cir. 1996); *Anderson*, 77 F.3d at 366–67; *Pelletier v. Zweifel*, 921 F.2d 1465, 1517–18 (11th Cir. 1991); *Fullman v. Graddick*, 739 F.2d 553, 557 (11th Cir. 1984). Such action is imperative as

that if the plaintiff fails to comply with the court's or-der—by filing a repleader with the same deficiency—the court should strike his pleading or, depending on the circumstances, dismiss his case and consider the imposition of monetary sanctions.

District court intervention in this fashion accom-plishes several objectives. First, it conserves judicial and parajudicial resources and thereby benefits liti-gants standing in the queue waiting to be heard. Sec-ond, it curtails the need for satellite litigation under Rule 11, 28 U.S.C. § 1927, or the court's inherent power. Third, it minimizes counsel's and his client's exposure to a criminal contempt citation. Fourth, it limits the potential for post-litigation tort actions for abuse of process or malicious prosecution. Fifth, early sua sponte intervention—coupled with the imposi-

------

a more definite statement, if properly drawn, will present each claim for relief in a separate count, as required by Rule 10(b), and with such clarity and precision that the defendant will be able to discern what the plaintiff is claiming and to frame a re-sponsive pleading. Moreover, with the shotgun pleading out of the way, the trial judge will be relieved of the cumbersome task of sifting through myriad claims, many of which may be foreclosed by various defenses. Experience teaches that, unless cases are pled clearly and precisely, issues are not joined, dis-covery is not controlled, the trial court's docket becomes un-manageable, the litigants suffer, and society loses confidence in the court's ability to administer justice.

*Anderson*, 77 F.3d at 366–67 (internal citations and quotation marks omitted).

tion of punitive measures when the use of abusive lit-
igation tactics is deliberate—operates as both a spe-
cific and a general deterrent. And, finally, early sua
sponte intervention will ensure public confidence in
the court's ability to administer civil justice.

261 F.3d 1075, 1133–34 (11th Cir. 2001).

The SEC was familiar with *Byrne*. It cited that very decision
in its request that the District Court grant it leave to amend its com-
plaint if the Court found, as it should have, that the complaint failed
to meet federal pleading standards. The District Court was familiar
with the decision as well. It has stated multiple times in the past
that "courts are under an independent obligation to order a re-
pleader when faced with a shotgun pleading." *Gregory v. City of Tar-
pon Springs*, No. 8:16-CV-237-T-33AEP, 2016 WL 2961558, at *2
(M.D. Fla. May 23, 2016) (Covington, J.); *Barr v. One Touch Direct,
LLC*, No. 8:15-CV-2391-T-33MAP, 2016 WL 1621696, at *5 (M.D.
Fla. Apr. 22, 2016) (Covington, J.); *Thomas v. Derryberry*, No. 8:16-
CV-3482-T-33AEP, 2017 WL 2267977, at *2 (M.D. Fla. May 24,
2017) (Covington, J.); *see also U.S. ex rel. Westfall v. Axiom World-
wide, Inc.*, No. 8:06-CV-571-T-33TBM, 2009 WL 764528, at *9
(M.D. Fla. Mar. 20, 2009) (Covington, J.) ("[I]f, in the face of a shot-
gun complaint, the defendant does not move the district court to
require a more definite statement, the court, in the exercise of its
inherent power, must intervene sua sponte and order a repleader."
(internal quotation marks omitted)). And it has dismissed shotgun
complaints when it determined that repleader could not render the
complaint amenable to a responsive pleading. *See Roman v. Grinnell,*

22-13129                TJOFLAT, J., Dissenting                34

No. 8:16-CV-3449-T-33AEP, 2017 WL 53978, at *2 (M.D. Fla. Jan. 3, 2017) (Covington, J.) ("[T]he Complaint should be dismissed because it is unclear what claims Roman is bringing against Tyco. *See Byrne v. Nezhat*, 261 F.3d 1075, 1129–30 (11th Cir. 2001) (noting that a complaint that fails to identify claims with sufficient clarity constitutes a 'shotgun pleading,' which must be dismissed).").

## B. Errors Beget Errors

Beyond misapplying the law, the District Court's denial of the defendants' motion to dismiss tarnished the proceedings in at least two ways. First, it created an appearance of partiality. Second, it deprived the defendants of their due process right to defend the action at hand. *See Simon v. Craft*, 182 U.S. 427, 436, 21 S. Ct. 836, 839 (1901) ("The essential elements of due process of law are notice and opportunity to defend."). I consider these two points in order.

The District Court went out of its way to create a plausible claim for the SEC. In *Barmapov v. Amuial*, I wrote separately to explain the intolerable risk to the system this creates:

> District courts are flatly forbidden from scouring shotgun complaints to craft a potentially viable claim for a plaintiff. By digging through a complaint in search of a valid claim, the courts "would give the appearance of lawyering for one side of the controversy." *Jackson v. Bank of Am., N.A.*, 898 F.3d 1348, 1355 n.6 (11th Cir. 2018). This, in turn, would cast doubt on the impartiality of the judiciary. *Id.* Such a result is plainly inconsistent with the oath to which each judge has sworn.

986 F.3d at 1328 (Tjoflat, J., concurring).

The SEC's complaint did not identify the "factual content" that would permit a court to "draw the reasonable inference that the defendant[s were] liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678, 129 S. Ct. at 1949. As a consequence, the defendants had to rummage through the 122 paragraphs in an effort to hopefully tie the relevant facts to each of the SEC's 304 alleged causes of action.[18]

But it was the SEC's burden to notify the defendants of the predicate facts supporting each of its causes of action. *See Est. of Bass v. Regions Bank, Inc.*, 947 F.3d 1352, 1358 (11th Cir. 2020) ("[A shotgun] pleading is never plain because it is impossible to comprehend which specific factual allegations the plaintiff intends to support which of his causes of action, or how they do so."); *Keith v. DeKalb Cnty.*, 749 F.3d 1034, 1045 n.39 (11th Cir. 2014) ("By the time a reader of the pleading gets to the final count, it is exceedingly difficult, if not impossible, to know which allegations pertain to that count . . . ."). It clearly was not the District Court's role to find those facts. By assuming that role, the Court invited more questions than answers.

That brings me to the second point. The causes of action of Counts III through XIII alleged parallel violations of Section

---

[18] Suppose the defendants' lawyers erred in identifying the factual content and focused on facts different from what the SEC's lawyers would be relying on in their closing argument to the jury. What then?

17(a)(1) and (3) and Rule 10b-5(a), (b), and (c). Violations of Section 17(a)(1) and Rule 10b-5(a), as alleged in Counts III and V, respectively, occur when a defendant employs a "device, scheme, or artifice to defraud." 15 U.S.C. § 77q(a)(1); 17 C.F.R. § 240.10b-5(a). The defendants were entitled, as a matter of fundamental due process, to notice of the circumstances constituting this fraud. The District Court's rulings deprived them of such notice.

The same is true regarding the parallel violations of Section 17(a)(3) and Rule 10b-5(c), as alleged in Counts IV and VII, respectively. Those violations occur when a defendant engages in "any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person." 17 C.F.R. § 240.10b-5(c); 15 U.S.C. § 77q(a)(3) (providing that it is unlawful to "engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser" in the "offer or sale of any securities"). Again, the defendants were entitled, as a matter of fundamental due process, to notice of the circumstances constituting this fraud.

Finally, a violation of Rule 10b-5(b), as alleged in Count VI, occurs when a defendant "make[s] any untrue statement of a material fact or . . . omit[s] to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b). As in the case of the previous counts, defendants were entitled as a matter of fundamental due process to notice of the circumstance constituting that fraud and the factual content supporting

the untrue statements made or omitted. But the District Court's rulings deprived them of such notice.

## IV. PROCEEDINGS CONTINUE

In this Part, I walk through the subsequent stages of litigation, taking particular note of the pretrial conference and the crafting of the jury instructions. The defendants' consistent objections to the complaint's lack of specificity combined with the District Court's "fill in the blank" approach to drafting the jury instructions shows that the defendants were continually deprived of the notice they needed to mount a defense.

As recapped in Part I *supra*, the SEC presented its 260-plus fraud claims in Counts III through XIII. The following claims are pertinent here:

(1) Defendants violated Section 17(a)(1) and (3) (Counts III and IV);

(2) Defendants violated Rule 10b-5(a) through (c) (Counts V through VII);

(3) Defendants aided and abetted the Fraudsters' violation of Section 17(a)(1), (2), and (3) (Counts VIII through X);

(4) Defendants aided and abetted the Fraudsters' violation of Rule 10b-5(a), (b), and (c) (Counts XI through XIII).

★            ★            ★

Once the District Court denied the motion to dismiss, allowing these claims to proceed, the SEC's strategy was set. The SEC

22-13129                TJOFLAT, J., Dissenting                38

would prosecute these claims without identifying—much less stating with particularity—the circumstances constituting the alleged fraud as Rule 9(b) required.[19]

The reality is that the SEC's case was not built on violations of Section 17(a)(1) or (3) or Rule 10b-5(a) or (c).[20] Rather, it was built exclusively on the "untrue statements" provisions of each law: Section 17(a)(2) and Rule 10b-5(b). Whittling down the complaint to these claims and stating them in separate counts would have done wonders to isolate the relevant facts, force the SEC to plead those facts with particularity, and provide fair notice to the defendants. Perhaps the SEC's inclusion of the other claims in its complaint helped obfuscate the fact that the only plausible claims in the complaint were plagued with systemic ambiguity?

### A. Proposed Jury Instructions & Charge Conference

On January 13, 2021, the parties filed a Joint Pretrial Statement with eleven exhibits attached. Among the exhibits were the parties' Joint Proposed Jury Instructions, which included the SEC's

---

[19] To state the circumstances of the fraud that the fraud counts alleged, the SEC would have to amend its complaint pursuant to Rule 15(a)(2) of the Federal Rules of Civil Procedure via the defendants written consent or with leave of the District Court.

[20] The alleged violations of Section 17(a)(1) and Rule 10b-5(a), based on a "device, scheme, or artifice to defraud," were window dressing. So too were the violations of Section 17(a)(3) and Rule 10b-5(c), which are based on a "practice, or course of business which operates or would operate as a fraud or deceit upon any person." In reality, the SEC only alleged violations in the form of misstatements or material omissions.

proposed instructions and, where relevant, the defendants' objections and alternate proposals. Both sides used the Eleventh Circuit Pattern Jury Instructions for Civil Cases in presenting their proposed instructions.

Eleventh Circuit Pattern Instruction 6.2, designed for Rule 10b-5(b), formed the basis for the instruction on Count VI. That pattern instruction reads, in part:

> [If the SEC brings the case, add the following: The SEC does not need to identify any particular purchase or sale of securities by a specific person, including [name of defendant]. Rather, it's enough if the SEC proves that the misrepresentation or omission involved or touched any purchase or sale of a security in any way.] The SEC claims that [name of defendant] made the following misrepresentations or omissions: [*Describe the specific statements or omissions claimed to have been fraudulently made.*].

Pattern Civ. Jury Instr. 11th Cir. 6.2 at 5 (2025) (emphasis added).

The final sentence, in conspicuously labeled brackets, called for the SEC to describe the "specific statements or omissions" it alleged were fraudulent. But the SEC was not keen to acquiesce. Indeed, it reproduced the above-excerpted paragraph *almost* in its entirety, with the final sentence omitted. The SEC's proposal read:

> The SEC does not need to identify any particular purchase or sale of securities by a specific person, including Spartan, Island, Dilley, or Eldred. Rather, it's enough if the SEC proves that the misrepresentation

> or omission involved or touched any purchase or sale
> of a security in any way.

Joint Proposed Jury Instrs. at 69.

The defendants objected to the omission. They also objected to combining in one instruction the violations of Rule 10b-5(a), (b), and (c) alleged in Counts V, VI, and VII.

The same defect arose with Count IX, where the SEC alleged that the defendants aided and abetted the Fraudsters' material misstatements or omissions. There, Eleventh Circuit Pattern Instruction 6.9, designed for Section 17(a)(2), was on point. *See* Pattern Civ. Jury Instr. 11th Cir. 6.9 (2025). Like their proposed Count VI instruction, the SEC's Count IX instruction omitted the crucial bracketed portion of the pattern instructions: "[Describe the alleged misrepresentations or omissions claimed to have been fraudulently made.]" *Compare Id.* at 1–3 *with* Joint Proposed Jury Instrs. at 62. The defendants objected again.

On July 7, 2021, the parties presented the District Court with revised Joint Proposed Jury Instructions. The new instructions were, in all relevant respects, the same as the original version. The defendants once again objected to the SEC's refusal to describe the fraudulent statements supporting their fraud counts. And once again they objected to the composite instruction for Counts V, VI, and VII—stating that the SEC "must prove its case against each defendant, and for each count it must prove each element."

The Final Pretrial Conference occurred on Friday, July 9, 2021, and there was no discussion of the jury instructions. The trial

22-13129                TJOFLAT, J., Dissenting                41

began on Monday, July 12. On Thursday, July 22, the Court informed the parties that it would hold a "charge conference" the next day at 2:00 p.m., and it explained that it had "some questions" about the proposed jury instructions. The conference was held on July 23 as scheduled, although the Court stated that it was not actually the charge conference but rather "a preliminary meeting." The Court provided counsel with a draft of its tentative jury instructions, to which the defense counsel lodged objections.

Defense counsel explained that the instructions on the fraud counts lacked specificity and that their failure to "describe the alleged scheme or device" was "a major concern."[21] They highlighted analogous securities fraud proceedings, arguing that courts ubiquitously require the plaintiff to provide "an itemized list," explaining "this is the scheme, these are the allegations."

---

[21] Defense counsel was referring to Eleventh Circuit Civil Pattern Jury Instruction 6.1 — Device, Scheme, or Artifice to Defraud (designed for Rule 10b-5(a) claims). The instruction applied to the Count V causes of action. It required the filling out of brackets as follows: "[Name of plaintiff/The SEC] claims that the scheme or device [name of defendant] employed was [describe the alleged scheme or device]." Pattern Civ. Jury Instr. 11th Cir. 6.1 at 3 (2025). In addition, Counsel was referring to Eleventh Circuit Civil Pattern Jury Instruction 6.8 — Fraud In the Offer and Sale of a Security Through A Device, Scheme, or Artifice to Defraud — SEC Version (designed for Section 17(a)(1) claims). The instruction applied to the Count III causes of action. It required the filling out of brackets as follows: "The SEC has alleged that the scheme or device [name of defendant] employed [describe the alleged scheme or device]." Pattern Civ. Jury Instr. 11th Cir. 6.8 at 3 (2025).

22-13129                TJOFLAT, J., Dissenting                42

As the meeting wore on, defense counsel explained that it was "really impossible" for his clients to defend against the fraud counts. After an extended discussion on the issue, counsel summarized his position:

> When the SEC is asserting that the defendants aided and abetted the following misrepresentations of fact or misrepresentations of fact *by Mirman, Rose, Daniels, et cetera*. If they never tell us what those are, then there's no possible way to defend against them. I mean, this is just sort of a basic issue of fairness.

(emphasis added)[22]

Purporting to understand these concerns, the District Court instructed the SEC to, "over the weekend . . . take some time to come up with these statements that [it thought] would be appropriate or . . . a short analysis . . . of the specific statements or omissions that have been made."[23]

On Tuesday, July 27, the Court checked in with the parties

---

[22] Defense counsel was referring to the pattern instructions for the causes of action alleged in Counts IX and XII alleging the *Fraudsters'* violations of Section 17(a)(2) Rule 10b-5(b), respectively.

[23] The Court was referring to Eleventh Circuit Civil Pattern Jury Instruction 6.9 — Misrepresentation or Omission in the Offer or Sale of a Security — SEC Version (designed for Section 17(a)(2) claims). The instruction applied to the Count IX aiding and abetting causes of action based on the *Fraudsters'* misrepresentations and omissions. It required the filling out of the following brackets: "[Describe the alleged misrepresentations or omissions claimed to have been fraudulently made.]." Pattern Civ. Jury Instr. 11th Cir. 6.9 at 3 (2025); *see also* Pattern Civ. Jury Instr. 11th Cir. 6.2 at 5 (2025).

to see what remained pending. The following exchange took place:

> DEFENSE COUNSEL: The only thing that's outstanding at this point that I'm aware of is the list of misrepresentations or alleged schemes to defraud. We had asked for that on Friday. I have not received that from the SEC.
>
> THE COURT: You did. You did. Right. I had forgotten about that. So what's going on with that?
>
> SEC COUNSEL: Your Honor, we actually have -- we've been working on revisions to the instructions. So for the -- the ones that we do have redlines that we were taking into account things that we discussed the other day, should I file them and send them via e-mail tonight?
> . . .
>
> THE COURT: -- I would send it to chamber's e-mail.

On Wednesday, July 28, the Court convened the charge conference at 4:56 p.m. At this point, the defendants had still not been presented with the fraudulent statements they had long requested. The Court explained that it would get them soon:

> I mean, we have these jury instructions to go through . . . [but] I have to be at another part of downtown at 5:30, but I think that I at least have some time to get started on this, about 10 to 15 minutes. So we can make a dent in this, but it's not going to be finished. All right? So we'll have to come up with an alternate

22-13129                TJOFLAT, J., Dissenting                44

time.

. . .

THE COURT: . . . So what I've got, it's basically the Eleventh Circuit Pattern Instruction 6.2 altered to combine Rule 10b-5(a) through (c) with some other changes as well. I mean, I pretty much think I can live with this. Let's see. . . . If you have anything for me to consider, let me know.

. . .

THE COURT: . . . All right. So we will copy these tonight so that you have -- or early in the morning so that, when you come in at 9:00, you will have [the jury instructions]. . . . I give a package to each juror so they read through as I do. I think it's going to take me at least an hour to read this.

## B. Final Jury Instructions

After receiving the parties' Joint Proposed Jury Instructions, just three days before the trial was to begin, the Court realized they were unacceptable. The SEC could not present a plausible case to the jury if the bracketed portions of the pattern instructions were omitted or left blank. Of course, this problem was not new. It arose when the SEC, in obvious disregard of Rule 9(b), failed to state with particularity the fraud forming the basis of the case in its complaint. But the Court had allowed the SEC's case to go forward—at

an enormous cost to the parties, the Middle District of Florida docket, and the litigants standing in line waiting to be heard.

At this point, the Court had two options. It could unwind the litigation, revisit its ruling on the motion to dismiss, and order repleader. Or it could fill in the blanks. The Court chose the second option, scouring the complaint's 122 paragraphs to craft jury instructions that would identify the fraudulent conduct needed for Counts III through XIII. As it turned out, the Court was able to describe the fraudulent conduct alleged in only four Counts: III, V, IX, and XII.

Counts III and V alleged that *the defendants* violated Section 17(a)(1) and Rule 10b-5(a) by employing a "device, scheme, or artifice to defraud" in relation to the sale of the Fraudsters' shell-company securities (the "Defendants' Scheme"). The Court drafted the following description for the jury on those counts:

> The SEC has alleged that Spartan, Island, Dilley, or Eldred violated Section 17(a)[1] of the Securities Act when Dilley schemed with Mirman and Rose, and Eldred schemed with Daniels, Fan and Harrison, to defraud the public that the Mirman/Rose Companies and Daniels/Harrison/Fan Companies were operating businesses with independent management and shareholders, rather than undisclosed "blank check" or "shell" companies for sale. The SEC contends that in furtherance of the Mirman/Rose scheme, Spartan and Dilley signed and submitted false Form 211 applications to FINRA; Spartan, Island and Dilley contributed to false DTC applications; Dilley found potential

22-13129                TJOFLAT, J., Dissenting                46

shell buyers; Dilley and Island signed an escrow agree-
ment and false attestation letters for shell buyers; and
Dilley and Island effectuated the bulk transfer of the
entire deceptive public float of Mirman/Rose Com-
panies to shell buyers. The SEC alleges that Spartan
and Eldred similarly schemed with Daniels, Harrison,
and Fan by filing false Forms 211 with FINRA, all in
support of the manufacture of undisclosed blank
check companies – one of which Eldred expressly
proposed to acquire himself while its Form 211 was
pending.

The SEC claims that Spartan Securities and Island
Stock Transfer provided various services which were
critical to the Mirman/Rose and Daniels/Harri-
son/Fan shell factories, including filing a Form 211
application with FINRA to demonstrate compliance
with Rule 15c2-11. Finally, the SEC contends that
Spartan, Dilley and Eldred Securities also had infor-
mation that undermined any reasonable basis that the
information required by Rule 15c2-11 was materially
accurate and from a reliable source.

Jury Instr. No. 16.

Then, the District Court used this same language from the
Defendants' Scheme to describe the fraudulent conduct of Counts
VIII[24] and XI, which alleged that the *Fraudsters* employed a "device,

---

[24] Without attempting to describe the SEC's specific allegations, the Court's
instruction on Count VIII simply stated, "To determine whether Mirman,

22-13129          Tjoflat, J., Dissenting                    47

scheme, or artifice to defraud," and that the defendants "provided substantial assistance" thereto. In doing so, the Court misinformed the jury regarding who orchestrated the scheme. The Court's instructions, contrary to the SEC's complaint, implied that the defendants were the primary violators.

Similarly, Counts X and XIII alleged that the Fraudsters violated Section 17(a)(3) and Rule 10b-5(c) by engaging in an "act, practice, or course of business which operates or would operate as a fraud or deceit upon any person," and that the defendants were aiders and abettors. But in its instructions, the Court simply pointed the jury to the Defendants' Scheme.[25] In doing so, the Court again misinformed the jury that the defendants were the primary violators.

The instructions on Count VI, IX, and XII were also flawed. Those counts alleged "untrue statements [or omissions] of material fact" in violation of Rule 10b-5(b) and Section 17(a)(2). Count

---

Rose, Daniels, Fan, or Harrison violated Section 17(a)(1), you should use the elements and definitions I gave you regarding Count III." Jury Instr. No. 18.

[25] The Court combined the instructions for Counts VIII, IX, and X in Jury Instruction 18. It stated: "To determine whether Mirman, Rose, Daniels, Fan, or Harrison violated Section 17(a)(3), you should use the elements I gave you regarding Count IV." Jury Instr. No. 18. The Court combined the instructions for Counts XI, XII and XIII in Instruction 20. It stated, "To determine whether Mirman, Rose, Daniels, Fan, or Harrison violated Section 10(b) and Rule 10b-5, you should use the elements and definitions I gave you for Counts V, VI, and VII." Jury Instr. No. 20. The Court's only factual content in Instruction 20 relates Count XII and is a copy of its Count IX instruction on 17(a)(2). I will discuss these instructions in turn.

VI alleged that the *defendants* were the statement-makers at issue, while Counts IX and XII alleged that the *Fraudsters* were the statement-makers.

Recall that at the July 23 "preliminary meeting," the Court directed the SEC to "come up with . . . the specific statements or omissions that have been made." The SEC drafted a description of alleged statements made *only by the defendants*, but not the Fraudsters:

> The SEC contends that Spartan, Island, Dilley, and Eldred made misrepresentations and omissions to, among others, FINRA, DTC participants, and securities purchasers. The SEC claims that Spartan, Dilley, and/or Eldred made misrepresentations and omissions in the filing of 15c2-11 applications and submissions, including, but not limited to:
>
> - Alvin Mirman and Sheldon Rose's involvement and/or role in the issuers;
> - Mirman and Rose's control of the issuers;
> - Whether the issuers were shells or blank check companies;
> - That the issuers had no consultants;
> - The true business purpose of the issuers;
> - Communications with CEOs/Presidents of the issuers;
> - The relationships and affiliations among shareholders and Mirman and Rose;
> - The solicitations of the shareholders;

- The issuers' plans for potential mergers or acquisitions;
- That the issuers' shareholders have control of their shares;
- That Spartan conducted due diligence on the issuers;
- Spartan and Island's relationship with Sheldon Rose and Alvin Mirman, Diane Harrison, Michael Daniels and Andy Fan;
- Michael Daniels, Diane Harrison, and Andy Fan's involvement in the issuers;
- Circumstances surrounding the Form 211 submissions, including the identity of the person for whom the quotation is being submitted;
- That there are no other issuers that the current officers or directors of the issuers have requested a listing quotation on;
- That there was no material information, including adverse information regarding the issuer that the firm is aware of or has in its possession.
- Spartan, Island, and Dilley initiated and provided false information for applications filed with the DTC, including misrepresenting the shell status of issuers.
- Island and Dilley made misrepresentations and omissions regarding the designation of the securities as free trading.
- Island and Dilley made misrepresentation [sic] and omissions when effectuating the bulk issuance and

22-13129                 TJOFLAT, J., Dissenting                 50

> transfer of securities, including stock certificates
> without restrictive legends.

Jury Instr. No. 19.[26]

This description did not, in any sense, comply with Rule 9(b). None of its bullet points constituted a statement a defendant made in a document or to a person or entity on a date in connection with the purchase or sale of securities. The bullet points surely *alluded* to statements being made. But they did nothing to identify such statements for the jury, nor did they provide sufficient context for the jury to go find them. The same was true of the "omissions." Who omitted what, and when? What statements could have been cured without the omissions? Not to be deterred, the District Court inserted this description into the instruction for Count VI and sent it to the jury.

What about Counts IX and XII, which alleged statements made by the Fraudsters? With no help from the SEC, the Court, on its own initiative, drafted the following instruction for those counts:

> [T]he SEC must prove that someone made a misrepresentation of material fact or an omission of material fact.
>
> The SEC claims that Mirman, Rose, Daniels, Fan, or Harrison *are responsible for the following misrepresentations of fact or omissions*. The SEC allege that Rose and

---

[26] The record does not clearly reveal whether the Court or the SEC drafted Instruction 19 on Count VI. However, following the Court's directive, it appears that it was most likely drafted by the SEC.

Mirman recruited persons to act as straw CEOs, to fraudulently obtain the effective registration of shell companies with the SEC, through the use of false and fraudulent statements and documents that were submitted to the SEC for this purpose. The SEC contends that a further purpose of *the* [Rose and Mirman] *scheme* was to issue unrestricted stock for these companies that could be secretly controlled by them. This was allegedly done so that Rose and Mirman would be in a position to control all or nearly all of the publicly traded shares of the companies, so that when they later sold a shell company, part of the sale would include the undisclosed transfer of the unrestricted free trading shares to the purchaser. In this way, the purchaser of the shell company would be in a position to engage in fraudulent schemes, such as "pump and dump" stock swindles.

The SEC further alleges that Daniels, Fan, and Harrison manufactured undisclosed blank check companies based on a deceptive public float of purportedly unrestricted shares. Harrison and her husband, Daniels, allegedly manufactured at least five public companies. The Form 211s, including the responses to FINRA's deficiency letters, contained misrepresentations with respect to the management, business purpose, and shareholders to give the false appearance of an operating company with a specific business plan (i.e. no plans to seek a merger or acquisition), independent management and an independent shareholder base. The SEC contends that Daniels and Har-

22-13129               TJOFLAT, J., Dissenting                52

> rison sold their first company to Fan as part of his en-
> deavor to amass a roster of public companies for later
> reverse mergers with Chinese companies. Daniels
> and Fan then allegedly agreed to create three more
> public vehicles from scratch.

Jury Instr. No. 18 (emphasis added).[27]

Like the description in Jury Instruction 19, this description failed to specifically ascertain any actionable statements or omissions. Further, it did not identify how, if at all, the defendants "knowingly or recklessly provided substantial assistance" to the Fraudsters in the making of these statements.

Setting the voluminous issues with the jury instructions aside, the extraordinary measures the District Court took in their crafting reveal that it was, in effect, prosecuting the SEC's case. The Court could have aborted the proceedings on numerous occasions, all in acknowledging defendants' rights to due process and fair treatment, but it chose to go forward instead.

---

[27] This instruction is reproduced in Jury Instruction 20 on Count XIII, except for this language: "[T]he SEC must prove that someone made a misrepresentation of material fact or an omission of material fact. The SEC claims that Mirman, Rose, Daniels, Fan, or Harrison are responsible for the following misrepresentations of fact or omissions."

## V. Grounds for Reversal

In this Part, I explain why district court proceedings, like those in the instant case, that lack any meaningful notion of fundamental fairness cannot be allowed to stand. I identify two independent grounds for reversal.

### A. Erroneous Denial of the Motion to Dismiss

This Dissent has explained, at length, why the SEC's complaint was abominable. It was a prototypical shotgun pleading that failed to even approach the level of requisite specificity to satisfy the Federal Rules of Civil Procedure. But we are, admittedly, well past the motion to dismiss stage. Here, I explain why I believe—at least in this extraordinary circumstance—that an erroneous ruling on a motion to dismiss may constitute grounds for setting aside a judgment after trial.

To begin, it is important to understand why our review is taking place now, rather than when the motion to dismiss was denied. This Court is vested with limited jurisdiction, generally limited to "jurisdiction of appeals from all final decisions of the district courts." 28 U.S.C. § 1291. "A 'final decision' is typically one by which a district court disassociates itself from a case.'" *Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, 106, 130 S. Ct. 599, 604–05 (2009) (quoting *Swint v. Chambers Cnty. Comm'n*, 514 U.S. 35, 42, 115 S. Ct. 1203, 1208 (1995)) (alteration adopted) (internal quotation marks omitted). "From the very foundation of our judicial system," Congress has expressed a policy to "save the expense and delays of repeated appeals in the same suit, and to have the whole case and every matter

22-13129                TJOFLAT, J., Dissenting                54

in controversy in it decided in a single appeal." *McLish v. Roff*, 141 U.S. 661, 666–67, 12 S. Ct. 118, 120 (1891).

There are two caveats that may permit an appeal before the district court reaches a final disposition. First, the Supreme Court has long held that there are "a small category of decisions that, although they do not end the litigation, must nonetheless be considered 'final.'" *Swint*, 514 U.S. at 42, 115 S. Ct. at 1208 (quoting *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546, 69 S. Ct. 1221, 1225–26 (1949)). But "[t]hat small category includes only decisions that are conclusive, that resolve important questions separate from the merits, and that are effectively unreviewable on appeal from the final judgment in the underlying action."[28] *Id.* Second, 28 U.S.C. § 1292 creates a narrow class of appealable interlocutory orders—orders that do not constitute final judgments but are nonetheless appealable. This class includes, among other things, orders so certified by a district judge to include "a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal . . . may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b).

Here, the District Court's denial of the defendants' Rule 12(b)(6) motion to dismiss the SEC's complaint was neither a final order that disposed of the litigation nor did it otherwise qualify for

---

[28] Famously, when a district court denies a defendant's claim of qualified immunity, it constitutes an appealable final decision "notwithstanding the absence of a final judgment." *Mitchell v. Forsyth*, 472 U.S. 511, 530, 105 S. Ct. 2806, 2817 (1985).

immediate review. The same is true of the District Court's denial of the defendants' Rule 56 motion for summary judgment and Rule 50(a) motion for judgment as a matter of law. In short, this is the first opportunity for our Court to review all pre- and post-trial decisions made by the lower court.

When the District Court denied the motion to dismiss, the train departed from the tracks, and it would have been nearly impossible to correct course. Is there some legal principle that says this Court cannot, due to the passage of time and advancement through discovery and trial, go back in time to review that critical decision? I argue there is not.

The Supreme Court endorsed this common-sense notion in *Dupree v. Younger*, 598 U.S. 729, 143 S. Ct. 1382 (2023). There, Kevin Younger sued Maryland correctional officer Neil Dupree for allegedly using excessive force in violation of Younger's Fourteenth Amendment due process rights. *Id.* at 734, 143 S. Ct. at 1387. Dupree moved for summary judgment, arguing that Younger "failed to exhaust his administrative remedies as required by the Prison Litigation Reform Act." *Id.* The district court denied the motion on the grounds that the state prison system had internally investigated the incident, which satisfied Younger's exhaustion obligation. *Id.* At trial, the jury found Dupree liable and awarded Younger $700,000. *Id.*

Dupree did not re-assert the exhaustion argument in either a Rule 50(a) motion for judgment as a matter of law or a renewed motion under Rule 50(b). *Id.* But he did seek to have the Fourth

Circuit review that issue on appeal. *Id.* at 733, 143 S. Ct. at 1388. The Fourth Circuit declined, relying on its own binding precedent that required all issues to be renewed in a post-trial motion in order for them to be preserved for appellate review. *Id.* The Supreme Court granted certiorari to resolve a circuit split. *Id.*

The Court explained that, because interlocutory orders "are typically not immediately appealable," the "general rule is that a party is entitled to a single appeal, to be deferred until final judgment has been entered, in which claims of district court error at any stage of the litigation may be ventilated." *Id.* at 734, 143 S. Ct. at 1388 (internal quotation marks omitted) (quoting *Quackenbush*, 517 U.S. at 712, 116 S. Ct. at 1718). It acknowledged that some rulings are "unreviewable after final judgment because they are overcome by later developments in the litigation." *Id.* at 734, S. Ct. at 1389. For example, "[f]act-dependent rulings must be appraised in light of the complete trial record," therefore "a party must raise a sufficiency-of-the-evidence claim in a post-trial motion to preserve it for review on appeal." *Id.* The Court, though, refused to extend this renewal preservation requirement to purely legal issues:

> From the reviewing court's perspective, there is no benefit to having a district court reexamine a purely legal issue after trial, because nothing at trial will have given the district court any reason to question its prior analysis. We therefore hold that a post-trial motion under Rule 50 is not required to preserve for appellate review a purely legal issue resolved at summary judgment.

22-13129                TJOFLAT, J., Dissenting                57

*Id.* at 736, 143 S. Ct. at 1389.

Returning to the case at hand, the question of whether the SEC's complaint satisfied federal pleading standards is plainly a question of law. That analysis would not morph throughout the proceedings or be "overcome by later developments," and there would be no benefit for the defendants to re-raise the issue on subsequent motions below. *See* Luke Meier, *The Reviewability of Denied Twombly Motions*, 84 U. Cin. L. Rev. 1145, 1199 (2016) ("[The] Twombly analysis is a unique analysis that is not replicated at later stages of the trial court proceedings.").

Therefore, *Dupree* tells us that the defendants adequately preserved their right to appeal the District Court's erroneous legal conclusions in ruling on the motion to dismiss. Logic dictates this same outcome; if the defendants could not appeal the denial of their motion to dismiss now, they would never have the opportunity to do so.[29] This would give district courts *carte blanche* to flout binding precedent when denying motions to dismiss.

The Majority Opinion points out that the defendants did not appeal the District Court's denial of the motion to dismiss in its initial brief. Thus, they argue, the defendants abandoned the issue. But when briefs were submitted, the defendants could not have known they were *allowed* to appeal on motion-to-dismiss grounds.

---

[29] And, of course, requiring defendants to inundate district courts with arguments about the pleadings after a motion to dismiss is denied would make no practical sense.

Our Court (pre-*Dupree*) has refused to look at motions to dismiss after trial. In a 2021 decision, we declined to entertain the appellant's argument that the appellees' allegations lacked "reasonable particularity" because, we explained, "those concerns dissipate when, as here, the alleged [causes of action] have been litigated and adjudicated in a full-blown trial." *iControl Sys., USA*, 21 F.4th at 1273 n.2.

This *iControl* holding finds itself squarely at odds with *Dupree*'s instruction that "a party is entitled to a single appeal, to be deferred until final judgment has been entered, in which claims of district court error *at any stage of the litigation* may be ventilated." *Dupree*, 598 U.S. at 734, 143 S. Ct. at 1388 (internal quotation marks omitted) (emphasis added) (quoting *Quackenbush*, 517 U.S. at 712, 116 S. Ct. at 1718). However, *Dupree* was not decided until the window for briefing had closed in the instant case. Under such circumstances, should we fault the litigants for not predicting this development and look the other way in the face of manifest injustice in an effort to rigidly adhere to "the principle of party presentation?" We should not.

The party-presentation principle represents the general notion that the litigants "frame the issues for decision" and the court acts as the "neutral arbiter of matters the parties present." *Clark v. Sweeney*, No. 25-52, 2025 WL 3260170, at *1 (U.S. Nov. 24, 2025) (internal quotation marks omitted) (quoting *United States v.*

*Sineneng-Smith*, 590 U.S. 371, 375, 140 S. Ct. 1575, 1579 (2020)).[30] Issues that are not briefed before the court, then, are generally considered to be forfeited.[31] But this judge-made principle is "supple, not ironclad." *Sineneng-Smith*, 590 U.S. at 376. 140 S. Ct. at 1579. "The degree to which we adhere to the prudential practice of forfeiture and the conditions under which we will excuse it are up to us as an appellate court." *Campbell*, 26 F.4th at 873.

In our en banc *Campbell* opinion, we explained the five situations where "we may exercise our discretion to consider a forfeited issue:"

> (1) the issue involves a pure question of law and refusal to consider it would result in a miscarriage of

---

[30] The majority overstates the holdings of *Clark* and *Sineneng-Smith*. Neither opinion stands for the idea that a court of appeals can *never* decide an appeal based on a legal theory not raised by either party. Rather, in *Clark*, the Supreme Court held that "[t]he Fourth Circuit's 'radical transformation' of Sweeney's simple ineffective-assistance claim 'departed so drastically from the principle of party presentation as to constitute an abuse of discretion.'" 2025 WL 3260170, at *2 (quoting *Sineneng-Smith*, 590 U.S. at 375, 140 S. Ct. at 1578). In other words, it is sometimes within the court of appeals' discretion to decide an issue on grounds not raised by the parties. Furthermore, in both *Clark* and *Sineneng-Smith*, the issue raised by the court of appeals was not litigated at the district court—meaning that the record was not properly developed. Here, all pertinent issues were fully litigated at the District Court.

[31] Forfeited issues stand in contrast to issues that are "waived." "Although jurists often use the words interchangeably, forfeiture is the failure to make the timely assertion of a right; waiver is the intentional relinquishment or abandonment of a known right." *Campbell*, 26 F.4th at 872 (quoting *Kontrick v. Ryan*, 540 U.S. 443, 458 n.13, 124 S. Ct. 906, 917 n.13 (2004)).

justice; (2) the party lacked an opportunity to raise the issue at the district court level; (3) the interest of substantial justice is at stake; (4) the proper resolution is beyond any doubt; or (5) the issue presents significant questions of general impact or of great public concern.

*Id.* at 873 (citing *Access Now, Inc. v. Sw. Airlines Co.*, 385 F.3d 1324, 1332 (11th Cir. 2004)).

We emphasized that the party-presentation rule is "prudential, not jurisdictional" and that "we ought to be able to excuse a violation of the rule 'when prudence dictates.'" *Id.* at 873–74 (quoting *Davis v. United States*, 512 U.S. 452, 464, 114 S. Ct. 2350, 2358 (1994) (Scalia, J., concurring)). Though "a party loses the right to demand consideration of an abandoned issue," this Court retains the discretion to consider it *sua sponte* if we find the "issue is extraordinary enough . . . [to] excuse the forfeiture." *Id.* at 874–75. In 1941, Justice Black spoke broadly of the imperative to not let prudential rules stand in the way of justice:

> Rules of practice and procedure are devised to promote the ends of justice, not to defeat them. A rigid and undeviating judicially declared practice under which courts of review would invariably and under all circumstances decline to consider all questions which had not previously been specifically urged would be out of harmony with this policy. Orderly rules of procedure do not require sacrifice of the rules of fundamental justice.

*Hormel v. Helvering*, 312 U.S. 552, 557, 61 S. Ct. 719, 721 (1941); *see also Unites States v. Atkinson*, 297 U.S. 157, 160, 56 S. Ct. 391, 392 (1936) ("In exceptional circumstances . . . appellate courts, in the public interest, may, of their own motion, notice errors to which no exception has been taken, if the errors are obvious, or if they otherwise seriously affect the fairness, integrity, or public reputation of judicial proceedings.").

Here, the defendants had no notice of their ability to appeal the District Court's denial of the motion to dismiss after trial. But the lower court's error was obvious and precipitated a manifest miscarriage of justice. Refusing to consider the issue, as the Majority does, to cling to a prudential doctrine makes little sense.

I would reverse the judgment on the grounds that the SEC's complaint was inadequate, tainted the subsequent proceedings, and debilitated the defendant's ability to mount a proper defense. As this Court has explained, shotgun complaints "undermine[] the public's respect for the courts," drain the "time and resources the court[s have] available to reach and dispose of the cases and litigants waiting to be heard," and "wreak havoc on appellate court dockets." *Davis*, 516 F.3d at 982. This is more important, not less, when a shotgun complaint is allowed to form the basis of a litigation that proceeds to trial.

## B. Judicial Impartiality

The SEC filed a complaint no district judge would readily accept. The SEC's lawyers surely anticipated it would be rough sledding. They were aware of this Court's decision in *Byrne v.*

22-13129               TJOFLAT, J., Dissenting                    62

*Nezhat*, and relied on it in requesting the District Court grant them leave to amend the complaint if the Court concluded it was legally insufficient.

> Here is what *Byrne* told the lawyers:

> Shotgun pleadings, if tolerated, harm the court by impeding its ability to administer justice. The time a court spends managing litigation framed by shotgun pleadings should be devoted to other cases waiting to be heard. "[W]ast[ing] scarce judicial and parajudicial resources . . . impedes the due administration of justice" and, in a very real sense, amounts to obstruction of justice. *United States v. Silverman*, 745 F.2d 1386, 1395 (11th Cir. 1984). *See also United States v. Essex*, 407 F.2d 214, 218 (6th Cir. 1969). Although obstruction of justice is typically discussed in the context of criminal contempt, the concept informs the rules of law—both substantive and procedural—that have been devised to protect the courts and litigants (and therefore the public) from abusive litigation tactics, like shotgun pleadings. If use of an abusive tactic is deliberate and actually impedes the orderly litigation of the case, to-wit: obstructs justice, the perpetrator could be cited for criminal contempt.

261 F.3d at 1031–32 (alterations in original).

The SEC's lawyers risked being sanctioned under Rule 11(b) for filing a complaint woefully insufficient under the Federal Rules of Civil Procedure. The risk failed to materialize, though, because the District Court looked the other way. Why? The record contains

no reason. What it reveals is a Court that attempted to make a silk purse out of a sow's ear.

The Court could not have sustained the complaint using Eleventh Circuit precedent. The Court's solution, and perhaps its most surprising move, was to misrepresent its holding in *Terry*, as noted *supra*, to strip down Eleventh Circuit precedent on shotgun pleadings. By ignoring Rule 8(a)(2), Rule 9(b), Rule 10(b), Supreme Court precedent, and Eleventh Circuit precedent, the District Court called its impartiality into question.

The structure of a trial by jury resembles a three-legged stool. One leg consists of a jury whose members adhere to an oath. Another consists or lawyers who adhere to a high ethical and professional standard as members of the bar and as officers of the court. And the third leg consists of an impartial judge. If one leg collapses, justice is denied.

Section 455(a) of Title 28 of the United States Code focuses on the judicial leg of this stool. It states: "Any justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." 28 U.S.C. § 455(a). Would a member of the organized bar engaged in civil litigation, a judge of a trial or appellate court handling civil litigation, or a citizen familiar with the administration of civil justice in the Nation's courts reasonably question the impartiality of the district judge who presided over this case? Given the judge's approval of a thoughtless complaint and ultimate repleading of the case for the jury, I argue the answer is yes.

22-13129　　　　　TJOFLAT, J., Dissenting　　　　　64

In *Liljeberg v. Health Services Acquisition Corp.*, the Supreme Court held that § 455 can be used as grounds to set aside a final judgment under Rule 60(b)(6) of the Federal Rules of Civil Procedure.[32] 486 U.S. 847, 868, 108 S. Ct. 2194, 2206 (1988). It noted that "[a]lthough § 455 defines the circumstances that mandate disqualification of federal judges, it neither prescribes nor prohibits any particular remedy for a violation of that duty. Congress has wisely delegated to the judiciary the task of fashioning the remedies that will best serve the purpose of the legislation." *Id.* at 862, 108 S. Ct. at 2204. The Supreme Court provided three factors to weigh when determining whether to grant relief: "the risk of injustice to the parties in the particular case, the risk that the denial of relief will produce injustice in other cases, and the risk of undermining the public's confidence in the judicial process." *Id.* at 864, 108 S. Ct. at 2205.

Although *Liljeberg* was decided on a Rule 60(b) posture, this Court has previously contemplated whether § 455(a) could be used to reverse a final judgment on direct appeal, and we found that it could. *See United States v. Kelly*, 888 F.2d 732, 747 (11th Cir. 1989). We further explained that because Rule 60(b)(6) is typically limited to "extraordinary circumstances," "the standard for reversal on appeal in cases involving § 455(a) violations may not be as stringent

---

[32] Rule 60(b) of the Federal Rules of Civil Procedure allows a court to set aside a final judgment upon the movant's showing of certain enumerated grounds, such as fraud, mistake, or newly discovered evidence. Fed. R. Civ. P. 60(b). Subpart (6) of the rule includes a catch-all for "any other reason that justifies relief." Fed. R. Civ. P. 60(b)(6).

22-13129                TJOFLAT, J., Dissenting                65

as the three-part test enunciated in *Liljeberg*." *Id*. at 747 n.27. Here, the risk of injustice and the deleterious effect on public confidence in the courts could not be more profound. In my view, the most appropriate remedy in light of the unobscured record would be to vacate the judgment on direct appeal.

## VI. POST-APPEAL PROCEEDINGS

The Majority has affirmed the District Court's judgment, but it has likely not brought the litigation to a conclusion. Once our mandate issues, the defendants may pursue two courses of action. The first is to move the District Court pursuant to Rule 60(b)(6) for the vacatur of the Count VI judgment on the grounds of demonstrated impartiality and bias. The second course of action is to move the District Court for sanctions against the SEC.[33]

In *Pelletier v. Zweifel*, we explained that:

[T]hree types of conduct warrant the imposition of Rule 11 sanctions: (1) when a party files a pleading that has no reasonable factual basis; (2) when the party files a pleading that is based on a legal theory

---

[33] In *Cooter & Gell v. Hartmarx Corp.*, the Supreme Court held that a district court could allot Rule 11 sanctions after the plaintiff voluntarily dismissed the action. 496 U.S. 384, 395, 110 S. Ct. 2447, 2455 (1990). The Court explained that "a federal court may consider collateral issues after an action is no longer pending" and that Rule 11 "requires the determination of a collateral issue: whether the attorney has abused the judicial process . . . . Such a determination may be made after the principal suit has been terminated." *Id*. at 395–96, 110 S. Ct. at 2455–56.

that has no reasonable chance of success and that can-
not be advanced as a reasonable argument to change
existing law; and (3) when the party files a pleading in
bad faith for an improper purpose.

921 F.2d at 1514.

Of interest here is the third type of conduct, which is sourced in Federal Rule of Civil Procedure 11(b)(1). When the SEC filed its complaint, it certified that the complaint was "not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation." Fed. R. Civ. P. 11(b)(1). This rule effectively codifies the common law tort of abuse of process, which occurs when "[o]ne . . . uses a legal process, whether criminal or civil, against another primarily to accomplish a purpose for which it is not designed." Restatement (Second) of Torts § 682 (A.L.I. 1977). "The gravamen of the misconduct" the tort concerns itself with "is not the wrongful procurement of legal process or the wrongful initiation of criminal or civil proceedings" but rather "the misuse of process, no matter how properly obtained." *Id.* § 682 cmt. a. The record in this case contains prima facie evidence that the SEC's lawyers brought the instant lawsuit because the SEC wanted to harass the defendants and put them out of business.

The SEC knew that its 300-plus causes of action were both unmanageable and unsupported by the facts. Evidently, the jury, too, was skeptical, finding the defendants not liable on thirteen of the fourteen counts. Further evidence that the SEC's goal was to harass the defendants can be found in its complaint. There, the SEC

sought as its principal remedy a "[p]ermanent [i]njunction restraining and enjoining Defendants, their officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them, and each of them, from violating the federal securities laws alleged in this [c]omplaint."[34] In other words, the SEC sought an injunction ordering the defendants (and the others) to obey the law.

An "obey-the-law" injunction is noxious yet refreshingly self-descriptive—it is an injunction that orders a defendant to obey the law, rather than to abide by or refrain from a precise and ascertainable mode of conduct. They have long been disallowed in the Eleventh Circuit. In fact, over twenty-five years ago, we wrote: "This Circuit has held repeatedly that 'obey the law' injunctions are unenforceable." *Fla. Ass'n of Rehab. Facilities, Inc. v. State of Fla. Dep't of Health & Rehab. Servs.*, 225 F.3d 1208, 1222 (11th Cir. 2000). The SEC knew this when it requested relief because we have, *on several occasions*, repudiated injunctions granted to the SEC specifically. In *SEC v. Goble*, we vacated the SEC's injunction and chided the SEC for its "[g]laringly absent" discussion of why the injunction complied with federal law. 682 F.3d 934, 950–951 (11th Cir. 2012). And

---

[34] Enjoining the defendants' "officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them" would be to enjoin non-parties. As non-parties they would not be subject to the District Court's civil contempt power.

22-13129                TJOFLAT, J., Dissenting                68

in *SEC v. Smyth*, we explained that the SEC's injunction was unenforceable because it was a "quintessential 'obey-the-law' injunction."420 F.3d 1225, 1233 n.14 (11th Cir. 2005).

Obey-the-law injunctions present numerous issues, including vagueness, due process concerns, and a lack of enforceability. Moreover, because injunctions are enforced through civil and criminal contempt proceedings, obey-the-law injunctions run the risk of circumventing a defendant's Sixth and Seventh Amendment rights to a trial by jury.

To illustrate, imagine that the District Court granted the SEC's requested relief, and that the SEC subsequently found that Dilley "violat[ed] the federal securities laws." On the SEC's initiative, the Court could order Dilley to show cause that he did not violate the injunction. If he could not prove this to the satisfaction of the Court, Dilley would be found in civil contempt and delivered to the custody of the Attorney General. Ordinarily, a civil contemnor has a key to the jail; he can get out when he performs the act enjoined. But here, Dilley was not enjoined to perform or not perform a specific act. He was simply ordered not to violate the law; something he cannot undo. The Court has issued an injunction it is powerless to enforce via its civil contempt power because the contemnor, Dilley, would have no means of purging his contempt.

In sum, the SEC filed a complaint replete with ambiguity in violation of the Federal Rules of Civil Procedure and binding precedent. It knowingly requested an illegal form of relief and conducted the litigation with no regard for the defendants' due process

rights. It presented fourteen convoluted counts to the jury, secured a verdict on Count VI, and successfully obtained sweeping remedies. In fewer words, the SEC abused the process.

## CONCLUSION

For the foregoing reasons, I dissent.

**UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA**

CASE NO. _____

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| SPARTAN SECURITIES GROUP, LTD., | ) |
| ISLAND CAPITAL MANAGEMENT LLC, | ) |
| CARL E. DILLEY, | ) |
| MICAH J. ELDRED, and | ) |
| DAVID D. LOPEZ, | ) |
| | ) |
| Defendants. | ) |
| | ) |

**COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF**

Plaintiff Securities and Exchange Commission ("Plaintiff" or the "Commission") alleges:

## I. INTRODUCTION

1.      The Commission brings this action to enjoin Defendants Spartan Securities Group, Ltd. ("Spartan Securities"), Island Capital Management LLC, d/b/a Island Stock Transfer ("Island Stock Transfer"), Carl E. Dilley ("Dilley"), Micah J. Eldred ("Eldred"), and David D. Lopez ("Lopez") (collectively, "Defendants") from violating the provisions of the federal securities laws described herein.

2.      Spartan Securities, a registered broker-dealer, and Island Stock Transfer, a registered transfer agent, are commonly owned and tout their "one-stop shop" services provided

in tandem to issuers of microcap securities.  At material times to this Complaint, Dilley, Eldred, and Lopez were common owners of the parent of both Spartan Securities and Island Stock Transfer, and principals of both Spartan Securities and Island Stock Transfer.

3.      This action involves Defendants' roles in one or two separate fraudulent schemes from approximately December 2009 through August 2014 to manufacture at least 19 public companies for sale fundamentally premised on a deceptive public float of purportedly "free-trading" securities:    14 by Alvin Mirman and Sheldon Rose (the "Mirman/Rose Companies," identified in paragraph 30 below) and five by Michael Daniels, Andy Fan, and Diane Harrison (the "Daniels Companies," identified in paragraph 102 below).

4.      The fraudulent schemes depended on misrepresentations and omissions to, among others, the Commission, the Financial Industry Regulatory Authority ("FINRA"), and the Depository Trust Company ("DTC") that the Mirman/Rose and Daniels Companies were legitimate small businesses with independent management and shareholders.  In reality, both the management and shareholders were nothing more than nominees for control persons who always intended merely to sell all the securities of the companies privately in bulk for their own benefit.  The essential value of these securities (each bulk sale realized proceeds of hundreds of thousands of dollars) was their false designation as "free-trading" with the ability to be sold immediately on the public market.  If the truth had been known to the public, the securities would have been restricted from such sales and would have had little value.

5.      Dilley and Eldred knew or were reckless in not knowing from the onset that the Mirman/Rose Companies and Daniels Companies, respectively, were pursuing their stated plans under false pretenses and instead being packaged for sale as public vehicles, and that the

2

shareholders were mere nominees for the control persons. Nonetheless, Defendants took critical steps to advance the frauds.

6.      Dilley schemed with Mirman and Rose, and Eldred schemed with Daniels, Fan and Harrison, to defraud the public that the Mirman/Rose Companies and Daniels Companies were operating businesses with independent management and shareholders, rather than undisclosed "blank check" companies (sometimes referred to as "shells" or "vehicles") for sale. In furtherance of the Mirman/Rose scheme, Dilley signed false Form 211 applications submitted to FINRA, contributed to false DTC applications, found potential shell buyers, signed an escrow agreement and false attestation letters for shell buyers, and effectuated the bulk transfer of the entire deceptive public float of Mirman/Rose Companies to shell buyers. Eldred similarly schemed with Daniels, Fan and Harrison by filing false Forms 211 with FINRA, signing false securities deposit forms and executing trades in Spartan Securities' proprietary account, all in support of the manufacture of undisclosed public vehicles – one of which Eldred expressly proposed to acquire himself while its Form 211 was pending.

7.      A necessary step in both fraudulent schemes was for the issuer's stock to be eligible for public quotation, which requires a broker-dealer to file a Form 211 application with FINRA to demonstrate compliance with Rule 15c2-11 under the Securities Exchange Act of 1934 ("Exchange Act"). FINRA typically raises specific concerns or seeks further information from the broker-dealer in one or more deficiency letters before clearing the application. Meanwhile, transfer agents perform a number of roles for issuers pertaining to their securities and shareholders, including recording changes of ownership, maintaining the issuer's security

3

holder records, canceling and issuing certificates, and resolving problems arising from lost, destroyed or stolen certificates.

8.    Spartan Securities and Island Stock Transfer acted in tandem to provide these various services which were critical to the Mirman/Rose and Daniels/Fan/Harrison shell factories.  For example, Spartan Securities filed the Form 211 application with FINRA in order for the securities of these 19 issuers to be publicly quoted.  Spartan Securities, Dilley, and Eldred made materially false statements and omissions to FINRA regarding the purpose, management and shareholders of the Mirman/Rose Companies and Daniels Companies.  Spartan Securities and its principals also had information that undermined any reasonable basis that the information required by Rule 15c2-11 was materially accurate and from a reliable source.  Spartan Securities then initiated unpriced quotations for all the Mirman/Rose Companies and Daniels Companies (except PurpleReal) upon FINRA's clearance of the Form 211.

9.    Lopez was a Spartan Securities principal who, with Dilley and Eldred's knowledge, personally undertook responsibility for much of the Form 211 process on at least four Mirman/Rose Companies.  In addition, Lopez was Spartan Securities' Chief Compliance Officer and the principal responsible for effectuating its extensive written policies and procedures applicable to Form 211 applications.  Nonetheless, Lopez knowingly or recklessly ignored those procedures and the other requirements inherent in Rule 15c2-11, including failing to conduct any investigation or inquiry into red flags raised by FINRA in the deficiency letters and other adverse information in Spartan Securities' possession, or even to familiarize himself with the issuers.  As a result, Lopez was a substantial factor in Spartan Securities'

4

failure to have a reasonable basis for believing that required information about those four Mirman/Rose Companies was accurate and from a reliable source.

10.     After obtaining Form 211 clearance for the Mirman/Rose Companies, Spartan Securities and Island Stock Transfer then initiated and provided false information for applications filed with DTC through which the securities became eligible for electronic clearance.  Island Stock Transfer also effectuated both the bulk issuance and transfer of the Mirman/Rose Company securities without restriction despite Dilley's knowing (or recklessly not knowing) and numerous red flags that the securities were in the hands of affiliates and therefore restricted, while Spartan Securities effectuated the unlawful deposit and open-market sales of some Daniels Company shares by signing false deposit requests and entering pre-arranged trades through a proprietary account.

11.     As a result of the conduct alleged in this Complaint:

(a)     Defendant Spartan Securities violated Sections 5(a), 5(c), 17(a)(1) and 17(a)(3) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77e(a), 77e(c), 77q(a)(1), 77q(a)(3), and Sections 10(b) and 15(c)(2) and Rules 10b-5 and 15c2-11 of the Exchange Act, 15 U.S.C. §§ 78j(b), 78o(c)(2) and 17 C.F.R. §§ 240.10b-5, 240.15c2-11; and aided and abetted violations of Section 17(a) of the Securities Act, 15 U.S.C. § 77e(a), and Section 10(b) and Rule 10b-5 of the Exchange Act, 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5;

(b)     Defendant Island Stock Transfer violated Sections 5(a), 5(c), 17(a)(1) and 17(a)(3) of the Securities Act, 15 U.S.C. §§ 77e(a), 77e(c), 77q(a)(1), 77q(a)(3), and Section 10(b) and Rule 10b-5 of the Exchange Act, 15 U.S.C. § 78j(b) and 17 C.F.R.

5

§ 240.10b-5; and aided and abetted violations of Section 17(a) of the Securities Act, 15 U.S.C. § 77e(a), and Section 10(b) and Rule 10b-5 of the Exchange Act, 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5;

(c) Defendant Dilley violated Sections 5(a), 5(c), 17(a)(1) and 17(a)(3) of the Securities Act, 15 U.S.C. §§ 77e(a), 77e(c), 77q(a)(1), 77q(a)(3), and Section 10(b) and Rule 10b-5 of the Exchange Act, 15 U.S.C. § 78j(b), and 17 C.F.R. § 240.10b-5; and aided and abetted violations of Section 17(a) of the Securities Act, 15 U.S.C. § 77e(a), and Sections 10(b) and 15(c)(2) and Rules 10b-5 and 15c2-11 of the Exchange Act, 15 U.S.C. §§ 78j(b), 78o(c)(2), and 17 C.F.R. §§ 240.10b-5, 240.15c2-11;

(d) Defendant Eldred violated Sections 17(a)(1) and 17(a)(3) of the Securities Act, 15 U.S.C. §§ 77q(a)(1), 77q(a)(3), and Section 10(b) and Rule 10b-5 of the Exchange Act, 15 U.S.C. § 78j(b), and 17 C.F.R. § 240.10b-5; and aided and abetted violations of Section 17(a) of the Securities Act, 15 U.S.C. § 77e(a), and Sections 10(b) and 15(c)(2) and Rules 10b-5 and 15c2-11 of the Exchange Act, 15 U.S.C. §§ 78j(b), 78o(c)(2), and 17 C.F.R. §§ 240.10b-5, 240.15c2-11;

(e) Defendant Lopez aided and abetted violations of Section 15(c)(2) and Rule 15c2-11 of the Exchange Act, 15 U.S.C. § 78o(c)(2) and 17 C.F.R. § 240.15c2-11; and

(f) Unless enjoined, Defendants are reasonably likely to continue to violate the federal securities laws.

12. The Commission therefore respectfully requests the Court enter an order: (i) permanently enjoining Defendants from violating the federal securities laws; (ii) directing Island Stock Transfer to pay disgorgement with prejudgment interest; (iii) directing Defendants

6

to pay civil money penalties; and (iv) imposing penny stock bars against Spartan Securities, Dilley, Eldred and Lopez.

## II. DEFENDANTS AND OTHER RELEVANT PERSONS

### A. DEFENDANTS

13.    **Spartan Securities** has been registered with the Commission as a broker-dealer since 2001, with its principal place of business in Clearwater, Florida.  Spartan Securities is a Florida limited partnership wholly owned by Connect X Capital Markets LLC ("Connect X"), whose managing member is Eldred and shareholders have included Dilley, Eldred and Lopez. Between 2009 and 2018, Spartan Securities has been the subject of at least 10 disciplinary actions by FINRA or the NASDAQ Stock Market.

14.    **Island Stock Transfer** has been registered with the Commission as a transfer agent since 2003, with its principal place of business in Clearwater, Florida.  Island Stock Transfer is a Florida limited liability company wholly owned by Connect X that shares office space, computer systems, officers and employees with Spartan Securities.

15.    **Dilley**, a resident of Seminole, Florida, was a registered principal and representative of Spartan Securities from 2004 to 2015.  Dilley was also the President of Island Stock Transfer from 2004 until January 2018.  Dilley is presently the Vice President of another registered transfer agent owned by Connect X and of which Eldred and Lopez are also officers.

16.    **Eldred**, a resident of Seminole, Florida, has been a registered principal and representative of Spartan Securities and the Chief Executive Officer of Island Stock Transfer from 2001 to the present.

7

17.     **Lopez**, a resident of St. Petersburg, Florida, has been a registered principal and Chief Compliance Officer of Spartan Securities from March 2001 to the present and the Chief Compliance Officer of Island Stock Transfer from August 2006 to the present.

## B. OTHER RELEVANT PERSONS

18.     **Alvin Mirman**, of Sarasota, Florida, was the undisclosed control person of Changing Technologies, Inc. ("Changing Technologies") and an undisclosed control person, along with Rose, of On the Move Systems Corp. ("On the Move"), Rainbow Coral Corp. ("Rainbow Coral"), First Titan Corp. ("First Titan"), Neutra Corp. ("Neutra"), Aristocrat Group Corp. ("Aristocrat"), First Social Networx Corp. ("First Social"), Global Group Enterprises Corp. ("Global Group"), E-Waste Corp. ("E-Waste") and First Independence Corp. ("First Independence").  Mirman was a defendant in SEC v. McKelvey et al., Case No. 15-cv-80496 (S.D. Fla. 2015), in which the Court entered, by consent, a judgment of permanent injunction, officer and director bar and penny stock bar against Mirman.  On August 19, 2016, Mirman pled guilty to a one-count Information charging him with conspiracy to commit securities fraud.  U.S. v. Mirman et al., Case No. 16-cr-20572 (S.D. Fla.).   Both the Commission and criminal actions included his misconduct in connection with the Mirman/Rose Companies.  In 2007, without admitting or denying wrongdoing, Mirman consented to being barred by FINRA from association with any FINRA member.

19.     **Sheldon Rose**, of Sarasota, Florida, was the undisclosed control person of Kids Germ Defense Corp. ("Kids Germ"), Obscene Jeans Corp. ("Obscene Jeans"), Envoy Group Corp. ("Envoy") and First Xeris Corp. ("First Xeris") and an undisclosed control person, along with Mirman, of On the Move, Rainbow Coral, First Titan, Neutra, Aristocrat, First Social,

8

Global Group, E-Waste and First Independence. The Commission entered, by consent, a cease-and-desist order, officer and director bar and penny stock bar against Rose. In re Sheldon Rose et al., Exch. Act Rel. No. 78894 (Sept. 21, 2016). The Commission later ordered Rose to pay disgorgement and prejudgment interest in the amount of $2,973,916.18. In re Sheldon Rose, Exch. Act Rel. No. 80301 (Mar. 23, 2017). On November 9, 2016, Rose pled guilty to a one-count Information charging him with conspiracy to commit securities fraud. U.S. v. Kass et al., Case No. 16-cr-20706 (S.D. Fla.). Both the Commission and criminal actions included his misconduct in connection with the Mirman/Rose Companies.

20.    **Michael Daniels**, of Palmetto, Florida, was the undisclosed control person of Dinello Restaurant Ventures, Inc., n/k/a AF Ocean Investment Management Co. ("Dinello/AF Ocean"), President, Chief Executive Officer, Chief Financial Officer, Treasurer and Chairman of the Board of Court Document Services, Inc., n/k/a ChinAmerica Andy Movie Entertainment Media Co. ("Court/ChinAmerica"), Principal Executive Officer, Secretary, Treasurer, Chairman of the Board and Chief Financial Officer of Quality Wallbeds, Inc., n/k/a Sichuan Leaders Petrochemical Co. ("Wallbeds/Sichuan"), Secretary, Chief Financial Officer, Treasurer, Director, and Chairman of the Board of Top to Bottom Pressure Washing, Inc., n/k/a Ibex Advanced Mortgage Technology Co. ("TTB/Ibex"), and undisclosed control person of PurpleReal.com Corp. ("PurpleReal"). On April 25, 2018, the Commission filed a Complaint against Daniels related to his conduct in connection with the Daniels Companies. SEC v. Harrison, et al., No. 8:18-cv-01003 (M.D. Fla.).

21.    **Diane Harrison**, of Palmetto, Florida, was the Chief Financial Officer, Secretary, Treasurer and Director of Dinello/AF Ocean, Treasurer, Principal Accounting

9

Officer and Director of Wallbeds/Sichuan, Director and Secretary of TTB/Ibex, and President, Director, and Chairman of the Board of PurpleReal.  Harrison, an attorney, is the owner of the law firm Harrison Law, PA, which is based in Florida.  Harrison, who is Daniels' wife, is a defendant in the SEC v. Harrison case based on her conduct with respect to the Mirman/Rose Companies and the Daniels Companies.

22.    **Andy Fan**, of Las Vegas, Nevada, was the President, Treasurer, Chief Executive Officer, Chief Financial Officer and Director of Dinello/AF Ocean and Court/ChinAmerica, and was the President and Director of Wallbeds/Sichuan and TTB/Ibex. The Commission entered, by consent, a cease-and-desist order, officer and director bar and penny stock bar against Fan, and ordered him to pay a civil money penalty of $140,000.  In re Andy Z. Fan, Securities Act Rel. No. 10487 (Apr. 25, 2018).  The Commission's action related to Fan's conduct with respect to certain of the Daniels Companies.

## III.  JURISDICTION AND VENUE

23.    The Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1) and 22(a) of the Securities Act, 15 U.S.C. §§ 77t(b), 77t(d)(1) and 77v(a); and Sections 21(d), 21(e) and 27(a) of the Exchange Act, 15 U.S.C. §§ 78u(d), 78u(e) and 78aa(a).

24.    The Court has personal jurisdiction over Defendants and venue is proper in this District because, among other things, some or all of the Defendants reside or transact business in this District and/or participated in the offer, purchase, or sale of securities in this District, and many of the acts and transactions constituting the violations alleged in this Complaint occurred in this District.  In addition, venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events giving rise to the Commission's claims occurred here.

10

25.    In connection with the conduct alleged in this Complaint, Defendants, directly and indirectly, singly or in concert with others, have made use of the means or instrumentalities of interstate commerce, the means or instruments of transportation or communication in interstate commerce, and of the mails.

## IV.  FACTUAL ALLEGATIONS

### A.    The Mirman/Rose Shell Factory

26.    Mirman and Rose, alone or together, manufactured at least 14 undisclosed "blank check" companies in assembly-line fashion in order to sell in bulk the entire deceptive float of purportedly unrestricted securities.

27.    Mirman and Rose manufactured each Mirman/Rose Company in a similar fashion.  Mirman and Rose recruited a sole officer, director, employee, and majority shareholder (the "sole officer") to act in name only.  Mirman and Rose prepared and filed false and misleading registration statements with the Commission (the "Forms S-1") misrepresenting that the sole officer was pursuing a specific business plan (versus Mirman and Rose controlling mere shells to sell all the securities in bulk) and would be solely responsible to solicit investors for the company (versus Mirman and Rose using similar rosters of friends and family to "invest" in name only).

28.    After the Form S-1 became effective, Mirman and Rose solicited the same or virtually the same number of friends and family as shareholders while maintaining complete control through stock certificates with blank stock powers, which are signed by the named shareholder and entitle whoever holds the stock certificate to sell or transfer it.

11

29.    Mirman and Rose directed Spartan Securities and Island Stock Transfer to prepare applications with FINRA and DTC that contained materially false and inaccurate information in order to make the Mirman/Rose Companies marketable as public vehicles. Specifically, Mirman and Rose needed the purportedly public float of securities available for immediate public quotation and sale through DTC electronic clearance. Mirman and Rose then effectuated the bulk sale of the shares of the issuer for a single cash price by delivering all the stock certificates with blank stock powers to a single buyer group. Mirman and Rose split the net proceeds after paying a nominal amount to their straw sole officer and shareholders.

30.    Mirman and Rose, alone or together, created and developed the following Mirman/Rose Companies:

| Mirman/Rose Company | Control Person(s) | Effective Date of Form S-1 | Date of Change of Control | Time Between Form S-1 and Change of Control |
|---|---|---|---|---|
| Kids Germ | Rose | 12/2009 | 2/2010 | 3 months |
| Obscene Jeans | Rose | 8/2010 | 12/2010 | 4 months |
| On the Move | Mirman/Rose | 12/2010 | 6/2011 | 6 months |
| Rainbow Coral | Mirman/Rose | 1/2011 | 10/2011 | 9 months |
| First Titan | Mirman/Rose | 2/2011 | 9/2011 | 7 months |
| Neutra | Mirman/Rose | 4/2011 | 11/2011 | 7 months |
| Aristocrat | Mirman/Rose | 11/2011 | 7/2012 | 8 months |
| First Social | Mirman/Rose | 3/2012 | 2/2013 | 11 months |
| Global Group | Mirman/Rose | 3/2012 | 4/2013 | 13 months |
| E-Waste Corp. | Mirman/Rose | 6/2012 | 4/2013 | 10 months |

12

| Mirman/Rose Company | Control Person(s) | Effective Date of Form S-1 | Date of Change of Control | Time Between Form S-1 and Change of Control |
|---|---|---|---|---|
| First Independence | Mirman/Rose | 8/2012 | 5/2013 | 9 months |
| Envoy Group | Rose | 9/2013 | 4/2014 | 7 months |
| Changing Technologies | Mirman | 10/2013 | 6/2014 | 8 months |
| First Xeris | Rose | 1/2014 | N/A | N/A |

31.     Mirman and Rose never intended to take any step to advance the purported business plan stated in the Form S-1.  Rather, as evidenced in part by the short amount of time between Form S-1 effectiveness and the change of control, Mirman and Rose solely sought to manufacture a public vehicle in assembly-line fashion, and sell all its securities in bulk once obtaining the necessary clearances from the Commission, FINRA, and DTC.

32.     Mirman and Rose retained Spartan Securities and Island Stock Transfer for a number of critical steps to develop the Mirman/Rose Companies in quick succession from Form S-1 effectiveness to public vehicles with securities eligible for public quotation and electronic clearance.

33.     Mirman and Rose routinely contacted Dilley to simultaneously start broker services through Spartan Securities and transfer agent services through Island Stock Transfer. Mirman or Rose emailed Dilley stating that the issuer's Form S-1 recently had gone effective and "[w]e want to start a 15c211" and have Island Stock Transfer act as transfer agent.  Dilley instructed Spartan Securities and Island Stock Transfer employees to send the materials for, respectively, the Form 211 application and transfer agent services to Mirman or Rose.

13

34.    Spartan Securities and Island Stock Transfer, which share office space, computer systems, officers and employees, acted in tandem for the Mirman/Rose Companies. For example, Island Stock Transfer prepared certified shareholder lists at the request and upon the approval of Mirman and Rose. Spartan Securities then submitted those shareholder lists to FINRA as part of the Form 211 applications.

35.    Spartan Securities and Island Stock Transfer's actions allowed Mirman and Rose to sell the Mirman/Rose Companies via the bulk sale of all the issued securities to a small buyer group generating combined proceeds totaling at least $3.7 million:

| Mirman/Rose Company | Spartan Securities Form 211 Signatory | Island Stock Transfer Original Issuance | FINRA Form 211 Clearance | DTC Filing | Island Stock Transfer Bulk Transfer To Buyer Group |
|---|---|---|---|---|---|
| Kids Germ | Dilley | 12/2009 | 1/2010 | 1/2010 | 2/2010 |
| Obscene Jeans | Dilley | 8/2010 | 9/2010 | 10/2010 | 12/2010 |
| On The Move | Dilley | 1/2011 | 2/2011 | 4/2011 | 6/2011 |
| Rainbow Coral | Dilley | 2/2011 | 3/2011 | 7/2011 | 10/2011 |
| First Titan | Dilley | 4/2011 | 5/2011 | 7/2011 | 9/2011 |
| Neutra | Dilley | 6/2011 | 7/2011 | 8/2011 | 11/2011 |
| Aristocrat Group | Dilley | 12/2011 | 12/2011 | 2/2012 | 7/2012 |
| First Social Networx | Dilley | 3/2012 | 4/2012 | 7/2012 | 2/2013 |
| Global Group | Dilley | 4/2012 | 5/2012 | 8/2012 | 4/2013 |
| E-Waste | Dilley | 7/2012 | 8/2012 | 9/2012 | 4/2013 |
| First Independence | Dilley | 2/2013 | 3/2013 | 4/2013 | 5/2013 |
| Envoy Group | Dilley | N/A | 12/2013 | N/A | N/A |
| Changing Technologies | Dilley | 11/2013 | 1/2014 | 4/2014 | 6/2014 |
| First Xeris | Dilley | 1/2014 | 3/2014 | 4/2014 | N/A (SEC stop order) |

14

**Dilley's Knowledge of/Participation in the Mirman/Rose Fraud**

36.     Dilley, a registered principal of Spartan Securities and Island Stock Transfer, knew or was reckless in not knowing that Mirman and Rose were manufacturing the Mirman/Rose Companies to control and sell a deceptive float of purportedly unrestricted securities (versus the material misrepresentations in the Forms 211 and Commission filings that the issuers were legitimate startups controlled by the nominee sole officer with an independent shareholder base).

37.     Dilley knew or was reckless in not knowing of Mirman and Rose's undisclosed control of and intent for the Mirman/Rose Companies with the earliest issuer, Kids Germ.  Rose solicited Dilley to have Spartan Securities file the Kids Germ Form 211.  On January 4, 2010 – the same day FINRA cleared the Form 211 – Rose emailed Dilley: "What do you recommend [Kids Germ] do with the DTC, know[ing] the route it is taking?  Do you want to speak to the attorney interested in the company, or do you want me to call him?  If you want me to call him, please forward telephone number."  By email that same day, Dilley responded: "We should apply for DTC eligibility.  Let me call you on this once I talk to [the attorney]."

38.     On January 13, 2010, Island Stock Transfer initiated the DTC application for Kids Germ misrepresenting "the company is not a shell" despite Dilley knowing or recklessly not knowing it was a shell because of, among other things, its lack of assets or revenues and knowing "the route it is taking."  One month later, Island Stock Transfer transferred the Kids Germ shares from Rose's friends and family in bulk without a restrictive legend stamped on the certificate to indicate that the shares are restricted from transfer or sale.  Dilley knew or was reckless in not knowing that these shareholders were affiliates of Kids Germ because of

15

Rose's control over all their shares to effectuate a bulk sale of Kids Germ and therefore, the shares should have been restricted from transfer or sale.

39.     For the second Mirman/Rose Company, Obscene Jeans, Dilley signed the Form 211.  On September 3, 2010 (the day FINRA cleared the Form 211), at Rose's request, Dilley contacted a DTC participant firm to file a DTC application for Obscene Jeans.  By email dated October 4, 2010, Dilley's assistant forwarded to Rose (copying Dilley) the DTC participant firm's refusal to file the application because it was "looking to sponsor operating companies. We understand that having a shell DTC eligible raises its price but we are just not interested in the risk that the company falls into the wrong people's hands."  The following week, despite this admonition, Dilley's assistant asked the firm to reconsider filing the application.  The firm agreed, and Spartan Securities re-initiated the DTC application at the behest of Dilley.

40.     In the meantime, by email dated October 5, 2010, Rose sent Dilley a term sheet for the sale of Obscene Jeans making no mention of the sole officer or purported business plan and focusing largely on the share structure and tradeability status (for example, the shares were quoted with one market maker, which was Spartan Securities).  The term sheet also listed that Obscene Jeans had no liabilities and only $20,000 in assets (all cash).

41.     On October 22, 2010, a buyer emailed Dilley (copying Rose) that "we are closing on [Obscene Jeans] – can you post a bid-ask today?"  The following day, Dilley emailed Rose: "I have to have someone open an account and deposit shares and offer some for sale. . . . I have never seen this to be a requirement from anyone wanting a shell."

42.     On October 25, 2010, Rose emailed Dilley: "I told our mutual friend ???? today to F off, respectfully.  Thanks for your effort."

16

43.    These various documents and events involving Dilley in September and October 2010 were clear signs that Obscene Jeans was a blank check company and Rose controlled all shares of Obscene Jeans for sale in bulk.

44.    One month later, Rose asked Dilley for Island Stock Transfer to act as escrow agent for the sale of Obscene Jeans. At Rose's request, Dilley signed an escrow agreement on behalf of Island Stock Transfer by which all of the shares of Obscene Jeans (both the control block and all purportedly unrestricted shares in the names of the 24 nominee shareholders) were being sold pursuant to one stock purchase agreement for $440,000. All of these documents and communications received by Dilley were clear signs that Obscene Jeans was a blank check company and Rose controlled all shares of Obscene Jeans for sale in bulk.

45.    Dilley communicated exclusively with Mirman and Rose, and was aware that they directed the finances across the Mirman/Rose Companies. For example, by email dated September 19, 2011, Mirman told an Island Stock Transfer employee: "We spoke to Carl [Dilley] and told him we will pay [the Rainbow Coral invoice] through the Neutra account," despite Rainbow Coral and Neutra purportedly being unrelated companies with separate management. Dilley told that same employee (copying Mirman): "We went through what was supposed to happen with this." The following month (and on the same day) Dilley signed the stock certificates by which all the shares of both Rainbow Coral and Neutra were sold to the same buyers represented by the same counsel, demonstrating Dilley knew or was reckless in not knowing that Mirman and Rose controlled all shares of both issuers.

46.    Dilley knew or was reckless in not knowing that Mirman and Rose similarly manufactured E-Waste and Global Group for sale. By email dated December 4, 2012, Mirman

17

wrote Dilley: "We [Mirman and Rose] are in the process of selling E-Waste and the attorney wants," among other things, "[c]onfirmation from the T[ransfer] A[gent] that it has not put restrictions on any free trading shares." Dilley responded "will do," and instructed Island Stock Transfer's Director of Operations to prepare the letter. Dilley signed the requested letter, and was copied on the transmittal of the letter exclusively to Mirman. The Director of Operations soon thereafter signed the stock certificates transferring all of E-Waste's issued shares per the buyer's counsel's instructions.

47.     By email dated January 1, 2013, Rose wrote Dilley: "Please send [the] same letter [as E-Waste] but for Global [Group] and e-mail to me ASAP." Dilley signed that requested letter as well at Rose's request.

48.     On January 16, 2013, the buyer's counsel for E-Waste sent an instruction letter to Island Stock Transfer enclosing a stock purchase agreement expressly stating that "all of the free trading shares of the Company consisting of an aggregate of 3,000,000 shares" were simultaneously being purchased pursuant to stock purchase agreements "of like tenor" with Rose as "Seller's Representative," evidencing that Rose, from whom Island Stock Transfer had exclusively taken instructions to date, controlled the bulk sale of all the "free-trading" shares.

49.     By email dated February 27, 2013, Mirman asked Dilley how to handle a lost certificate of one of the "free-trading" shareholders because "Sheldon [Rose] is in New York today closing Global." Dilley instructed Island Stock Transfer's Director of Operations to respond to Mirman's request. Island Stock Transfer effectuated the bulk transfer of virtually

18

all shares of Global Group to the same exact small group of buyers as E-Waste represented by the same counsel.

50.    Dilley also assisted Rose's efforts to sell the last Mirman/Rose Company, First Xeris.  Soon after FINRA's clearance of Spartan Securities' Form 211 for First Xeris in March 2014, a shell finder emailed Dilley: "I understand Sheldon Rose is trying to contact you regarding his new company [First Xeris] being dropped to Pink[] [Sheet] from QB based on the new bid/ask rules.  I have a buyer for it, but not as a pink."  Dilley then placed daily bids in the open market at Rose's request.  Accordingly, Dilley knew or was reckless in not knowing that First Xeris was a company that Rose controlled and was looking to sell.

**Spartan Securities' Involvement in the Mirman/Rose Fraud**

51.    With Dilley's knowing or reckless involvement, Spartan Securities made crucial contributions to the Mirman/Rose fraud.

52.    Dilley's assistant as of 2012 prepared the Form 211 and all related documents based on templates.  The assistant was instructed that a Spartan Securities' principal would review the assistant's draft and revise it to match the facts particular to each issuer.  Dilley's assistant submitted the Form 211 only upon Dilley's approval.  The assistant would similarly draft responses to FINRA deficiency letters for review by a Spartan Securities principal (Lopez from early 2013 onward), and only sent the responses to FINRA upon that principal's (usually Lopez) express approval.

53.    Dilley signed the Forms 211 for the Mirman/Rose Companies but was largely uninvolved in responding to FINRA's deficiency letters or investigating any red flags identified by FINRA.

19

54. By letter dated February 8, 2013, the Commission's examination staff identified deficiencies and weaknesses in Spartan Securities' compliance with certain federal securities laws, including (1) Spartan Securities' possible violation of Rule 15c2-11 by failing to adequately address numerous red flags and provide material information to FINRA in connection with an unrelated Form 211 application, and (2) Lopez's failure to adequately implement Spartan Securities' written procedures regarding Forms 211 which required Lopez to review the information outlined in Rule 15c2-11 together with any supplemental information obtained and to be alert to red flags.

55. As of 2013, Dilley and Eldred instructed the assistant to send draft responses to the FINRA deficiency letters to Lopez for review and approval. For example, by email dated October 18, 2013, the assistant wrote Eldred: "I know that Dave [Lopez] looks at these [draft deficiency responses] now, but he's been slammed . . . . Any chance you can make an exception and review this one?" Dilley tasked Lopez with that responsibility, for example, when Dilley was unavailable or because Lopez "has got a lot more experience."

56. Mirman and Rose were Spartan Securities' primary source of information throughout the Form 211 process. Mirman and Rose would provide Spartan Securities with documents in the name of the sole officer and many documents they prepared themselves, including spreadsheets detailing who solicited the shareholders and the relationship between the solicitor and shareholder. There were substantial similarities in these shareholders lists, including the sole officer of First Social appearing as a shareholder of 10 other Mirman/Rose Companies.

20

57.     The assistant sent FINRA deficiency letters to Mirman and Rose without confirming or inquiring into the authority of Mirman and Rose to act for the Mirman/Rose Companies (i.e. if they were a reliable source of information), despite the fact that Mirman and Rose were not officers, directors or even named shareholders of any of the Mirman/Rose Companies.

58.     Sometimes within one week of Mirman and Rose's solicitation, Spartan Securities submitted the Form 211 and a cover letter (with exhibits) to FINRA.  However, Spartan Securities consistently misrepresented that: (1) the sole officer – not Mirman or Rose – called Dilley based on a referral (often from an attorney); (2) Spartan Securities agreed to file the Form 211 after "months" of due diligence; and (3) Spartan Securities had no prior relationship with the issuer or any of its "representatives" (despite repeatedly filing Forms 211 at Mirman and Rose's request).

59.     For example, by email dated November 6, 2013, Rose solicited Dilley to file a Form 211 for Envoy Group and told Dilley:  "We know the process, included is some due dil[igence] per our conversation" including a chart listing the Form S-1 shareholders and their purported relationships with each other.  Spartan Securities filed the Envoy Group Form 211 five days later, misrepresenting that Envoy Group's sole officer contacted Dilley (with no mention of Rose), Spartan Securities had conducted due diligence over the past month, and Spartan Securities had no other relationship with Envoy Group's "representatives."

60.     Each Form 211 cover letter also misrepresented that the issuer was "not working with any consultants" despite Dilley knowing or being reckless in not knowing that

21

Mirman and Rose had no publicly disclosed association with the Mirman/Rose Companies yet took various critical actions on their behalf.

61.     Each Form 211 cover letter also misleadingly stated that "there are no other companies that the current officers or directors have requested a listing quotation on," despite Dilley knowing or being reckless in not knowing that Mirman or Rose, who acted as de facto officers and directors, had requested all Forms 211 for the Mirman/Rose Companies.

62.     Each Form 211 cover letter also misrepresented that the issuer was not in negotiations for any actual or potential merger or acquisition, despite Dilley knowing or being reckless in not knowing that the first Mirman/Rose Company had been available for sale upon Form 211 clearance by FINRA and his involvement in numerous other sales by Mirman and Rose shortly after Form 211 clearance.

63.     Each cover letter also attached a shareholder chart stating that the sole officer had solicited each shareholder as a "friend" and that no other people had been solicited to invest, when in fact Mirman and Rose had solicited the shareholders and reused many of the same shareholders across up to 12 Mirman/Rose Companies.  Dilley knew or was reckless in not knowing that Mirman and Rose controlled all the shares given, among other things, the substantial similarities across the shareholder lists.

64.     Each Form 211 cover letter also misrepresented that the Mirman/Rose Company was following a specific business plan, despite Dilley knowing or being reckless in not knowing that the issuer was merely a public vehicle being packaged for sale and controlled by Mirman and Rose.

22

65.     Each Form 211 also misrepresented that Spartan Securities was not aware or in possession of any material information, including adverse information, regarding the Mirman/Rose Company, despite Dilley knowing or being reckless in not knowing that Mirman and Rose were undisclosed control persons developing the Mirman/Rose Company as a mere public vehicle to be sold as a shell.

66.     No one at Spartan Securities questioned the accuracy of the Rule 15c2-11(a) information for any of the Mirman/Rose Companies.  The Forms S-1 described start-up companies run exclusively by the sole officer with no mention of Mirman or Rose.  Dilley did not even review (but "just kept on file") the Forms S-1 which were strikingly similar across the Mirman/Rose Companies, including: (1) the same number of issued shares; (2) similar annual budgets (purportedly for effectuation of vastly different business plans); (3) the same small offering size (dwarfed by the annual budgets); and (4) similar assets (all cash and substantially the same amount):

23

### MIRMAN/ROSE COMPANY FORM S-1 DISCLOSURES

| Mirman/Rose Company | Form S-1 Shares | Form S-1 Offering Size | # Of Shares In Name Of Sole Officer | Total Assets (All Cash) | Operating Budget (Duration) | Sole Officer # of Hours Work Week |
|---|---|---|---|---|---|---|
| **Kids Germ** | 3,000,000 | $30,000 | 9,000,000 | $5,351 | $400,000 (18 months) | 10-25 hours |
| **Obscene Jeans** | 3,000,000 | $52,500 | 9,000,000 | $9,000 | $500,000 (18 months) | 10-25 hours |
| **On The Move** | 3,500,000 | $52,500 | 9,000,000 | $9,000 | $477,500 (12 months) | 10-25 hours |
| **Rainbow Coral** | 2,500,000 | $31,250 | 9,000,000 | $8,912 | $500,000 (18 months) | 10-25 hours |
| **First Titan** | 3,000,000 | $37,500 | 9,000,000 | $8,922 | $587,500 (18 months) | 10-25 hours |
| **Neutra** | 3,000,000 | $42,000 | 9,000,000 | $8,900 | $425,000 (12 months) | 10-25 hours |
| **Aristocrat** | 3,900,000 | $39,000 | 9,000,000 | $8,900 | $500,000 (18 months) | 10-25 hours |
| **First Social** | 3,000,000 | $45,000 | 9,000,000 | $8,900 | $475,000 (18 months) | 10-25 hours |
| **Global Group** | 3,000,000 | $34,500 | 9,000,000 | $8,900 | $500,000 (18 months) | 10-25 hours |
| **E-Waste** | 3,000,000 | $36,000 | 9,000,000 | $8,301 | $600,000 (18 months) | 10-25 hours |
| **First Independence** | 3,000,000 | $34,500 | 9,000,000 | $8,900 | $500,000 (18 months) | 10-25 hours |
| **Envoy Group** | 3,000,000 | $37,500 | 9,000,000 | $8,908 | $612,500 (18 months) | 10-25 hours |
| **Changing Technologies** | 3,000,000 | $30,000 | 9,000,000 | $8,900 | $339,000 (18 months) | 10-25 hours |
| **First Xeris** | 3,000,000 | $39,000 | 9,000,000 | $8,976 | $650,000 (18 months) | 10-25 hours |

24

67.    Moreover, many Mirman/Rose Companies publicly filed periodic reports with the Commission prior to Form 211 clearance which reported no assets, revenues, or expenses other than professional fees.

68.    In at least 7 deficiency letters (including those for First Independence, Changing Technologies and First Xeris), FINRA requested detailed information with respect to the circumstances surrounding the registered offering per the Form S-1, including how many persons were solicited and ultimately invested.  Spartan Securities submitted shareholder charts stating that the sole officer had solicited each shareholder as a "friend," and reported the same solicitation success rate (24 solicited, 24 invested).  The lists had remarkably similar features, including the same number of shares and shareholders, and overlapping rosters (some shareholders were the sole officer of other Mirman/Rose Companies and appeared on up to 12 lists).

69.    In at least 12 deficiency letters (including those for First Independence, Envoy Group and First Xeris), FINRA specifically inquired whether anyone other than the named shareholders had control over any aspect of the shares, including "any past, present, or future arrangements."  Spartan Securities conducted no inquiry despite, among other things, the striking similarities across rosters that contained the same shareholder names, Dilley's involvement in bulk sales of all shares by Mirman and Rose, and Island Stock Transfer's bulk issuance and transfer of all shares of Mirman/Rose Companies.

70.    Spartan Securities also failed to inquire regarding numerous red flags as required by Rule 15c2-11, which requires a broker-dealer to evaluate any "adverse information" in its possession when determining whether it has a reasonable basis for the

25

accuracy of information and reliability of its source.  For Spartan Securities, such red flags included the substantial similarities in the Forms S-1, the substantially similar shareholder rosters, the use of sole officers who were related to each other and appeared as shareholders on other Mirman/Rose Companies, and Mirman and Rose as the same solicitors and sources of information across the Mirman/Rose Companies.

71.    FINRA also posed several other issuer-specific questions or concerns in its deficiency letters.  In responding to FINRA's deficiency letters, Spartan Securities did not follow its own written policies and procedures which required that the assistant "together with the CCO or other designated officer gather information from the issuer to respond to the FINRA comments" in deficiency letters and investigate red flags.  Spartan Securities' procedures further required the designated officer to initial each page of correspondence to FINRA evidencing that review and investigation.  None of Spartan Securities' correspondence to FINRA in connection with the Mirman/Rose Companies contained any such initials.

72.    Lopez cursorily reviewed and approved Spartan Securities' responses to at least the following deficiency letters for the Forms 211 of First Independence, Envoy Group, Changing Technologies and First Xeris:

| Mirman/Rose Company | Date of FINRA Deficiency Letter | Date of Spartan Response | Number of Questions from FINRA |
|---|---|---|---|
| First Independence | 2/27/2013 | 3/12/2013 | 7 |
| Envoy Group | 11/21/2013 | 11/25/2013 | 6 |
| Envoy Group | 12/5/2013 | 12/9/2013 | 1 |
| Envoy Group | 12/17/2013 | 12/18/2013 | 1 |
| Changing Technologies | 12/3/2013 | 12/17/2013 | 4 |
| First Xeris | 2/7/2014 | 2/13/2014 | 5 |

26

73.     Lopez approved each response within an hour of the assistant's request, making no inquiry into FINRA's questions (or the issuer more generally) despite FINRA raising at least 24 questions about these four issuers.

74.     For example, FINRA questioned whether First Independence was a "shell company" despite its non-shell designation in periodic reports. Despite understanding that any shell issue should be investigated by asking the issuer basic questions about its business operations to see whether it is a "blank check company, that there's an ongoing effort to further the business plan," Lopez made no such investigation or inquiry with respect to First Independence's business operations or purpose.

75.     Spartan Securities (including Lopez) failed to review Rule 15c2-11 information or inquire further regarding red flags that were expressly raised by FINRA on the subsequently filed Forms 211. On the Envoy Group Form 211, in its deficiency letter dated November 21, 2013, FINRA asked Spartan Securities for detailed descriptions of the relationships between: (1) Envoy Group, Jocelyn Nicholas (Envoy Group's sole officer) and Mark Nicholas (Kids Germ's sole officer); (2) Envoy Group, Jocelyn Nicholas, Mark Nicholas, and Kids Germ; and (3) Mark Nicholas and Spartan Securities. By email dated November 22, 2013, Dilley's assistant forwarded this letter to Dilley and Lopez, and alerted them to the facts that "Shelly [Rose] sent us this one" and that Spartan Securities had filed the Form 211 for Kids Germ. Dilley and Lopez conducted no investigation into the two issuers (including whether Rose was a reliable source for Envoy Group) or Spartan Securities' relationship with either of them. Specifically, Lopez merely told the assistant that "I am not familiar with any of those people or that company," and Dilley instructed the assistant simply to rely on Envoy Group's

27

response.  Lopez then approved the deficiency response, which misrepresented that the only relationship among all the identified parties was the spousal relationship between Jocelyn and Mark Nicholas, Envoy Group's sole officer had "no participation in any way with Kids Germ," and Spartan Securities had no relationship with Kids Germ "and/or any of its representatives."

76.     In its deficiency letter dated November 25, 2013, FINRA inquired a second time for details of any relationship between Envoy Group's sole officer and Kids Germ.  Lopez approved the deficiency response, which misrepresented that Envoy Group's sole officer's only relationship with Kids Germ was as a 0.42% shareholder despite the fact that she was also an officer of Kids Germ.

77.     Dilley and Lopez had numerous facts readily in their possession contradicting these representations and the Rule 15c2-11 information, including: (1) Spartan Securities through Dilley filed both the Envoy Group and Kids Germ Form 211, and Kids Germ's DTC application, at Rose's request; (2) Spartan Securities possessed numerous documents showing that Envoy Group's sole officer had become a Kids Germ officer per Spartan Securities' advice to Rose to obtain DTC eligibility; (3) Lopez acted on Rose's authorization to speak with an auditor for Kids Germ despite Rose not being an officer, director, or authorized person on Kids Germ's Corporate Authorization Form; (4) Envoy Group and Kids Germ had 11 shareholders in common (including the sole officers of two other Mirman/Rose Companies) and the same capitalization structure (9,000,000 share control block, 3,000,000 Form S-1 shares among 24 shareholders); and (5) Dilley attempted to arrange a sale of Kids Germ for Rose.

78.     On November 6, 2013, Mirman told Dilley "I need to file a 211 through your firm" for Changing Technologies.  That same day, Rose had solicited Dilley to file the Form

28

211 for Envoy Group. Dilley told Mirman: "Funny you guys called me within a few minutes of each other." Dilley then put Spartan Securities and Island Stock Transfer employees in contact with Mirman, who in turn approved the certified shareholder list for Changing Technologies which Spartan Securities submitted to FINRA with the Form 211.

79. Dilley drafted the portion of the Form 211 representing that Mirman had referred Changing Technologies to Spartan Securities, but that Spartan Securities "does not have any other relationship with Al Mirman." Dilley knew or was reckless in not knowing that this statement was false given the fact that Spartan Securities filed this and other Forms 211 at Mirman's request.

80. By deficiency letter dated December 3, 2013, FINRA asked Spartan Securities for a "detailed explanation of the Issuer's relationship with Al Mirman." Spartan Securities sent FINRA's deficiency letter only to Mirman to address this and other questions. Spartan Securities misrepresented to FINRA that the sole officer approached Mirman, a social acquaintance, for a broker-dealer recommendation and "Mirman has no relationship with Changing Technologies." Lopez authorized this response despite Mirman having solicited Spartan Securities, sent Spartan Securities a series of documents for the Form 211, and approved the certified shareholder list which Spartan Securities submitted to FINRA with the Form 211. Moreover, no one at Spartan Securities (including Lopez) conducted any investigation into Mirman's disciplinary history, including his being barred by FINRA in 2007 from association with any FINRA member.

29

**Island Stock Transfer's Involvement in the Mirman/Rose Fraud**

81.     Mirman and Rose retained Island Stock Transfer as the transfer agent for at least 12 of the Mirman/Rose Companies at or around the same time as retaining Spartan Securities to file the Form 211.  For example, by email dated June 29, 2012, Dilley instructed an employee from each of Spartan Securities and Island Stock Transfer to "send [Rose] 211 docs.  [Transfer agent] agreement same terms as last deal they sent us."

82.     Dilley, Island Stock Transfer's president, originated each relationship and personally took a number of steps on behalf of Island Stock Transfer for Mirman and Rose.  Island Stock Transfer's employees also ignored a host of red flags indicating that Mirman and Rose controlled the issuers as blank check companies and sold all the securities of those issuers owned by affiliates.

83.     Island Stock Transfer has extensive written policies and procedures, which it largely ignored in its various transfer agent functions for the Mirman/Rose Companies.  Island Stock Transfer's policies and procedures contained many provisions intended to ensure that Island Stock Transfer employees communicated only with authorized persons as identified in writing by the issuer clients.  As part of the initial "client" package (sent to Mirman or Rose), Island Stock Transfer requested the issuer to complete a "Corporate Authorization Form" to identify those persons with whom Island Stock Transfer could communicate about the issuer.  Mirman or Rose was named as an authorized person for only two of the 12 Mirman/Rose Companies for which Island Stock Transfer acted as transfer agent, yet for all 12 companies Island Stock Transfer took directions exclusively from Mirman and Rose.

30

84.    Island Stock Transfer's policies and procedures also required the issuer to provide a "list of insiders/control persons" at the onset of the relationship.  Island Stock Transfer's employees requested such lists from Mirman and Rose (not the sole officer), but never received one for any of the Mirman/Rose Companies.

85.    According to Island Stock Transfer's policies and procedures, all transfer records and shareholder lists are the "highly confidential" property of the issuer, and "shall not be given to unauthorized parties under any circumstances."  Moreover, Island Stock Transfer's policies and procedures stated that "[s]hareholders may inquire about shares they own personally, but may not be provided with information concerning any other shareholder." Nonetheless, Island Stock Transfer employees consistently provided both issuer and shareholder information to Mirman and Rose without inquiry.

86.    At Dilley's instruction, Island Stock Transfer employees exclusively communicated with and took direction from Mirman and Rose – and not the sole officer or shareholders – regarding both the issuers and the shares in the names of the friends and family. Island Stock Transfer first prepared a certified shareholder list with personal information provided by Mirman and Rose.  Island Stock Transfer employees (some of whom were also employees of Spartan Securities, which used the lists for the pending Forms 211) requested and acted on Mirman and Rose's approval of the list.  Also, by email dated February 8, 2013, Rose instructed Dilley to make changes to the certified shareholder list of a Mirman/Rose Company.

87.    Mirman and Rose then requested Island Stock Transfer to prepare stock certificates without a restrictive legend (stamped on the certificate to indicate that the shares

31

are restricted from transfer or sale) in the names of the same number of friends-and-family shareholders (24). Island Stock Transfer's policies and procedures provided that shares without restrictive legend "can NOT be issued in the name of an insider" (emphasis in original). Island Stock Transfer training materials reiterated that "Insiders ALWAYS have restricted stock" (emphasis in original). Island Stock Transfer's Director of Operations, who trained the lower-level employees, knew that "insider" included "affiliates" as defined in Rule 144 of the Securities Act. Despite the "affiliate" definition including those controlled by or together with an issuer, the Director of Operations only looked to see if the shareholder was a named officer or 15%+ shareholder (or spouse of either one) to determine the "insider" or "affiliate" status. Even so, Island Stock Transfer issued unlegended certificates in the name of the spouse of the sole officer for at least 4 Mirman/Rose Companies.

88.    Island Stock Transfer delivered all 24 certificates to Mirman and Rose (who were not named shareholders), despite Island Stock Transfer's policies and procedures that shareholder information could only be provided to the shareholders themselves. For example, on February 14, 2013, Island Stock Transfer asked Rose for delivery instructions for "each certificate" of First Independence stock. Rose directed Island Stock Transfer to "mail all of the certificates to me as always in the past."

89.    Shortly after the clearance of Spartan Securities' Form 211, Mirman and Rose requested Island Stock Transfer's assistance with DTC applications premised on the securities being unrestricted. Island Stock Transfer submitted at least 12 DTC transfer agent attestation forms (6 signed by Dilley) attesting that it would comply with DTC's operational requirements, including exercising diligence in the related securities transactions and providing DTC with

32

complete and accurate information about the securities. Island Stock Transfer also received $7,500 from Envoy Group in connection with a DTC "services agreement."

90.     Island Stock Transfer, at the direction of Mirman or Rose, routinely transferred an unlegended certificate in the name of one friend-and-family shareholder to Cede & Co. in order to secure DTC eligibility. Dilley and other Island Stock Transfer employees also fielded Rose's frequent urgent requests for updates on the DTC applications.

91.     Island Stock Transfer then effectuated the bulk transfer of all or virtually all the securities (both the control block in the name of the sole officer and the friends-and-family shares) of at least 12 Mirman/Rose Companies through the preparation and delivery of unlegended stock certificates to a small buyer group. The same or substantially similar groups (represented by the same counsel) purchased multiple Mirman/Rose Companies.

92.     Island Stock Transfer received instruction letters from buyer's counsel who presented Island Stock Transfer with blank stock powers (sometimes dated months earlier) for the entire set of certificates that Island Stock Transfer had originally delivered to Mirman or Rose. The instruction letters detailed how all the shares would be transferred. For some issuers, there was a single instruction letter indicating that all shares were simultaneously being purchased pursuant to attached stock purchase agreements "of like tenor" with Rose identified as "Seller's Representative." For other issuers, Island Stock Transfer received 5-6 instruction letters from the same counsel in a short period of time with a series of stock purchase agreements with the same effective date and purchase price.

93.     Island Stock Transfer received a legal opinion letter for only two of the 12 bulk transfers (First Independence and First Social). Those two letters were from the same lawyer

33

(Harrison) on the same day with obvious misstatements that First Independence was not a "shell" company and First Social's sole officer's spouse was not an "affiliate" of First Social.

94.     Shortly after the bulk transfers, Island Stock Transfer continued to support the small buyer groups in transferring their certificates into Cede & Co. and broker positions by which the buyer groups publicly traded shares of the Mirman/Rose Companies.  For example, First Independence became the subject of a fraudulent pump-and-dump in public trading shortly after FINRA's clearance of Spartan Securities' Form 211 and Island Stock Transfer's bulk transfer of First Independence securities.

95.     Island Stock Transfer routinely processed the bulk transfers without restrictive legend solely on the basis of the instruction letters and blank stock powers, and despite knowing or recklessly not knowing – and ignoring red flags – that the bulk transfers involved affiliates.  The bulk nature of the sale itself was indicative of the affiliate status of the sellers – i.e. the fact that all shares were being sold at the same time to a small group of buyers indicated common control over all such shares.

96.     For example, in October 2011, Island Stock Transfer transferred all the securities of two Mirman/Rose Companies (Rainbow Coral and Neutra) to the same buyers' counsel.  Dilley had recently signed the Forms 211 for both issuers upon Mirman and Rose's request.  Dilley was also aware that in September 2011 Mirman had ordered Island Stock Transfer to pay a Rainbow Coral invoice out of funds attributed to Neutra.  Also in September 2011, Rose requested that Island Stock Transfer transfer the certificate of one Neutra shareholder to a buyer who, two weeks later, was part of the bulk transfer of all other Neutra

34

securities.  Dilley signed unlegended certificates for both the Neutra and Rainbow Coral bulk transfers on the same day.

97.     Similarly, in December 2012 and January 2013, Dilley signed letters on behalf of Island Stock Transfer at Mirman and Rose's request expressly in furtherance of Mirman and Rose's selling E-Waste and Global Group.  In January and February 2013, Island Stock Transfer received instructions from the same buyers' counsel for the transfer of virtually all the securities of E-Waste and Global Group to the same group of five buyers (including an entity in the counsel's name).  Island Stock Transfer also received a stock purchase agreement providing that "all of the free trading shares" of E-Waste were being purchased pursuant to stock purchase agreements "of like tenor" with Rose as "Seller's Representative."

98.     Later in 2013, Island Stock Transfer similarly delivered all the shares of two other Mirman/Rose Companies (First Independence and First Social) to the same buyer's counsel based on instructions to transfer all the "free-trading" securities at the same time as the control block.

99.     In June and July 2014, Island Stock Transfer effectuated the bulk transfer of all the securities of Changing Technologies per instruction letters and blank stock powers on behalf of the same or substantially similar buyer group represented by the same counsel as at least four other Mirman/Rose Companies.  Island Stock Transfer's "batch" (the set of documents reviewed for the transfer requests) included an email exchange dated June 3, 2014, between Mirman and the buyer's counsel with respect to the stock certificate of one of the friends-and-family shareholders for whom Island Stock Transfer had already issued a new certificate in the name of Cede & Co.  The buyer's counsel told Mirman that it was missing

35

that shareholder's certificate. Mirman responded: "His stock was deposited with [a broker] for DTC purposes. You have to have someone open an account with [the broker] and purchase the stock at a nominal amount." Despite these indications of Mirman's control over the bulk transfer of all the "free-trading" shares of Changing Technologies to one buyer group, Island Stock Transfer delivered unlegended certificates for all of the other outstanding shares to the buyer's counsel.

### B.    The Daniels/Fan/Harrison Shell Factory

100.    Daniels, Fan and Harrison manufactured undisclosed blank check companies based on a deceptive public float of purportedly unrestricted shares. Other than PurpleReal, Daniels acquired a small local business and filed a Form S-1 secondary offering for shares he had gifted to approximately 30 friends and family. Daniels and Harrison then orchestrated Form 211 and DTC applications for the float to be eligible for open-market trading and clearing.

101.    Daniels and Harrison sold their first company, Dinello/AF Ocean, to Fan for approximately $500,000 in Fan's endeavor to amass a roster of public companies for later reverse mergers with Chinese companies. Daniels and Fan then agreed to create three more public vehicles from scratch: Court/ChinAmerica, Wallbeds/Sichuan, and TTB/Ibex.

102.    Daniels and Harrison retained Spartan Securities to file the following Forms 211:

| Daniels Company | Form 211 Filing Date | Form 211 Clearance Date | Form 211 Signatory |
|---|---|---|---|
| Dinello/AF Ocean | 5/20/2011 | 06/14/2011 | Dilley |
| Court/ChinAmerica | 7/24/2012 | 8/30/2012 | Eldred |
| Wallbeds/Sichuan | 10/25/2012 | 11/30/2012 | Eldred |
| TTB/Ibex | 9/6/2013 | 10/29/2013 | Eldred |

36

| PurpleReal | 7/31/2014 | N/A (stop order) | Eldred |

**Eldred's Knowledge of/Participation in the Daniels/Fan/Harrison Fraud**

103.    Daniels and Harrison have been friends with Eldred for at least 10 years. Harrison and Eldred's wife had each been the sole officer of an issuer which had been acquired by reverse merger or other change-in-control transaction.  Harrison and Daniels had assisted with the registration and sale of the issuer associated with Eldred's wife.  Eldred had offered that issuer to a prospective buyer performing a "shell search" in October 2009, and Daniels referred to that issuer as a "vehicle" in March 2010.

104.    By email dated November 30, 2010, Eldred asked Harrison if regulators would have concern if his wife "creates another public company."  Harrison responded that she and Daniels "are filing [Dinello/AF Ocean] under my name and it has been two years since [Harrison's other public company's] acquisition."

105.    Eldred otherwise understood Daniels to be a principal (albeit undisclosed) of Dinello/AF Ocean.  In April 2011, Daniels requested that Eldred prepare an Island Stock Transfer transfer agent agreement for Dinello/AF Ocean.  In return for waiving Island Stock Transfer's normal $7,500 setup fee, Eldred asked Harrison to modify Island Stock Transfer's form contract by "put[ting] a paragraph in the contract that if the company does a reverse merger or there is a change of control then . . . there is a $5,000 termination fee," a red flag that the issuer was intended to be sold from the onset.

106.    Spartan Securities then filed Dinello/AF Ocean's Form 211 in May 2011 misrepresenting that the current and future business plan was the operation of a pizzeria, there was no present or future arrangement with respect to the transfer of any shares, and Spartan

Securities was not aware or in possession of any material or adverse information about Dinello/AF Ocean. Spartan Securities also misrepresented that Eldred was contacted by the named officer (other than Harrison) of Dinello/AF Ocean, whose identity Daniels and Harrison used to create the façade of independent management and who never communicated with and had not even heard of Spartan Securities or Eldred.

107. Soon after Form 211 clearance, by email dated July 20, 2011, Daniels asked Eldred if he knew whether a law firm was "doing any [reverse mergers] that they may need a shell for?" Two days later, Eldred referred that law firm to Daniels for "an OTCBB vehicle that [Daniels] would like to do something with." On August 18, 2011, Daniels again asked Eldred about "available vehicles for a [reverse merger]" with Dinello/AF Ocean.

108. Eldred also assisted Daniels with DTC eligibility for Dinello/AF Ocean. In June 2011, Spartan Securities initiated the DTC application misrepresenting that Dinello/AF Ocean was "not a shell" and otherwise eligible for electronic clearance. The application was granted in July 2011, but revoked because there was no subsequent deposit of shares into the DTC system. By email dated October 10, 2011, Eldred told Daniels "I'm working on getting it fixed for you" and discussed internally that an "x-clear transaction needs to take place" for DTC eligibility to be reinstated.

109. That same day, Eldred signed securities deposit forms misrepresenting that Daniels was never an "affiliate" of Dinello/AF Ocean. Specifically, in signing the forms, Eldred misrepresented to Spartan Securities' clearing firm that he had "carefully reviewed" the request and supporting documents, and to his "best knowledge the information is true and

38

correct and is made in compliance with all applicable federal and state securities laws" – despite knowing or being reckless in not knowing that Daniels controlled Dinello/AF Ocean.

110.    On October 12, 2011, Eldred was copied on an email confirming that Spartan Securities was putting in an order to sell Dinello/AF Ocean shares on Daniels' behalf.  In fact, a Spartan Securities proprietary account purchased Daniels' shares.  Eldred confirmed with Daniels that this trade "has your problem worked out as long as DTC cooperates with our plan."

111.    As early as October 2011, Eldred knew or was reckless in not knowing that Daniels and Harrison had sold Dinello/AF Ocean to Fan.  In or about June 2012, Eldred first negotiated with Fan to use Dinello/AF Ocean as a "public shell" for a potential reverse merger with Spartan Securities and Island Stock Transfer's parent company.  By email dated July 11, 2012, Eldred wrote Fan (copying Daniels and Harrison):  "The net result is that you and your investors get an equity interest in our business, and you end up with the same basic public OTCBB shell that you have now."

112.    Eldred also became aware that Daniels and Fan were manufacturing Court/ChinAmerica, Wallbeds/Sichuan, and TTB/Ibex for Fan as public vehicles.  On July 24, 2012, Spartan Securities filed the Form 211 for Court/ChinAmerica with Eldred signing as the principal responsible for all related submissions to FINRA.  On July 30, 2012, Daniels told Eldred "Don't forget that Andy [Fan] has three companies that he is doing registrations on including the 211 we filed on Court.  So there should be plenty of room for you to have a meeting of the minds with [Fan].  Court is a super clean company that is a non-shell and the assets are fully depreciated so there can be a disposal of assets for a real clean deal."  By email

39

dated July 30, 2012, Eldred responded "I would be happy to use Court as a vehicle" while its Form 211 was pending.

113.    Eldred took further actions for Court/ChinAmerica, Wallbeds/Sichuan, and TTB/Ibex knowing or being reckless in not knowing that both Fan's involvement in and the purpose of the issuers were undisclosed.  On September 5, 2012, Eldred received an email (with the subject "AF Ocean Investment") from an Island Stock Transfer employee to sign up Wallbeds/Sichuan as "yet another company with [Island Stock Transfer]."  Eldred forwarded the message to Daniels and asked him to "call me."

114.    In October 2012, Eldred approved Spartan Securities' submission of a price quote to FINRA for Court/ChinAmerica per the request of an employee of Dinello/AF Ocean, which Eldred himself had referred to as a "public OTCBB shell that [Fan has] now."  In January 2013, Eldred was forwarded a request from an AF Ocean employee for a transfer agent agreement for TTB/Ibex.  Eldred then sent Daniels the TTB/Ibex agreement with the same terms as Dinello/AF Ocean, including the waiver of all upfront fees in favor of a fee in the event of a reverse merger.

115.    Despite knowing or recklessly not knowing that these issuers were being developed as public vehicles for Fan, Eldred signed the three Forms 211 misrepresenting that each issuer was pursuing local business operations with no plans for mergers or changes of control despite, for example, Eldred himself proposing to "use [Court/ChinAmerica] as a vehicle" while its Form 211 was pending.  The three Forms S-1 (part of the Rule 15c2-11(a) information) made these same misrepresentations, and also omitted any reference to Fan.  The

40

three Forms 211 also misrepresented that Spartan Securities had no other material or adverse information in its possession.

116.    In these three Forms 211, Spartan Securities also misrepresented that it had no relationship with any officer or representative, despite (1) Daniels assisting the Eldreds with the sale of the prior public company in the name of Eldred's wife; (2) Daniels being a customer with whom Spartan Securities entered open-market trades, (3) Eldred assisting Daniels with a shell buyer for Dinello/AF Ocean, and (4) Daniels assisting Spartan Securities in finding a potential reverse merger candidate (including all three Fan issuers).

117.    Spartan Securities also misrepresented the manner in which it was solicited to file the Form 211.  On Wallbeds/Sichuan and TTB/Ibex, Spartan Securities misrepresented that Eldred had been telephonically contacted by a "friend" (a Dinello/AF Ocean employee), and had no relationship with any of their representatives (e.g. Daniels).  FINRA then asked for more detail on the manner of solicitation in its first Wallbeds/Sichuan deficiency letter.  The assistant sent Eldred the portion of the Form 211 on the manner of solicitation:  "Am I missing something here, or did I do something wrong?"  Eldred told the preparer just to "remove the friend part," which remained in the later Form 211 for TTB/Ibex.

118.    Spartan Securities also failed to inquire further regarding the presence of other red flags.  For example, on both Court/ChinAmerica and Wallbeds/Sichuan, by letters dated July 27, 2012 and November 5, 2012, respectively, FINRA noted that numerous shareholders purportedly purchased shares with sequentially numbered cashier's checks (a potential sign of someone other than the shareholder paying for the shares).  Spartan Securities' own policies and procedures (and SEC guidance) identify the "transfer of shares by control persons, as gifts,

41

to third persons in order to help create a public market" as a red flag. Without any further inquiry into the information containing red flags, Spartan Securities simply cut-and-pasted responses received on behalf of the issuers (from Harrison and a Dinello/AF Ocean employee) that one shareholder obtained the checks with cash gathered from the others, when in fact it was Daniels who provided all of the cash for the purchase of the cashier's checks.

119.    Spartan Securities ignored other red flags, including the fact that the same officers and shareholders were involved (up to 26 of the 29 shareholders overlapped on substantially similar "regression diagrams" of the history of share transfers) and each Form S-1 was for a secondary offering by which a small company was not raising any money yet incurring all the expenses related to the offering. Eldred did not review the Forms S-1 in connection with the Forms 211 as required by Rule 15c2-11.

120.    Eldred later signed the Form 211 and received draft deficiency letter responses for TTB/Ibex. FINRA's deficiency letter raised eight detailed questions, including inquiries into: (1) all relationships among the shareholders and officers; (2) present or future arrangements by which any person other than the named shareholder had control over the Form S-1 shares; (3) confirmation of the Form 211's representation that TTB/Ibex had no intent either to effect a sale of shares or engage in change-of-control transaction; and (4) TTB/Ibex's shell company status. Spartan Securities cut-and-pasted a response letter drafted by a Dinello/AF Ocean employee which listed Fan merely as an officer of TTB/Ibex as of September 2013 and the shareholders (the vast majority of which were shareholders of Dinello/AF Ocean, Court/ChinAmerica, and Wallbeds/Sichuan) as friends of Daniels. However, Spartan Securities failed to disclose any aspect of the Daniels/Fan/Spartan Securities

42

relationship. Specifically, Spartan Securities stated that TTB/Ibex had no intent to engage in a change-of-control transaction and that the purported business objective (local pressure washing services) would be followed for at least one year, despite Eldred knowing or being reckless in not knowing of Daniels and Fan's manufacture of public shells for Fan without regard to the purported local business operations.

121.    Beyond the initial Forms 211 (and Spartan Securities' initiation of unpriced quotations), Eldred approved submissions of priced quotations to FINRA pursuant to Rule 15c2-11 for Court/ChinAmerica, TTB/Ibex, and Wallbeds/Sichuan in December 2013, January 2014 and May 2014, respectively – just prior to the public trading in those stocks initiated by Daniels and the Dinello/AF Ocean employee. FINRA rejected the initial $0.10 quote on TTB/Ibex given the Form S-1 offering price of $0.01. By email dated January 6, 2014, Eldred acted upon the authorization of Daniels, who was no longer an officer of TTB/Ibex, to lower the quote to that price.

122.    In July 2014, Harrison contacted Eldred to file a Form 211 for PurpleReal. FINRA requested proof of payment by the shareholders (many of whom were shareholders of the other Daniels Companies). Eldred learned that Daniels and Harrison had paid for all the shares, but by email approved Spartan Securities' response to FINRA misrepresenting that the shareholders had purchased their shares.

43

## COUNT I

### Violations of Section 15(c)(2) and Rule 15c2-11 of the Exchange Act

### (Against Spartan Securities)

123.    The Commission repeats and realleges Paragraphs 1 through 122 of its Complaint.

124.    From at least as early as January 2010 through at least May 2014, Spartan Securities published quotations for securities or, directly or indirectly, submitted quotations for publication, in any quotation medium without having a reasonable basis for believing, based on a review of the documents and information required by Rule 15c2-11(a)(1) through (a)(5) ("paragraph (a) information") together with other documents and information required by Rule 15c2-11(b), that the paragraph (a) information was accurate in all material respects and that the sources of that information were reliable.

125.    By reason of the foregoing, Spartan Securities violated, and, unless enjoined, is reasonably likely to continue to violate, Section 15(c)(2) of the Exchange Act, 15 U.S.C. 78o(c)(2), and Rule 15c2-11, 17 C.F.R. § 240.15c2-11.

## COUNT II

### Aiding and Abetting Violations of Section 15(c)(2) and Rule 15c2-11 of the Exchange Act

### (Against Dilley, Eldred, and Lopez)

126.    The Commission repeats and realleges Paragraphs 1 through 122 of its Complaint.

44

127. From at least as early as January 2010 through at least May 2014, Spartan Securities published quotations for securities or, directly or indirectly, submitted quotations for publication, in any quotation medium without having a reasonable basis for believing, based on a review of the paragraph (a) information together with other documents and information required by Rule 15c2-11(b), that the paragraph (a) information was accurate in all material respects and that the sources of that information were reliable, and by reason of the foregoing, violated Section 15(c)(2) and Rule 15c2-11 of the Exchange Act, 15 U.S.C. § 78o(c)(2), and 17 C.F.R. § 240.15c2-11.

128. From at least as early as January 2010 through at least March 2014, Dilley knowingly or recklessly provided substantial assistance to Spartan Securities' violations of Section 15(c)(2) and Rule 15c2-11 of the Exchange Act, 15 U.S.C. § 78o(c)(2), and 17 C.F.R. § 240.15c2-11, and is deemed to be in violation of this provision to the same extent as Spartan Securities.

129. From at least as early as June 2011 through at least May 2014, Eldred knowingly or recklessly provided substantial assistance to Spartan Securities' violations of Section 15(c)(2) and Rule 15c2-11 of the Exchange Act, 15 U.S.C. § 78o(c)(2), and 17 C.F.R. § 240.15c2-11, and is deemed to be in violation of this provision to the same extent as Spartan Securities.

130. From at least as early as March 2013 through at least March 2014, Lopez knowingly or recklessly provided substantial assistance to Spartan Securities' violations of Section 15(c)(2) and Rule 15c2-11 of the Exchange Act, 15 U.S.C. § 78o(c)(2), and 17 C.F.R.

45

§ 240.15c2-11, and is deemed to be in violation of this provision to the same extent as Spartan Securities.

131.    By reason of the foregoing, Dilley, Eldred, and Lopez aided and abetted and, unless enjoined, are reasonably likely to continue to aid and abet, violations of Section 15(c)(2) and Rule 15c2-11 of the Exchange Act, 15 U.S.C. § 78o(c)(2), and 17 C.F.R. § 240.15c2-11.

## COUNT III

### Violations of Section 17(a)(1) of the Securities Act

132.    The Commission repeats and realleges Paragraphs 1 through 122 of its Complaint.

**(Against Spartan Securities, Island Stock Transfer, and Dilley – Mirman/Rose Companies)**

133.    From at least as early as December 2009 through at least July 2014, Spartan Securities, Island Stock Transfer, and Dilley, in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly knowingly or recklessly employed any device, scheme or artifice to defraud.

**(Against Spartan Securities and Eldred – Daniels Companies)**

134.    From at least as early as May 2011 through at least August 2014, Spartan Securities and Eldred, in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, knowingly or recklessly employed any device, scheme or artifice to defraud.

46

135.    By reason of the foregoing, Spartan Securities, Island Stock Transfer, Dilley and Eldred violated, and, unless enjoined, are reasonably likely to continue to violate, Section 17(a)(1) of the Securities Act, 15 U.S.C. § 77q(a)(1).

## COUNT IV

### Violations of Section 17(a)(3) of the Securities Act

136.    The Commission repeats and realleges Paragraphs 1 through 122 of its Complaint.

**(Against Spartan Securities, Island Stock Transfer, and Dilley – Mirman/Rose Companies)**

137.    From at least as early as December 2009 through at least July 2014, Spartan Securities, Island Stock Transfer and Dilley, in the offer or sale of securities by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, negligently engaged in transactions, practices and courses of business which operated or would have operated as a fraud or deceit upon the purchasers and prospective purchasers of such securities.

**(Against Spartan Securities and Eldred – Daniels Companies)**

138.    From at least as early as May 2011 through at least August 2014, Spartan Securities and Eldred, in the offer or sale of securities by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, negligently engaged in transactions, practices and courses of business which operated or would have operated as a fraud or deceit upon the purchasers and prospective purchasers of such securities.

47

139.    By reason of the foregoing, Spartan Securities, Island Stock Transfer, Dilley and Eldred violated, and, unless enjoined, are reasonably likely to continue to violate, Section 17(a)(3) of the Securities Act, 15 U.S.C. § 77q(a)(3).

## COUNT V

### Violations of Section 10(b) and Rule 10b-5(a) of the Exchange Act

140.    The Commission repeats and realleges Paragraphs 1 through 122 of its Complaint.

### (Against Spartan Securities, Island Stock Transfer, and Dilley – Mirman/Rose Companies)

141.    From at least as early as December 2009 through at least July 2014, Spartan Securities, Island Stock Transfer, and Dilley, directly and indirectly, by use of any means or instrumentality of interstate commerce, or of the mails, knowingly or recklessly employed devices, schemes or artifices to defraud in connection with the purchase or sale of securities.

### (Against Spartan Securities and Eldred – Daniels Companies)

142.    From at least as early as May 2011 through at least May 2014, Spartan Securities and Eldred, directly and indirectly, by use of any means or instrumentality of interstate commerce, or of the mails, knowingly or recklessly employed devices, schemes or artifices to defraud in connection with the purchase or sale of securities.

143.    By reason of the foregoing, Spartan Securities, Island Stock Transfer, Dilley and Eldred violated, and, unless enjoined, are reasonably likely to continue to violate, Section 10(b) and Rule 10b-5(a) of the Exchange Act, 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5(a).

48

## COUNT VI

### Violations of Section 10(b) and Rule 10b-5(b) of the Exchange Act

144.    The Commission repeats and realleges Paragraphs 1 through 122 of its Complaint.

### (Against Spartan Securities, Island Stock Transfer, and Dilley – Mirman/Rose Companies)

145.    From at least as early as December 2009 through at least April 2014, Spartan Securities, Island Stock Transfer, and Dilley, directly and indirectly, by use of any means or instrumentality of interstate commerce, or of the mails, knowingly or recklessly made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading in connection with the purchase or sale of securities.

### (Against Spartan Securities and Eldred – Daniels Companies)

146.    From at least as early as May 2011 through at least May 2014, Spartan Securities and Eldred, directly and indirectly, by use of any means or instrumentality of interstate commerce, or of the mails, knowingly or recklessly made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading in connection with the purchase or sale of securities.

147.    By reason of the foregoing, Spartan Securities, Island Stock Transfer, Dilley and Eldred violated, and, unless enjoined, are reasonably likely to continue to violate, Section 10(b) and Rule 10b-5(b) of the Exchange Act, 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5(b).

49

## COUNT VII

### Violations of Section 10(b) and Rule 10b-5(c) of the Exchange Act

148.    The Commission repeats and realleges Paragraphs 1 through 122 of its Complaint.

### (Against Spartan Securities, Island Stock Transfer, and Dilley – Mirman/Rose Companies)

149.    From at least as early as December 2009 through at least July 2014, Spartan Securities, Island Stock Transfer, and Dilley, directly and indirectly, by use of any means or instrumentality of interstate commerce, or of the mails, knowingly or recklessly engaged in acts, practices and courses of business which operated or would have operated as a fraud or deceit upon any person in connection with the purchase or sale of securities.

### (Against Spartan Securities and Eldred – Daniels Companies)

150.    From at least as early as May 2011 through at least May 2014, Spartan Securities and Eldred, directly and indirectly, by use of any means or instrumentality of interstate commerce, or of the mails, knowingly or recklessly engaged in acts, practices and courses of business which operated or would have operated as a fraud or deceit upon any person in connection with the purchase or sale of securities.

151.    By reason of the foregoing, Spartan Securities, Island Stock Transfer, Dilley and Eldred violated, and, unless enjoined, are reasonably likely to continue to violate, Section 10(b) and Rule 10b-5(c) of the Exchange Act, 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5(c).

## COUNT VIII

### Aiding and Abetting Violations of Section 17(a)(1) of the Securities Act

152.    The Commission repeats and realleges Paragraphs 1 through 122 of its Complaint.

**(Against Spartan Securities and Eldred – Daniels Companies)**

153.    From at least as early as July 2010 through at least August 2014, Daniels, Fan and Harrison, in the offer or sale of securities by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, knowingly or recklessly employed devices, schemes or artifices to defraud, and by reason of the foregoing, violated Section 17(a)(1) of the Securities Act, 15 U.S.C. § 77q(a)(1).

154.    From at least as early as May 2011 through at least August 2014, Spartan Securities and Eldred knowingly or recklessly provided substantial assistance to Daniels, Fan, and Harrison's violations of Section 17(a)(1) of the Securities Act, 15 U.S.C. § 77q(a)(1), and are deemed to be in violation of this provision to the same extent as Daniels, Fan, and Harrison.

**(Against Spartan Securities, Island Stock Transfer, and Dilley – Mirman/Rose Companies)**

155.    From at least as early as January 2009 through at least July 2014, Mirman and Rose, in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, knowingly or recklessly employed devices, schemes or artifices to defraud, and by reason of the foregoing, violated Section 17(a)(1) of the Securities Act, 15 U.S.C. § 77q(a)(1).

156.    From at least as early as December 2009 through at least July 2014, Spartan Securities, Island Stock Transfer, and Dilley knowingly or recklessly provided substantial

51

assistance to Mirman and Rose's violations of Section 17(a)(1) of the Securities Act, 15 U.S.C. § 77q(a)(1), and are deemed to be in violation of this provision to the same extent as Mirman and Rose.

157.    By reason of the foregoing, Spartan Securities, Island Stock Transfer, Dilley and Eldred aided and abetted and, unless enjoined, are reasonably likely to continue to aid and abet, violations of Section 17(a)(1) of the Securities Act, 15 U.S.C. § 77q(a)(1).

## COUNT IX

### Aiding and Abetting Violations of Section 17(a)(2) of the Securities Act

158.    The Commission repeats and realleges Paragraphs 1 through 122 of its Complaint.

### (Against Spartan Securities and Eldred – Daniels Companies)

159.    From at least as early as July 2010 through at least May 2014, Daniels, Fan, and Harrison, in the offer or sale of securities by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, negligently obtained money or property by means of untrue statements of material facts or omissions to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading, and by reason of the foregoing, violated Section 17(a)(2) of the Securities Act, 15 U.S.C. § 77q(a)(2).

160.    From at least as early as May 2011 through at least May 2014, Spartan Securities and Eldred knowingly or recklessly provided substantial assistance to Daniels, Fan, and Harrison's violations of Section 17(a)(2) of the Securities Act, 15 U.S.C. § 77q(a)(2), and are deemed to be in violation of this provision to the same extent as Daniels, Fan, and Harrison.

52

**(Against Spartan Securities, Island Stock Transfer, and Dilley – Mirman/Rose Companies)**

161.    From at least as early as January 2009 through at least July 2014, Mirman and Rose, in the offer or sale of securities by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, negligently obtained money or property by means of untrue statements of material facts or omissions to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading, and by reason of the foregoing, violated Section 17(a)(2) of the Securities Act, 15 U.S.C. § 77q(a)(2).

162.    From at least as early as December 2009 through at least July 2014, Spartan Securities, Island Stock Transfer, and Dilley knowingly or recklessly provided substantial assistance to Mirman and Rose's violations of Section 17(a)(2) of the Securities Act, 15 U.S.C. § 77q(a)(2), and are deemed to be in violation of this provision to the same extent as Mirman and Rose.

163.    By reason of the foregoing, Spartan Securities, Island Stock Transfer, Dilley and Eldred aided and abetted and, unless enjoined, are reasonably likely to continue to aid and abet, violations of Section 17(a)(2) of the Securities Act, 15 U.S.C. § 77q(a)(2).

## COUNT X

### Aiding and Abetting Violations of Section 17(a)(3) of the Securities Act

164.    The Commission repeats and realleges Paragraphs 1 through 122 of its Complaint.

**(Against Spartan Securities and Eldred – Daniels Companies)**

165.    From at least as early as July 2010 through at least August 2014, Daniels, Fan and Harrison, in the offer or sale of securities by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, negligently engaged in transactions, practices and courses of business which operated or would have operated as a fraud or deceit upon the purchasers and prospective purchasers of such securities, and by reason of the foregoing, violated Section 17(a)(3) of the Securities Act, 15 U.S.C. § 77q(a)(3).

166.    From at least as early as May 2011 through at least August 2014, Spartan Securities and Eldred knowingly or recklessly provided substantial assistance to Daniels, Fan and Harrison's violations of Section 17(a)(3) of the Securities Act, 15 U.S.C. § 77q(a)(3), and are deemed to be in violation of this provision to the same extent as Daniels, Fan, and Harrison.

**(Against Spartan Securities, Island Stock Transfer, and Dilley – Mirman/Rose Companies)**

167.    From at least as early as January 2009 through at least July 2014, Mirman and Rose, in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, negligently engaged in transactions, practices and courses of business which operated or would have operated as a fraud or deceit upon the purchasers and prospective purchasers of such securities, and by reason of the foregoing, violated Section 17(a)(3) of the Securities Act, 15 U.S.C. § 77q(a)(3).

168.    From at least as early as December 2009 through at least July 2014, Spartan Securities, Island Stock Transfer, and Dilley knowingly or recklessly provided substantial assistance to Mirman and Rose's violations of Section 17(a)(3) of the Securities Act, 15 U.S.C. § 77q(a)(3), and are deemed to be in violation of this provision to the same extent as Mirman and Rose.

169.    By reason of the foregoing, Spartan Securities, Island Stock Transfer, Dilley and Eldred aided and abetted and, unless enjoined, are reasonably likely to continue to aid and abet, violations of Section 17(a)(3) of the Securities Act, 15 U.S.C. § 77q(a)(3).

## COUNT XI

### Aiding and Abetting Violations of
### Section 10(b) and Rule 10b-5(a) of the Exchange Act

170.    The Commission repeats and realleges Paragraphs 1 through 122 of its Complaint.

**(Against Spartan Securities and Eldred – Daniels Companies)**

171.    From at least as early as July 2010 through at least May 2014, Daniels, Fan and Harrison, directly and indirectly, by use of any means or instrumentality of interstate commerce, or of the mails, knowingly or recklessly employed devices, schemes or artifices to defraud in connection with the purchase or sale of securities, and by reason of the foregoing, violated Section 10(b) and Rule 10b-5(a) of the Exchange Act, 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5(a).

172.    From at least as early as May 2011 through at least May 2014, Spartan Securities and Eldred knowingly or recklessly provided substantial assistance to Daniels, Fan and Harrison's violations of Section 10(b) and Rule 10b-5(a) of the Exchange Act, 15 U.S.C.

55

§ 78j(b) and 17 C.F.R. § 240.10b-5(a), and are deemed to be in violation of these provisions to the same extent as Daniels, Fan and Harrison.

**(Against Spartan Securities, Island Stock Transfer, and Dilley – Mirman/Rose Companies)**

173.    From at least as early as January 2009 through at least July 2014, Mirman and Rose, directly and indirectly, by use of any means or instrumentality of interstate commerce, or of the mails, knowingly or recklessly employed devices, schemes or artifices to defraud in connection with the purchase or sale of securities, and by reason of the foregoing, violated Section 10(b) and Rule 10b-5(a) of the Exchange Act, 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5(a).

174.    From at least as early as December 2009 through at least July 2014, Spartan Securities, Island Stock Transfer, and Dilley knowingly or recklessly provided substantial assistance to Mirman and Rose's violations of Section 10(b) and Rule 10b-5(a) of the Exchange Act, 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5(a), and are deemed to be in violation of these provisions to the same extent as Mirman and Rose.

175.    By reason of the foregoing, Spartan Securities, Island Stock Transfer, Dilley and Eldred aided and abetted and, unless enjoined, are reasonably likely to continue to aid and abet, violations of Section 10(b) and Rule 10b-5(a) of the Exchange Act, 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5(a).

56

## COUNT XII

### Aiding and Abetting Violations of
### Section 10(b) and Rule 10b-5(b) of the Exchange Act

176.    The Commission repeats and realleges Paragraphs 1 through 122 of its Complaint.

**(Against Spartan Securities and Eldred – Daniels Companies)**

177.    From at least as early as July 2010 through at least May 2014, Daniels, Fan and Harrison, directly and indirectly, by use of any means or instrumentality of interstate commerce, or of the mails, knowingly or recklessly made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading in connection with the purchase or sale of securities, and by reason of the foregoing, violated Section 10(b) and Rule 10b-5(b) of the Exchange Act, 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5(b).

178.    From at least as early as May 2011 through at least May 2014, Spartan Securities and Eldred knowingly or recklessly provided substantial assistance to Daniels, Fan and Harrison's violations of Section 10(b) and Rule 10b-5(b) of the Exchange Act, 15 U.S.C. § 78j(b), and 17 C.F.R. § 240.10b-5(b), and are deemed to be in violation of these provisions to the same extent as Daniels, Fan and Harrison.

**(Against Spartan Securities, Island Stock Transfer, and Dilley – Mirman/Rose Companies)**

179.    From at least as early as January 2009 through at least July 2014, Mirman and Rose directly and indirectly, by use of any means or instrumentality of interstate commerce, or of the mails, knowingly or recklessly made untrue statements of material facts and omitted

57

to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading in connection with the purchase or sale of securities, and by reason of the foregoing, violated Section 10(b) and Rule 10b-5(b) of the Exchange Act, 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5(b).

180.    From at least as early as December 2009 through at least July 2014, Spartan Securities, Island Stock Transfer, and Dilley knowingly or recklessly provided substantial assistance to Mirman and Rose's violations of Section 10(b) and Rule 10b-5(b) of the Exchange Act, 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5(b), and are deemed to be in violation of these provisions to the same extent as Mirman and Rose.

181.    By reason of the foregoing, Spartan Securities, Island Stock Transfer, Dilley and Eldred aided and abetted and, unless enjoined, are reasonably likely to continue to aid and abet, violations of Section 10(b) and Rule 10b-5(b) of the Exchange Act, 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5(b).

### COUNT XIII

### Aiding and Abetting Violations of
### Section 10(b) and Rule 10b-5(c) of the Exchange Act

182.    The Commission repeats and realleges Paragraphs 1 through 122 of its Complaint.

### (Against Spartan Securities and Eldred – Daniels Companies)

183.    From at least as early as July 2010 through at least May 2014, Daniels, Fan and Harrison, directly and indirectly, by use of any means or instrumentality of interstate commerce, or of the mails, knowingly or recklessly engaged in acts, practices and courses of business which operated or would have operated as a fraud or deceit upon any person in

58

connection with the purchase or sale of securities, and by reason of the foregoing, violated Section 10(b) and Rule 10b-5(c) of the Exchange Act, 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5(c).

184.    From at least as early as May 2011 through at least May 2014], Spartan Securities and Eldred knowingly or recklessly provided substantial assistance to Daniels, Fan and Harrison's violations of Section 10(b) and Rule 10b-5(c) of the Exchange Act, 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5(c), and are deemed to be in violation of these provisions to the same extent as Daniels, Fan and Harrison.

**(Against Spartan Securities, Island Stock Transfer, and Dilley – Mirman/Rose Companies)**

185.    From at least as early as January 2009 through at least July 2014, Mirman and Rose, directly and indirectly, by use of any means or instrumentality of interstate commerce, or of the mails, knowingly or recklessly engaged in acts, practices and courses of business which operated or would have operated as a fraud or deceit upon any person in connection with the purchase or sale of securities, and by reason of the foregoing, violated Section 10(b) and Rule 10b-5(c) of the Exchange Act, 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5(c).

186.    From at least as early as December 2009 through at least July 2014], Spartan Securities, Island Stock Transfer, and Dilley knowingly or recklessly provided substantial assistance to Mirman and Rose's violations of Section 10(b) and Rule 10b-5(c) of the Exchange Act, 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5(c), and are deemed to be in violation of these provisions to the same extent as Mirman and Rose.

187.    By reason of the foregoing, Spartan Securities, Island Stock Transfer, Dilley and Eldred aided and abetted and, unless enjoined, are reasonably likely to continue to aid and

59

abet, violations of Section 10(b) and Rule 10b-5(c) of the Exchange Act, 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5(c).

## COUNT XIV

### Violations of Sections 5(a) and 5(c) of the Securities Act

### (Against Spartan Securities, Island Stock Transfer, and Dilley)

188.    The Commission repeats and realleges Paragraphs 1 through 122 of its Complaint.

189.    From at least as early as December 2009 until at least July 2014, Spartan Securities, Island Stock Transfer and Dilley, directly or indirectly, have made use of the means or instruments of transportation or communication in interstate commerce or of the mails to sell securities, when no registration statement was in effect with the Commission as to such securities, and have made use of the means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell such securities when no registration statement had been filed with the Commission as to such securities.

190.    There were no applicable exemptions from registration.

191.    By reason of the foregoing, Spartan Securities, Island Stock Transfer and Dilley violated, and unless enjoined, are reasonably likely to continue to violate Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. § 77e(a), (c).

## RELIEF REQUESTED

**WHEREFORE**, the Commission respectfully requests the Court find the Defendants committed the violations alleged, and:

60

## I.

### Permanent Injunction

Issue a Permanent Injunction restraining and enjoining Defendants, their officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them, and each of them, from violating the federal securities laws alleged in this Complaint.

## II.

### Disgorgement

Issue an Order directing Island Stock Transfer to disgorge ill-gotten gains received within the applicable statute of limitations (including the time during which the statute of limitations was tolled by agreement with Island Stock Transfer), including prejudgment interest, resulting from the acts or courses of conduct alleged in this Complaint.

## III.

### Penalties

Issue an Order directing Defendants to pay civil money penalties pursuant to Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and Section 21(d) of the Exchange Act, 15 U.S.C. § 78u(d).

## IV.

### Penny Stock Bar

Issue an Order, pursuant to Section 20(g) of the Securities Act, 15 U.S.C. § 77t(g), and Section 21(d)(6) of the Exchange Act, 15 U.S.C. § 78u(d)(6), barring Spartan Securities, Dilley, Eldred and Lopez from participating in any future offering of a penny stock.

## V.

## Further Relief

Grant such other and further relief as may be necessary and appropriate.

## VI.

## Retention of Jurisdiction

Further, the Commission respectfully requests that the Court retain jurisdiction over this action and over Defendants in order to implement and carry out the terms of all orders and decrees that may hereby be entered, or to entertain any suitable application or motion by the Commission for additional relief within the jurisdiction of this Court.

Dated: February 20, 2019

By:s/Wilfredo Fernandez
Wilfredo Fernandez
Senior Trial Counsel
Fla. Bar No. 142859
Telephone: (305) 982-6376
Facsimile: (305) 536-4154
E-mail: fernandezw@sec.gov

Christine Nestor
Senior Trial Counsel
Fla. Bar No. 597211
Telephone: (305) 982-6367
Facsimile: (305) 536-4154
E-mail: nestorc@sec.gov

**ATTORNEYS FOR PLAINTIFF**
**SECURITIES AND EXCHANGE COMMISSION**
801 Brickell Avenue, Suite 1800
Miami, Florida 33131
Telephone: (305) 982-6300